IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHUFFLE TECH INTERNATIONAL, LLC, an Illinois limited liability company | |
| and | |
| ACES UP GAMING, INC., a Colorado corporation | |
| and | |
| POYDRAS-TALRICK HOLDINGS LLC, a Delaware limited liability company | |
| Plaintiffs | |
| v. | CIVIL ACTION NO. |
| SCIENTIFIC GAMES CORPORATION, a Delaware corporation | |
| and | |
| BALLY TECHNOLOGIES, INC., d/b/a SHFL Entertainment or Shuffle Master, a Nevada corporation | JURY TRIAL DEMANDED |
| and | |
| BALLY GAMING, INC., d/b/a Bally Gaming and Systems, a Nevada corporation | |
| Defendants | |

# Complaint for Damages and Other Relief for Patent Misuse, Violation of the Sherman and Clayton Acts, the Lanham Act and Illinois Unfair Competition and Deceptive Trade Practices Laws

## I.     Nature of the case

1.     This is a civil action for damages, injunctive and declaratory relief based on violations of Sections 1 and 2 of the Sherman Act, Section 7 of the Clayton Act, U.S. patent laws, the Lanham Act and Illinois unfair competition and deceptive trade practice laws.

## II. Jurisdiction and venue

2.     This action arises under the antitrust and patent laws of the United States, particularly Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2); Section 7 of the Clayton Act (15 U.S.C. § 18); the United States Patent Code (35 U.S.C. §§ 102, 103, 114, 283 and 285); § 1.56 of Title 37 of the Code of Federal Regulations ("C.F.R.")); the Declaratory Judgment Act (28 U.S.C. § 2201); Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)(1)(b)); Illinois unfair competition and deceptive trade practices statutes 815 ILCS §§ 505/2 and 510/2); and the common law of the State of Illinois. This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. §§ 4, 15, 26 and 1121; 28 U.S.C. §§ 1331, 1337 and 1338; and the Court's supplemental jurisdiction under 28 U.S.C. §1367.

3.     This Court has personal jurisdiction over Defendants in this state and district under 15 U.S.C. §22; 28 U.S.C. §§ 1391(b), (c) and (d); FED.R.CIV.P. 4(k)(1); the long-arm statutes of the State of Illinois; and the Due Process Clause of the Constitution since the Defendants regularly conduct business in this state and district, "reside" in this jurisdiction, and have committed acts violating the U.S. patent and antitrust laws, the Lanham Act, and the unfair competition and deceptive trade practices laws of the State of Illinois in this state and district.  A substantial part of the events giving rise to the claims asserted occurred in this district, and the potential impact of the violations alleged will be a substantial lessening of competition in the relevant market for card shufflers in this district.  Moreover, Defendants' acts, both within and without this district, have resulted in injury to Plaintiffs' business and property in this state and district.  Defendants have inflicted substantial and irreparable damage to Plaintiffs' business, revenues, and profits arising from activities within this district.  Defendants have a regular and established business in this district, are found in this district, have agents in this district and have

well more than "minimum contacts" with this state and district, all as further specified in the following paragraphs, including specifically paragraphs 5, 9 and 10.

4.     Venue is proper in this judicial district under  28 U.S.C. § 1391(b)(1) and (2), (c)(2) and (d); and 15 U.S.C. §§ 15 and 26, because, *inter alia*, the Defendants are subject to personal jurisdiction in this state and district, and therefore "reside" in this state and district, and a substantial part of the events giving rise to the claims asserted herein arose in this state and district, as further detailed in the following paragraphs.

5.     Defendants conduct business in this state and judicial district by, *inter alia*, distributing and/or selling card shufflers which are the subject of this action to casinos located in Joliet, Aurora, Elgin, and Des Plaines.  Defendant, SCIENTIFIC GAMES CORPORATION ("SGC"), also has a 483,000 square foot technology campus and offices in this judicial district at 2718 Roscoe St., Chicago, IL 60018, as well as a 365,000 square foot facility for administrative offices and manufacturing, which support SGC's gaming business in this judicial district, at 800 S. Northpoint Road Blvd, Waukegan, IL 60085.  Additionally, SGC has a long-term contract with the Illinois Gaming Board to design, implement, and administer a Central Communications System ("CCS") for Illinois that provides real-time communication and control between every licensed video gaming terminal in Illinois, as well as day-to-day management of the operation of the CCS and service throughout Illinois.   On information and belief, Defendant, Bally Technologies, Inc. has sold flush-mounted card shufflers manufactured by Defendant, Bally Gaming, Inc., based on the patents at issue in this case (owned by Bally Gaming, Inc.) to all five casinos within the Northern District of Illinois (Eastern Division), *i.e*., Hollywood Casino (Joliet); Harrah's Joliet Casino & Hotel (Joliet); Hollywood Casino (Aurora); Grand Victoria Casino (Elgin); and Rivers Casino (Des Plaines).

## III.    The parties

6.    Plaintiff, SHUFFLE TECH INTERNATIONAL LLC ("Shuffle Tech"), is a limited liability company organized and existing under the laws of the state of Illinois, having an office at 1440 N. Kingsbury Street, Suite 218, Chicago, IL 60642.  Shuffle Tech does business in this judicial district and state.

7.    Plaintiff, ACES UP GAMING INC. ("Aces Up"), is a corporation of the State of Colorado, with offices at 5855 W. 38th Ave., Wheatridge, CO 80212.  Aces Up does business in this state and judicial district.

8.    Plaintiff, POYDRAS-TALRICK HOLDINGS LLC ("Poydras"), is a limited liability company of the State of Delaware, with offices at 9456 Thornberry, Dallas, TX 75220.  Poydras does business in this state and judicial district.

9.    Defendant, SGC, is a corporation of the state of Delaware, with a corporate office in Las Vegas, Nevada and a technology campus at 2718 Roscoe St., Chicago, IL.  SGC does business in this judicial district by, *inter alia*, distributing and/or selling card shufflers which are the subject of this action to casinos located in Joliet, Aurora, Elgin, and Des Plaines.  SGC also has administrative offices and manufacturing facilities that supports SGC's gaming business in this judicial district at 800 S. Northpoint Road Blvd, Waukegan, IL 60085.

10.    Defendant, BALLY TECHNOLOGIES, INC. ("Bally" or "SHFL"),[1] is a corporation of the State of Nevada, with offices located at 6650 S. El Camino Road, Las Vegas, NV 89118.  On

---

[1] The records of the Secretaries of State of Nevada and Minnesota list SHFL Entertainment, Inc. as inactive and dissolved.  However, legal actions initiated by SHFL in 2012 were continued by Bally after the time of its 2013 acquisition of SHFL Entertainment, Inc.  Because this dispute relates to Bally's card shuffler business, which has been consistently known throughout the gaming industry and in prior patent infringement and antitrust litigation by its former

November 21, 2014, Bally became a wholly-owned subsidiary of SGC and its financial data has been consolidated with SGC's on financial reports to the Securities and Exchange Commission. After acquiring SHFL Entertainment, Inc. (f/k/a/ Shuffle Master Inc.) on Nov. 25, 2013, Bally began using "Shuffle Master" or "SHFL" as trade names and, upon information and belief, has sold or leased table-mounted card shufflers based on the patents at issue in this case to all five casinos within the Northern District of Illinois (Eastern Division), *i.e.*, Hollywood Casino (Joliet); Harrah's Joliet Casino & Hotel (Joliet); Hollywood Casino (Aurora); Grand Victoria Casino (Elgin); and Rivers Casino (Des Plaines).

11.     Defendant, BALLY GAMING, INC. ("BGI") is a corporation of the State of Nevada, with offices located at 6650 S. El Camino Road, Las Vegas, NV 89118. BGI operates as a subsidiary of BALLY GAMING INTERNATIONAL, INC., which operates as a subsidiary of ALLIANCE HOLDING CO., which operates as a subsidiary of BALLY TECHNOLOGIES, INC. Upon information and belief, BGI operates as a manufacturer of equipment and games for casinos in the U.S., including all five casinos within the Northern District of Illinois (Eastern Division), *i.e.*, Hollywood Casino (Joliet); Harrah's Joliet Casino & Hotel (Joliet); Hollywood Casino (Aurora); Grand Victoria Casino (Elgin); and Rivers Casino (Des Plaines). According to assignment records in the United States Patent and Trademark Office, BGI is the current owner of record in an unbroken chain of title of patents-in-suit U.S. 6,651,982 [Exhibit 1] and U.S. 7,523,935 [Exhibit 2] and their progeny.

12.     Shuffle Tech, Poydras, and Aces Up have each been damaged in their businesses and property by the actions of Defendants complained of herein and as set out below.

---

names "Shuffle Master" and "SHFL Entertainment," this Complaint will refer to Bally Technology, when it is doing business as SHFL or Shuffle Master, as "SHFL".

# IV.    Facts common to all counts

13.    Casinos routinely use automatic card shuffling machines ("card shufflers") on gaming tables to automate the historically labor-intensive process of shuffling physical playing cards between each hand of play.  For the purpose of this complaint, the "relevant market" is the market in the United States for card shufflers certified and approved for use by casinos, excluding card shufflers designed for private consumer use in unregulated environments and also excluding card shufflers that randomize virtual "cards" in video-based games.

14.    The first patents teaching automatic card shufflers were filed in the late 1800's.  Various types of *fully* automatic card shufflers, which randomly shuffle an initial set of cards without human assistance, were first taught in patents issued in the early 1930s, *e.g.*, U.S. Patent 1,889,729 to Hammond, filed in 1932.  Integration of automatic card shufflers into gaming tables where shuffling occurs below the table and delivery of the shuffled cards comes from below the top surface of the table to the dealer was also first taught in the 1930s.  *Id,* also U.S. Patent 2,065,824 to Plass, filed in 1930.  By the early 1990s, computer-controlled shufflers, where all "shuffling" is conducted electronically by the onboard computer, were introduced.  In those shufflers, the computer determined the final "random" or other intended order for the final set of cards, and the cards were mechanically sorted into that intended order.

15.    Casinos demand card shufflers because they increase labor efficiency, deter player/dealer collusion and cheating, and increase the number of "hands" played each hour at each gaming table, resulting in higher casino profits and dealer tips.

16.    There are no reasonable substitutes for automatic card shufflers for casino table games that use physical playing cards.  Without an automatic card shuffler, the dealer must

shuffle by hand, which is prohibited by gaming regulators in some jurisdictions and less economical in all other jurisdictions.

17.     The market for card shufflers comprises approximately 30,000 card shuffler units sold and leased to casinos.  SHFL has 100% market share in the relevant U.S. market, and nearly 100% market share worldwide.  SHFL's 2012 Annual Report indicates that, as of the report date, it had 8,285 SHFL shufflers on lease worldwide (primarily in the US), with an average monthly lease of $451/unit, producing $44,838,420 in recurring revenue.  According to SHFL, the majority of its leases are month-to-month and include service and support.  In 2012, SHFL sold 2,135 units at an average price of $15,843, for total sales of $33,824,805.  SHFL's service and "other" utility segment revenue in 2012 was $11,839,000, including monthly service fees for shufflers purchased and owned by casinos.  In summary, total SHFL utility segment revenues (excluding chipper sales) were $92,502,000 in 2012, an increase of approximately $11,000,000 from 2011 to 2012.  This figure is comprised of almost $34,000,000 in one-time sales (subject to ongoing support revenue) and $59,000,000 in recurring revenue.

18.     As of October 2012, SHFL had dominated the relevant U.S. market for more than a decade and had completely monopolized that market since at least 2009, when SHFL acquired the shuffler assets and patents of its only remaining competitor, VENDINGDATA CORPORATION ("VendingData").  SHFL has used the continued threat of litigation to drive out other potential competitors, including but not limited to, TAIWAN FULGENT ENTERPRISE CO., LTD. ("Taiwan Fulgent") and TCS/JOHN HUXLEY ("TCS"), as set forth below.

19.     Shuffle Tech is a developer and manufacturer of card shufflers.  It has been in business since March 2006.  Shuffle Tech has invented several innovative methods and devices for shuffling cards and has been awarded numerous patents by the U.S. Patent and Trademark

Office ("USPTO") and several foreign patent offices.[2] Beginning in 2008, Shuffle Tech manufactured card shufflers primarily for private consumer use, and sold several thousand shufflers to customers around the world. Shuffle Tech also intended to commercialize its technology for use in casinos and develop a full range of single- and multi-deck card shufflers based on its technology, which benefits casinos by enabling card shufflers that are simpler to build, less expensive, and more reliable than the devices offered by SHFL.

20.     Shuffle Tech developed its first prototype single-deck card shufflers intended for use by casinos between 2010 and 2012. It obtained certification of the effectiveness of its shufflers in March 2012 from Gaming Laboratories International ("GLI"), an independent testing agency recognized by gaming regulators in most gaming jurisdictions.

21.     Beginning in April 2012, Shuffle Tech demonstrated its card shuffler patents, technology, and working prototypes to Digideal Corporation ("Digideal"), an established gaming equipment manufacturer, with the intention that Digideal would engineer a series of shufflers based on Shuffle Tech technology that were suitable for mass-production and use in casinos and would pay Shuffle Tech royalties for the use of its technology and patents.

22.     In response to this market opportunity and based on the prototypes provided by Shuffle Tech, Digideal developed the DigiShuffle™ and the parties, together with Poydras, executed a patent and technology license agreement for the Shuffle Tech technology and patents

---

[2] U.S. 8,602,416 "Full-Text Card shuffling device and method,"
U.S. 8,480,088 "Full-Text Flush mounting for card shuffler,"
U.S. 8,109,514 "Full-Text Card shuffling device and method,"
U.S. 7,971,881 "Full-Text Apparatus and method for automatically shuffling cards,"
U.S. 7,900,923 "Full-Text Apparatus and method for automatically shuffling cards,"
U.S. 7,854,430 "Full-Text Card shuffling device and method," and
D578,577 "Full-Text Automatic card shuffler."

in September 2012.[3]  The license agreement provided for a minimum sales quota of 800 units in 2013 and 1,200 units per year from 2014 onward, at least until the Shuffle Tech patents expired (approximately 2027), and that Digideal would pay a royalty of $4,000 per unit to be divided equally between Shuffle Tech and Poydras.  Aces Up was retained to assist in the manufacture, sales and distribution of the licensed shufflers and was awarded an exclusive (except for Digideal) contract and sub-license in certain jurisdictions.  Updated GLI certification for the Shuffle Tech/Digideal final production model, called DigiShuffle™, was obtained in January 2013.

23.     Had Digideal (or its successor) not been prevented from meeting its sales quotas by Defendants, it would have paid Shuffle Tech and Poydras minimum royalties of $3,200,000 in 2013 and $4,800,000 in 2014 and each year thereafter until about 2028, when the existing Shuffle Tech patents expire.  Shuffle Tech's "know-how," trade secrets, and anticipated improvements, including later patented technology, would further justify additional, albeit reduced, payments after 2028.  In any event, it is reasonably predictable that Digideal would have sold or leased a minimum of 17,600 shufflers, resulting in patent and technology royalties of $70,400,000 paid by Digideal to Shuffle Tech and Poydras over the fifteen year period beginning in 2013.[4]  Altogether, Shuffle Tech, Poydras, and Digideal should have collectively earned more than $8,000,000/year, or $120,000,000 over the 15 year period from 2013 through

---

[3]  Shuffle Tech executed a patent license agreement for its patented card shuffler technology with Poydras, a gaming equipment finance company, which in turn sub-licensed the technology to Digideal, the manufacturer of the shufflers.  Shuffle Tech also agreed to pay Digideal's litigation costs in the event a patent infringement lawsuit was filed against Digideal asserting allegations of infringement based on the technology provided by Shuffle Tech.

[4]  At the minimum sales quota, Digideal would have sold 17,600 shufflers between 2013 and 2027, and assuming profits of at least $2,800/unit, after expenses and patent royalties, Digideal would have earned about $50,000,000 over the same 15 year period.

at least 2027, plus continued earnings from ongoing sales and leases for the ongoing use of Shuffle Tech's trade secrets after Shuffle Tech's patents expired in 2028. Additional sums would have been earned by Aces Up as a result of its role in manufacturing, sales and distribution of the licensed shufflers. It was anticipated that Aces Up would lease or sell a minimum of 100 licensed shufflers per quarter, i.e., over 400 licensed shufflers per year.

24. Pursuant to its recently executed license agreement with Shuffle Tech, Digideal displayed its initial single-deck prototype DigiShuffle™ card shuffler to customers for the first time at the 2012 Global Gaming Expo ("G2E") in Las Vegas, Nevada, on October 2-4, 2012. The proposed retail price for the DigiShuffle™ was $10,995. The proposed monthly lease price for casinos was $350/month. DigiShuffle's™ sale and lease prices were far less than the SHFL DeckMate or the then-recently announced DeckMate2, which respectively sold for $16,995 and $20,995, or leased for $450/month or $525/month, respectively. In addition to reduced purchase or lease costs, the DigiShuffle™ also offered customers substantial savings from increased reliability and lower routine maintenance costs. As a result of the DigiShuffle's™ lower cost and greater reliability, the market response to the DigiShuffle™ was very positive and demand was considerable from the start. Digideal's potential customers and the market in general were precluded from realizing these benefits by SHFL's subsequent actions.

25. Recognizing the threat of Shuffle Tech's improved technology and lower prices, SHFL immediately, on October 12, 2012, filed a sham patent infringement lawsuit against Digideal. SHFL's suit falsely alleged that the DigiShuffle™ single-deck card shuffling machine built by Digideal under license from Shuffle Tech infringed claims 1-3 and 42-46 of SHFL's U.S. patent 6,651,982 ("the '982 patent") and claims 1, 2, 9, 10, 11 and 14 of SHFL's U.S. patent

7,523,935 ("the '935 patent"). The lawsuit was filed as case no. 2:12-cv-01782, in the Nevada U.S. District Court.

26. On information and belief, SHFL conducted no reasonable pre-filing investigation of the DigiShuffle™ prior to filing suit in October 2012, or even six months later in March 2013 when SHFL served its initial infringement contentions or, if such investigation was conducted, it was ignored. Prior to filing suit, SHFL, under the leadership of Gavin Isaacs, then CEO of SHFL, declined to schedule a meeting with Digideal to inspect the DigiShuffle™. SHFL could have inspected the DigiShuffle's™ method and structure and quickly determined that it bore no relation to the patented inventions under any reasonable construction of the claims, but SHFL chose not to do so. Each of the infringement assertions made by SHFL against Digideal were objectively baseless. In addition, all of the asserted claims were invalid and were asserted for the purpose of inflicting collateral, anti-competitive injury, as further detailed below. In addition to the damage to the market, Shuffle Tech, Poydras, and Aces Up suffered substantial damages as a result of SHFL's unlawful activities, including, but not limited to, the loss of profits they otherwise would have made. Shuffle Tech was also forced to expend over $950,000 in legal expenses to defend Digideal against SHFL's sham patent infringement claims pursuant to Shuffle Tech's indemnity agreement with Digideal.

27. The '982 patent asserted against Digideal was originally issued on November 25, 2003 to named inventors Attila Grauzer, Feraidoon Bourbour, Troy D. Nelson, Paul K. Scheper, James B. Stasson, and Ronald R. Swanson, and was assigned to SHFL Entertainment, Inc. The '982 patent application was filed by SHFL patent attorney Mark Litman as Patent Application Serial No. 10/128,532 on April 23, 2002. It was a continuation-in-part of U.S. Patent

Application 09/967,502, now patented as U.S. Patent 6,651,981, also issued on November 25, 2003. Both patents claimed priority to September 28, 2001.

28.     The sole point of novelty and basis for allowance of the '982 claims was the "automatically moveable cover" over the card elevator, as opposed to a mere "moveable cover" that was found on most prior art shufflers: "Claims 1, 25, 27, 30, 48, 50, and 55 distinguish over the prior art of record with the limitation of an automatically moveable cover in association with card shuffler and dispenser." Notice of Allowability, p.6, June 13, 2003, Application 10/128,532.

29.     On January 2, 2014, Digideal initiated *ex-parte* reexamination of all of the contested claims of the '982 patent. The USPTO found that previously undisclosed prior art raised 136 "Substantial New Questions of Patentability" (for 8 claims; an average of 17 Substantial New Questions of Patentability per claim). SHFL attorney Alan Fanuchi prosecuted the application during reexamination. During *ex parte* reexamination in 2014, the Central Reexamination Unit ("CRU") examiner stated, with respect to independent claims 1 and 42 subject to re-examination: "In the previous examination of the '982 patent the original examiner determined that the prior art failed to disclose or fairly suggest an automatically moveable cover associated with a card shuffler and dispenser as recited in claims 1 and 42. Claims 2 and 3 depend from claim 1 and claims 43-46 depend from claim 42." All '982 claims asserted by SHFL against Digideal and subject to reexamination have been rejected as anticipated and/or rendered obvious by prior art. Notice of Non-Final Rejection in Office Action in *Ex parte* Reexamination 90/013,112, p.3, Aug. 15, 2014.

30.     The '935 patent asserted against Digideal was originally issued on April 28, 2009. It identified the same group of inventors listed on the '982 patent and was assigned to SHFL Entertainment Inc. It was filed by SHFL patent attorney Mark Litman on October 15, 2003 as

Patent Application Serial No. 10/686,164 and was a divisional of the '982 patent. The earliest possible priority date for the '935 patent is September 28, 2001. The point of novelty and basis for allowance of the '935 claims was a "card support surface" recessed beneath the top surface of the gaming table, as set out in the last Amendment (Oct. 30, 2008) before the Notice of Allowance.

31.     On January 2, 2014, Digideal initiated *ex parte* reexamination of all of the contested claims of the '935 patent. The USPTO found that previously undisclosed prior art raised 86 Substantial New Questions of Patentability (for 6 claims; an average of 14.3 Substantial New Questions of Patentability per claim). SHFL attorney Alan Fanuchi prosecuted the application during reexamination. During re-examination, with respect to independent claims 1 and 9 subject to reexamination, the CRU examiner stated: "In the previous examination of the '935 patent the original examiner determined that the prior art failed to disclose or fairly suggest an automatic card shuffler with a housing mounted to a gaming table surface such that a card receiver for accepting cards to be shuffled is accessible from the gaming table surface; wherein the card receiving area is recessed beneath the top of the gaming table." All '935 claims asserted by SHFL against Digideal and subject to reexamination have been rejected as obvious over prior art. Notice of Non-Final Rejection in Office Action in Ex Parte Reexamination, pp. 3, 15, 17 of 20, July 14, 2014, SN 90/013,111.

32.     However, SHFL's files also contained invaliding prior art that was even more damaging to SHFL's patentability arguments (unbeknownst to Digideal at the time of its reexamination requests) which SHFL had failed to produce to the USPTO or to Digideal during discovery. Multiple prior art references, known to SHFL as early as October 1997, but not disclosed by SHFL to the USPTO during prosecution or reexamination, support a *prima facie*

case of anticipation and/or obviousness against all '982 and '935 claims asserted against Digideal. These references include the Roblejo Prototypes which were known to SHFL as early as October 1997, and the Luciano Prototypes which were known to SHFL at least as early as September 2003 and, on information and belief, years earlier, and which are described in detail below. None of the claims asserted against Digideal would have issued if this art had been presented. In addition, U.S. 6,361,044 to Block ("the Block '044 patent") was withheld from the examiner during prosecution of the '982 patent, and while nominally disclosed in the '935 application, the card shuffler taught in the Block '044 patent was "buried" among irrelevant prior art not properly brought to the examiner's attention in the '935 application. SHFL made no attempt to advise the '935 examiner that Block's card shuffler was mounted below the gaming table, a critical but not immediately apparent fact. The importance of these facts is evidenced by the opinion of the CRU examiner during reexamination of the '982 and '935 patents. These acts and omissions by SHFL can only be characterized as affirmative acts of egregious misconduct which were part of a deliberately planned and carefully executed scheme to defraud the USPTO and gain allowance of claims that would not have otherwise been allowed. SHFL knew that the '982 and '935 patents were invalid and unenforceable at the time it sued Shuffle Tech's sub-licensee Digideal.

33.     The first group of still undisclosed prior art references, the Roblejo Prototypes, and in particular the second iteration prototype, were developed by CASINO CONCEPTS, INC. ("Casino Concepts") between 1995-1997 and were marketed as the "Sure Shuffler" in sales brochures distributed to potential customers. These prototypes were known to SHFL since at least October 1997. SHFL had received sales brochures from Casino Concepts and a business card from Dr. Conrad Roblejo, its founder and principal inventor, at the World Gaming Expo in Las Vegas, Nevada on October 14-16, 1997. These brochures were also included in an internal

SHFL report titled: "97 World Expo: Report on Shuffler Competition" which SHFL produced as belated, supplementary discovery in its case against CARD, LLC (see below) on January 30, 2004. Letter of Jan. 30, 2004 from SHFL to CARD attorneys (Ex. B to Morrill Declaration, Dkt. 193, *CARD, LLC v Shuffle Master, Inc.,* No. CV-N-03-244 (D. Nev.) ("*CARD* litigation").

34.    The first iteration of the Roblejo Prototypes was constructed between 1991-1995 and demonstrated to at least Bally's Casino in Atlantic City, New Jersey in 1995. Gola Decl., ¶6, Oct. 23, 2003, *CARD* litigation, (D. Nev.). It was obtained by CARD in December 2003 from Casino Concepts engineer Hal Solberg and demonstrated by CARD attorney Robert Morrill in a 16 minute video made in December 2003. The Morrill declaration and video were filed as evidence in the *CARD* case to demonstrate that several features of this prior art anticipated and invalidated the SHFL patents asserted against CARD.

35.    SHFL disclosed CARD's evidence of the Roblejo Prototypes in certain USPTO Information Disclosure Statements ("IDS") filed in more than twenty subsequent unrelated patent applications after January 2004, but SHFL failed to disclose these prototypes in the application that resulted in the '935 patent or in any continuations-in-part ("C-I-P") or divisionals of the '981/'982 patents. SHFL's inequitable conduct in the '982 and '935 patent prosecution bears an immediate and necessary relation to these additional applications, as further detailed below, and that conduct thus infected and tainted those subsequent or co-pending applications as well, rendering each of the resultant patents unenforceable.

36.    A verbatim transcript of the Roblejo Prototype demonstration video was presented in the *CARD* litigation via the Declaration of Robert Morrill in Support of CARD's Motion to Stay Injunction Pending Review [Dkt. 179, pages 14-21]. Additional corroborating evidence of the several Roblejo prototypes built and marketed between 1995-1997 was included the Gola

Declaration and the Solberg Declaration in that case. (¶¶ 15, 17, 23) (Dec. 18, 2003, *CARD* litigation).

37.     The Roblejo Prototypes and the sales brochures featuring the Roblejo Prototype shufflers mounted to gaming tables anticipate every claim of both the '982 and '935 patents, and render those claims invalid and unenforceable. In particular, the several 1995-1995 Roblejo Prototypes feature, *inter alia*, the "automatically moveable cover" over a card elevator which raises cards above the top surface of the device, which was the sole point of novelty over the cited prior art that resulted in the allowance of the asserted '982 claims. The Casino Concepts brochures also display the Roblejo Prototype mounted in a gaming table such that the card receiver has a support surface for receiving cards below the top surface of the gaming table and an elevator for raising the cards so that the entire shuffled deck of cards can be manually removed from an area proximate the surface of the gaming table, which was the sole point of novelty over the cited prior art that resulted in allowance of the asserted '935 claims.

38.     SHFL, its applicants and attorney, Mark Litman, failed to disclose the Casino Concepts brochure and SHFL's other records of the Roblejo Prototypes to the USPTO during the prosecution of either the '982 or '935 patents.

39.     SHFL, its applicants and attorney, Alan Fanucci, failed to disclose the Casino Concepts brochure and SHFL's other records of the Roblejo Prototypes to the USPTO during the 2014 *ex parte* re-examination of the '982 or '935 patents.

40.     SHFL and its attorneys failed to produce the Casino Concepts brochure and its other records of the Roblejo Prototypes to Digideal in response to Digideal's document discovery requests, further engaging in litigation misconduct.

41.     The second of the undisclosed prior art references was the Luciano Automatic Card Shuffler (ACS) Prototype.  The Luciano ACS was made known to SHFL and its predecessors-in-interest, including PROGRESSIVE GAMES INTERNATIONAL ("PGI") as early as late 1993, when Luciano Packaging was marketing its engineering services and prototype to nearly every gaming company, including PGI, as evidenced by an October 13, 1994 Letter.  Luciano Declaration, ¶¶ 14, 15, Oct. 4, 2003, *CARD* litigation.  The Luciano ACS was also fully disclosed to SHFL during the *CARD* litigation in November 2003.  October 4, 2003 Declaration of Lawrence Luciano, and a video demonstration of the 1992 Luciano Automatic Card Shuffler (ACS) filed as Exhibit K to the Lawrence Luciano Declaration.

42.     Not only was SHFL fully aware of the Luciano ACS, but SHFL actually cited the Luciano ACS as evidence of invalidating prior art for other patents asserted against SHFL in the 2005 lawsuit, *MP Games LLC, et. al. v. Shuffle Master, Inc.,* No. 2:05-cv-01017 (W.D. Wash.).  A deposition of Robert Luciano[5] was taken in that case and filed under seal at Dkt. 69-5 on July 7, 2006.  As evident from the extensive mechanical drawings attached as exhibits in the CARD litigation and the video demonstration filed as Exhibit K with the Lawrence Luciano Declaration, the Luciano ACS Prototype was an automatic card shuffler integrated into the top surface of a gaming table, such that the card receiver was below the surface of the gaming table and the shuffled cards were delivered on a card elevator to a point proximate the surface of the gaming table.  Luciano anticipated at least '935 claim 1 and rendered obvious all other claims of the '982 and '935 patents that were asserted against Digideal.  The Luciano Prototypes also bear an immediate and necessary relation to, but were not disclosed in, the prosecution of other

---

[5] Robert Luciano and Lawrence Luciano are brothers, and owners of Luciano Packaging, the developer and owner of the Luciano ACS.

progeny of the '982 and '935 applications or their parent applications, thus spreading the infectious unenforceability created by SHFL's inequitable conduct in the '982 and '935 applications to those other patent applications.

43.  SHFL and its attorney Mark Litman failed to disclose the Luciano ACS Prototype and its other records thereof to the USPTO during the prosecution of either the '982 or '935 patents.

44.  SHFL and its attorney Alan Fanucci failed to disclose the Luciano ACS Prototype and its other records thereof to the USPTO during the 2014 *ex parte* re-examination of the '982 or '935 patents.

45.  SHFL and its attorneys failed to produce the Luciano ACS Prototype and its other records in response to Digideal's document discovery requests, further engaging in litigation misconduct.

46.  SHFL failed to disclose the Block '044 patent during prosecution of '982 and it was not available or considered by the '982 examiner prior to allowance.  SHFL subsequently disclosed the Block '044 patent in an IDS for subsequent C-I-Ps and divisionals of '982, including CIP application 10/261,166, and divisional application 10/686,164, but did not disclose the Roblejo and Luciano Prototypes in each of those C-I-Ps and divisionals.

47.  SHFL knew about the Block '044 patent at least five months before the '982 patent issued in November 2003 as shown by the facts that:  (1) SHFL filed an unrelated patent application, serial number PCT/2005/009561 A2, titled "Smart Discard Rack For Playing Cards," on July 17, 2003, naming Attila Grauzer and other inventors named in the '982 and '935 patents as its inventors, which included a description of the Block '044 patent in its written specification, at page 8, ln. 4-14; and (2) SHFL filed an IDS citing the Block '044 patent as material prior art to

SHFL's disclosed invention on October 28, 2003 in CIP application 10/261,166, which issued as U.S. Patent 7,036,818 ("the '818 patent").

48.     The Block '044 patent teaches and claims a computerized, automated gaming table that uses physical playing cards (as opposed to digital, on-screen cards that are common in automated gaming tables).  An automatic card shuffler is inherently necessary to the operation of an automated gaming table that uses physical playing cards, although it was not a point of novelty in Block's claimed invention.  Block did not make reference to the automatic card shuffler of his automated gaming table in his title, his abstract, or his summary of his invention.  However, an automatic card shuffler was fully described in the detailed description of his invention.  Although SHFL identified the Block '044 patent as material to their claimed automatic card shuffler, it did not notify the examiner of its relevance, which the examiner would have only discovered if he read the entire specification, a very unlikely occurrence given SHFL's deceitful silence on this issue and the multitude of other, much less relevant prior art concurrently dumped on the examiner.

49.     The Block '044 patent anticipates and/or renders obvious all claims of '935 and '982 patents, as found by the CRU examiner during ex-parte reexamination in 2014.

50.     SHFL and its patent attorney, Mark Litman, failed to properly disclose the Block '044 patent to the USPTO, although it was in SHFL's possession no later than July 2003.  SHFL and Mark Litman failed to exercise their duty of candor and good faith regarding the Block '044 patent during prosecution of the '935 and '982 patents.

51.     SHFL's patent infringement lawsuit against Digideal was a sham, with no objective likelihood of success on the merits.  SHFL held in its records evidence of no less than three prior art references that anticipated and/or rendered obvious every '982 and '935 claim

asserted against Digideal but effectively withheld those prior art references from multiple patent examiners while arguing that no such teaching existed in the prior art. Because some of those same references had been the basis for inequitable conduct counterclaims against SHFL in prior litigations, causing SHFL to settle those cases and to pay large sums of money to those counterclaimants, SHFL could not have reasonably believed that the '982 and '935 patent claims asserted against Digideal were valid and enforceable.

52. In addition to the invalidity and unenforceability of the '982 and '935 patent claims asserted against Digideal, DigiShuffle's™ shuffling method and structure are fundamentally different from the shuffling method and structures disclosed and claimed in the '982 and '935 patents and clearly could not infringe either of those patents even if they were valid. The DigiShuffle™ shares only three common characteristics with the asserted patent claims, all of which are common to many prior art card shufflers: (a) rectangular shaped housings; (b) input and output apertures located on the top surface of the device, with elevators to lift shuffled cards for removal by the dealer near the output aperture; and (c) moveable doors/covers over the output aperture that open and close by a mechanism, rather than by hand. Thus, *even if* the '982 and '935 patents were valid and enforceable, no reasonable claim construction of the '982 and '935 patents could lead to a finding of infringement by the DigiShuffle™. No reasonable litigant could have expected to prevail on the merits of SHFL's infringement contentions against the DigiShuffle™.

53. Defendants' initiation and maintenance of this sham litigation against Digideal caused substantial damage to Shuffle Tech, Aces Up and Poydras, as well as the potential customers of each of these parties and Digideal and the market itself.

54.     SHFL intentionally misused the '982 and '935 patents, which were invalid and unenforceable, by filing suit to enforce them knowing them to be invalid, unenforceable (due to SHFL's inequitable conduct in the initial applications between 2001-2009), and not infringed. The '982 and '935 patents and various progeny patents deriving from those patents and their parent applications are further rendered unenforceable by SHFL's additional inequitable conduct during the *ex parte* reexaminations in 2014 and 2015 and by its wrongful assertion of those patents in multiple litigations and by SHFL's conduct of those litigations, including SHFL's failures to timely produce the extremely relevant prior art described above in response to document and other discovery requests in those multiple litigations.

**A.     Overview of SHFL's predatory acts to create and maintain its monopoly of the relevant shuffler market**

55.     SHFL's sham litigation against Digideal was not an isolated incident.  It was a continuation of SHFL's longtime strategy of concealing prior art known to and possessed by SHFL in order to obtain overly broad patents on card shufflers, then engaging in sham patent litigation against any competitor that dared to market competitive card shufflers in the relevant market.

56.     SHFL has been very successful in its efforts to monopolize the shuffler market. SHFL controls virtually 100% of the relevant U.S. market and has been the only supplier of card shufflers suitable for use in casinos in the U.S. since at least 2009.  SHFL also dominates the global market as well, with slightly less than 100% market share worldwide.

57.     SHFL's monopoly and market power in the relevant market has not occurred by virtue of superior acumen, innovation, skill, foresight, or industry, or by the proper functioning of the market, or by natural market conditions.  Instead, it has occurred as the result of SHFL's

purposeful abuse of the patent system and the judicial process. For more than a decade, SHFL has engaged in a series of sham patent infringement lawsuits against every potential competitor that has marketed competitive card shufflers to casinos in the United States. Digideal patent and technology licensors, Shuffle Tech and Poydras, and its distributor, Aces Up, are merely the latest victims.

58.     Prior to its suit against Digideal, SHFL filed sham patent infringement litigation lawsuits against every other competitor in the relevant market, then acquired their assets at a discount after they had been weakened by the litigation, or drove them out of the market with the threat of litigation expenses which small start-up operations could not afford. These litigations include: (1) an action against CARD LLC in 2003-2004 followed by an acquisition of CARD by SHFL in 2004; (2) a suit against VendingData in 2004-2009, followed by VendingData's acquisition by SHFL in 2009); (3) a suit against Taiwan Fulgent in 2009-2010; and (4) a suit against TCS Huxley in 2012-2013, similarly resulting in TCS's departure from the market.

59.     In addition to forcing all actual competitors out of the market, SHFL's lengthy pattern of predatory, vexatious patent litigation has effectively raised a substantial artificial barrier to entry for all potential competitors. As a result of SHFL's actions, no potential competitor can enter the relevant market without a multi-million dollar war chest and a business plan that includes millions in upfront litigation costs as part of its anticipated start-up expense.

60.     In each of the prior sham patent infringement cases, SHFL asserted patents procured from the USPTO by fraud. Several patents asserted against CARD, VendingData, Taiwan Fulgent, and TCS were from the same patent family, which began with the application that issued as U.S. Patent 6,149,154 ("the '154 patent"), and had a common priority date of April

15, 1998.[6]  As proven by CARD during its litigation in 2004, SHFL was in possession of at least one invalidating prior art reference since October 1997 that clearly invalidated the '154 patent claims asserted against CARD, and, on information and belief, invalidated or rendered unenforceable all remaining claims of the '154 patent and its progeny asserted against CARD, VendingData, Taiwan Fulgent, and TCS.

61.     SHFL was in possession of the 1997 Casino Concepts Brochure and other records of the Roblejo Prototypes since at least October 1997.  SHFL nevertheless failed to disclose this art to the USPTO during the initial examination of its applications that issued as the '982 and '935 patents, during reexamination of those patents, or during the applications that resulted in the '154 patent and its progeny, which were asserted against CARD and VendingData.

62.     In each patent infringement case filed by SHFL since at least 2003, SHFL's allegations failed on the merits, but ultimately resulted in SHFL's acquisition of each defendants' shuffler technology and patents, or otherwise drove the defendant out of the relevant U.S. market, thus preserving and extending SHFL's monopoly.  Through its predatory patent litigation, SHFL intended to raise, and succeeded in raising, substantial barriers to entry for *any* competing card shuffler, not just shufflers that would actually, or even in good faith allegedly, infringe *valid, enforceable* patents owned by SHFL.

63.     Former SHFL General Counsel Jerry Smith declared in SHFL's lawsuit against then competitor CARD that: "…the mere showing of the [CARD] one2six has the potential ability to disrupt Shuffle Master's order taking and sales process.  *It could confuse customers into*

---

[6] SHFL patent application 09/060,627, filed April 15, 1998, issued as U.S 6,149,154 on Nov 21, 2000.  Application 09/688,597 filed on Oct 16, 2000, as a CIP of 09/060,627, issued as U.S. 6,588,597 on July 8, 2003.  Application 09/912,879, filed on Jul 25, 2001, as a CIP of 09/688,597, issued on Dec 2, 2003 as U.S. 6,655,684.  SHFL asserted the '154 and '597 patents against CARD, and the '684 patent against VendingData.

*believing that there is an alternative to Shuffle Master's shufflers available to them*." Declaration of Jerry Smith, ¶ 14, Sept. 5, 2003, *CARD* litigation [Exhibit 15], emphasis added. Then and now, SHFL's attitude was that no competition and no alternatives to its shufflers would be permitted in the relevant market.

64.     In furtherance of its objective to monopolize the relevant market, SHFL has taken advantage of the fact that significant legal costs are required to defend against aggressive patent litigation, regardless of the merits of a case, and that such costs can drive the defendant out of the market and/or into SHFL's arms.  SHFL has actually bragged about its sue-and-acquire strategy to the press.  In a news article published several months after SHFL acquired former competitor CARD, SHFL's former CEO, Mark Yoseloff, explained how he forced the distress sale of CARD, a company with a "terrific product" that he coveted:

> "So we had to create a situation where they would be induced to sell," Yoseloff said. "It struck me that one way (to do that) was to sue them (and have them incur) legal fees sufficiently high even for a company the size of the parent."

INVESTOR'S BUSINESS DAILY, Nov. 15, 2004, at A3 [Exhibit 22, p.2 of 3].

**B.      Specific instances of SHFL's use of sham litigation to monopolize the relevant shuffler market**

**1)      *CARD Austria v. Shuffle Master Inc.* (2003-04)**

65.     On May 6, 2003, CASINO AUSTRIA RESEARCH AND DEVELOPMENT IN VIENNA and its U.S. subsidiary CARD, LLC (collectively "CARD") filed suit seeking declaratory judgment of non-infringement of U.S. Patents 6,149,154; 6,267,248; 6,139,014; and 6,588,750 by CARD's one2six shuffler.  Complaint, May 6, 2003, *CARD* litigation.  SHFL counterclaimed on August 25, 2003, seeking a finding of infringement of those and additional patents. *Id.*, Dkt. 10.

66.     On September 26, 2003, CARD served SHFL with its First Set of Production Requests.  Document Request 22 required SHFL to produce all prior art in its files relating to the

patents-in-suit. Morrill Declaration at Dkt. 193, ¶2. SHFL responded to CARD's First Set of Production Requests on October 27, 2003. However, SHFL failed to produce any of the documents in its possession concerning the "Sure Shuffler" developed for Casinos Concepts by Dr. Conrad Roblejo, Mr. Steven Gola, and Mr. Hal Solberg, which would later become the "smoking guns" in that case. *Id,* para. 3.

67.     Instead, SHFL sought, and unjustly obtained on December 8, 2003, a preliminary injunction preventing CARD from making, using, or selling, or even submitting its one2six device for regulatory testing. Preliminary Injunction, *CARD* litigation, paragraph bridging pages 2-3, Dec. 8, 2003, Dkt. 153.

68.     CARD continued to investigate the prior art, and in particular the Roblejo shuffler device developed by Casino Concepts. On December 13, 2003, CARD Attorney Brian Ogonowsky met with Hal Solberg, the engineer who had developed the Second Roblejo Prototype between 1996-1997. Ogonowsky Declaration, ¶2, Dec. 23, 2002, *CARD* litigation, Dkt. 169. On December 18, 2003, CARD obtained a declaration from Mr. Solberg, along with numerous exhibits, establishing the engineering and design of the First Roblejo Prototype beginning in 1995 and the construction of the Second Roblejo Prototype in 1996-1997. Solberg Declaration, ¶¶ 15, 17, 23, Dec. 18, 2003, *CARD* litigation.

69.     On December 22, 2003, CARD filed a motion to dissolve the preliminary injunction entered against it based on the newly discovered evidence that the patents asserted against CARD, which formed the basis for the preliminary injunction, were invalid. Dkt. 162. Five weeks later on January 30, 2004, SHFL inexplicably produced the "smoking gun" Roblejo documents that had been requested more than four months earlier and prior to the preliminary injunction having been ordered by the Court.

70.    One of the documents was a "Report on Shuffler Competition" from the "97 World Expo," which highlighted that Casino Concepts (run by Dr. Roblejo and Mr. Gola) had displayed its "Sure Shuffler" at the October 1997 Expo.  Exhibit B at SMI 10395-96, from Dkt. 193 Morrill Decl.  Attached to the report was a sales brochure for the Sure Shuffler (*Id.*, at 10397-401)*,* along with a business card from Dr. Roblejo.  Pp. 2-5 of 5, at SMI 010397-99, 10401.

71.    On information and belief, the sales brochure attached to the "Shuffler Competition" report was the same as the sales brochure attached to Exhibit H to the Solberg Declaration (*CARD* litigation, Dkt. 162), in which Mr. Solberg provided a detailed description of the Sure Shuffler "production prototype".  Mr. Solberg's description made clear that the Sure Shuffler anticipated and/or rendered obvious many of the claims of SHFL's patents-in-suit against CARD.

72.    During prosecution of the patents, however, SHFL had never disclosed to the USPTO what it had learned at the '97 World Gaming Expo.  Morrill Declaration, ¶ 4, Sept. 26, 2003, *CARD* litigation, Dkt. 193.  On February 4-5, 2004, Mr. Solberg was deposed in Dedham, Massachusetts.  Feb. 4-5, 2004 Solberg Deposition.  On February 13, 2004, CARD filed amended counterclaims seeking, *inter alia*, at Count Twelve, a declaratory judgment that, at least SHFL's patents 6,149,154; 6,267,248; 6,588,750; and 6,588,751 were unenforceable due to inequitable conduct, also seeking attorney fees.  Dkt. 192, pages 29-34.   Seven days later, on February 20, 2004, faced with devastating evidence of patent misuse and fraud on the USPTO which would have eviscerated SHFL's entire shuffle patent portfolio and laid the groundwork for potential antitrust damages, SHFL agreed to stay the litigation pending negotiation between the parties.  Dkt. 198.  Less than 90 days later, on May 13, 2004, SHFL paid approximately

$50,000,000 to acquire CARD, comprised of a cash payment and 767,076 shares of the company's common stock. SHFL 8-K SEC, p.2, May 13, 2004.

73.　Because it had discovered proof of SHFL's egregious misconduct before the USPTO and the district court, CARD, a company with a few million dollars of sales and a preliminary injunction preventing it from selling its core products in the United States, exited the market via a $50 million buyout less than five months after its discovery of the concealed prior art. For $50 million, SHFL avoided the threat of competition and an antitrust lawsuit, solidified its monopoly position in the market, and ensured that its casino customers would have no "alternative to Shuffle Master's shufflers available to them," thus achieving the goal set in the September 2003 declaration of SHFL General Counsel Jerry Smith. Decl. of Jerry Smith, ¶¶ 4, Sept. 5, 2003, *CARD* litigation, Dkt. 22. SHFL 8K, p. 2 (May 13, 2004).

### 2)　*Shuffle Master Inc. v. VendingData Corp.* (2004-2009)

74.　Less than six months later, on October 5, 2004, SHFL filed suit against its next target, VendingData. SHFL filed this suit one day after VendingData announced the availability of its PokerOne shuffler, a product that VendingData had spent millions of dollars to develop. VendingData's Memorandum In Support Of Its Rule 54 Motion For Award of Attorneys-Fees and Costs Under 35 U.S.C. § 285, page 4, lines 6-7, Feb. 15, 2008, *Shuffle Master, Inc. v VendingData Corp.,* No. 2:04-cv-1373, (D. Nev.) ("*VendingData* litigation"). In this action, SHFL alleged infringement of independent Claim 20 of U.S. Patent 6,655,684 ("the '684 patent"), which reads as follows:

> Claim 20. A method for delivering hands of randomly mixed cards from an apparatus comprising: providing at least one deck of playing cards; forming at least one set of cards within the apparatus from the at least one deck of playing cards; delivering to a delivery tray from the at least one set of cards within the apparatus a first individual set of randomly mixed playing cards for a game;

delivering the first individual set of randomly mixed playing cards from the delivery tray of the apparatus, with all cards in the first individual set delivered at the same time, and then providing a second individual set of randomly mixed playing cards into the delivery tray.

75. The '684 patent asserted against CARD was a continuation-in-part of SHFL's application 09/688,597 filed on October 16, 2000, now patent 6,588,750, issued on July 8, 2003, which itself was a continuation-in-part of SHFL's application 09/060,627, filed on April 15, 1998, now patent 6,149,154, issued November 21, 2000. Thus, the '684 patent asserted against VendingData was the progeny of the very patents (including at least the '154 and '750 patents) that CARD had demonstrated in February 2004 were invalid and/or unenforceable.

76. As with its earlier patent applications, SHFL failed to disclose the sales brochure and other information it possessed regarding the Sure Shuffler/Roblejo Prototypes to the USPTO examiner during prosecution of the '684 claims. On information and belief, SHFL also failed to disclose to VendingData any of SHFL's materials and information on the Roblejo Prototypes that resulted in the invalidity and inequitable conduct counterclaims filed by CARD less than a year earlier and the $50 million settlement with CARD. Had SHFL disclosed these materials to the USPTO, the examiner would never have allowed the '684 patent to issue. And, if SHFL had produced these materials to VendingData, VendingData's fate would likely have been much different.

77. However, SHFL's objective in the VendingData litigation was not to comply with VendingData's document production demands or to win the litigation after full disclosure. SHFL's objective was to impose overwhelming litigation costs and force VendingData out of the card shuffler business, then acquire its technology at a deep discount.

78. Prior to filing this lawsuit, SHFL had pursued VendingData's Random Ejection Shuffler™ ("RES") technology for many years. Blad Decl., paras 9-15 (submitted in support of

VendingData's Opposition to Shuffle Master's Motion For A Preliminary Injunction, Nov. 12, 2004, Dkt. No. 20). In keeping with SHFL's publicly acknowledged strategy, SHFL had bluntly told VendingData that if it would not sell its technology, SHFL was prepared to sue – repeatedly. *Id.* at para 15. This strategy worked again.

79.     After spending more than $1.6 million defending itself (as described by VendingData's attorneys in this case, WINSTON & STRAWN[7], *Id,* page 2, lines 1-6) and despite winning its case on summary judgment of non-infringement on February 1, 2008 (Dkt. 201), VendingData was forced to all but shut down manufacturing by early 2006.

80.     VendingData and its successor, ELIXIR GAMING TECHNOLOGIES INC. ("Elixir") thereafter sold its shuffler business and its shuffler patents to SHFL for "a base amount of $2.4 million, subject to adjustment related to the precise final inventory, not to exceed $2.8 million" and a seven year worldwide non-compete agreement. Elixir (formerly VendingData) SEC Form 8-K dated March 20, 2009 [Exhibit 26].

81.     Once again, SHFL "lost the battle but won the war," this time for a pittance, at least as compared to the CARD pay-off. Vending Data spent millions of dollars to develop the PokerOne Shuffler and $1.6 million more to defend against SHFL's sham patent infringement lawsuit, and won on summary judgment of non-infringement, but in the end was forced into a fire sale of its shuffler assets and patents to SHFL.

82.     As was the case with SHFL's prior litigation against CARD, SHFL's suit against VendingData was plainly intended to "cause VendingData to spend funds on legal representation," exactly as threatened by SHFL's then COO, Mr. Paul Meyer, during a May 18,

---

[7] The same attorneys at WINSTON & STRAWN who defended VendingData against SHFL and categorized SHFL as a vexatious litigant now represent SHFL.

29

2006 lunch meeting between Mr. Meyer and VendingData's President, Mr. Mark Newberg. Newburg Decl., ¶ 3, May 21, 2007, Dkt. 155-3 (attached as Ex. 3 to VendingData's Response to Shuffle Master's Motion For Protective Order, Dkt. 155).

83.     Unfortunately for VendingData, it failed to discover the prior art located by CARD (that should have been produced to VendingData by SHFL) proving that the patents asserted against VendingData had been procured by fraud on the USPTO and were asserted against VendingData with SHFL's full knowledge that the patents were invalid and unenforceable.  Unlike the CARD case that concluded earlier the same year with a $50 million buyout, VendingData never found the same "smoking gun" evidence that would have likely resulted in a much more favorable outcome for it.  A summary judgment of non-infringement was not enough to obtain a decent fire sale price for VendingData's shuffler business.  For the marketplace, however, the result was the same as it was with the CARD litigation:  SHFL eliminated another competitor, leaving its casino customers and potential customers with no "alternative to Shuffle Master's shufflers available to them."

### 3)      *Shuffle Master v. Taiwan Fulgent Enterprise Co., Ltd.* (2009-2010)

84.     Shortly after SHFL acquired the remaining assets of VendingData, thus consolidating their control over the U.S. market, SHFL filed suit against Taiwan Fulgent Enterprise Co., Ltd. ("Taiwan Fulgent") based on patents from the same family patent family shown to be invalid by CARD in 2004, specifically U.S. 6,588,751, and its progeny patents 7,255,344 and 7,322,576.  Case 2:09-cv-02194 (D. Nev.), filed Nov. 17, 2009.  The case was quickly dismissed on February 23, 2010 on undisclosed terms and, upon information and belief, Taiwan Fulgent has discontinued all marketing and sales of shufflers in the United States, again depriving the relevant marketplace of any competition.

4)      *Shuffle Master v. TCS John Huxley* **(2012-2013)**

85.      SHFL filed suit against gaming equipment distributor John Huxley ("TCS") on September 14, 2012, based on patents from the same family patent family that was shown to be invalid by CARD in 2004.  Case 2:12-CV-01626 (D. Nev.), filed Sept. 14, 2012.  Specifically, SHFL asserted U.S. patents 6,254,096; 6,588,751; 7,059,602; and 7,073,791 against TCS.  This case was quickly dismissed on undisclosed terms and, upon information and belief, TCS has discontinued marketing any shufflers in the United States, again depriving the relevant marketplace of competition.


## COUNT ONE

# Declaratory judgment of patent
# misuse, invalidity and unenforceability

86.      Plaintiffs repeat and incorporate by reference the allegations set forth in each of the preceding paragraphs, and, in particular, paragraphs 13-85.

87.      During prosecution of the '982 and '935 patents, one or more people substantially involved in the preparation and/or prosecution of those patents withheld material information from the USPTO with the intent to, and effect of, deceiving the USPTO and for the purpose, and with the effect of, obtaining patents that would not have otherwise issued.

88.      SHFL is the assignee of the '982 and '935 patents.  Pursuant to 37 CFR§ 1.56, all officers, employers, consultants and attorneys employed by SHFL who were substantially involved in the preparation or prosecution of the '982 and '935 patents – especially the named inventors working at SHFL – had a duty to disclose to the Patent Office information known or thought to be material to the patentability of the inventions claimed in these patents.

89.     Mark Litman was the principal patent attorney responsible for the prosecution of the original applications for '982 and '935.  Pursuant to 37 CFR § 1.56, Mark Litman had a duty to disclose to the USPTO information material to the patentability of the inventions claimed in the '982 and '935 patents.

90.     Allan Fanuchi was the principal patent attorney responsible for the prosecution of the '982 and '935 patents during their *ex parte* reexamination.  Pursuant to 37 CFR § 1.56, Allan Fanuchi also had a duty to disclose to the USPTO information material to the patentability of the inventions claimed in the '982 and '935 patents.

91.     Attila Grauzer is one of the named inventors of the '982 and '935 patents.  He was also, upon information and belief, the Director of Product Development for SHFL and was substantially involved in the prosecution of the '982 and '935 patents.  Pursuant to 37 CFR § 1.56, Attila Grauzer had a duty to disclose to the USPTO information material to the patentability of the inventions claimed in the '982 and '935 patents.

92.     Upon information and belief, one or more people from SHFL substantially involved in the preparation and prosecution of the '982 and '935 patents, including Attila Grauzer and other named inventors, observed the Roblejo Prototype/Sure Shuffler in operation at the '97 World Gaming Congress and Expo and/or saw the sales brochure from Casino Concepts. Shortly after the Expo concluded on October 16, 1997, one of the people at SHFL attending the Expo circulated a document titled "97 World Gaming Expo: Report on Shuffler Competition." *CARD v. SHFL*, SMI 10395-96.  Upon information and belief, this report provided a description of the SureShuffler shown at the expo and included the sales brochure or a summary thereof for the SureShuffler, along with a business card from Dr. Roblejo.  *CARD v. SHFL,* SMI 10397-99, 10401.  This report also included descriptions and information about four other competing card

shufflers displayed at the expo, including the Quick Draw shuffler and CARD's Shuffle Star shuffler. On information and belief, this report and the attached sales brochure were read by one or more people from SHFL substantially involved in the preparation or prosecution of the '982 and '935 patents, including Attila Grauzer and/or one of the other five named inventors working at SHFL.

93. Significantly, USPTO guidelines specifically state that information material to patentability may include information learned from "co-workers, trade shows, communications from or with competitors, potential infringers, or other third parties." MANUAL OF PATENT EXAMINING PROCEDURE § 2001.06. (8th ed. Aug 2001).

94. One or more people from SHFL substantially involved in the preparation and prosecution of the '982 and '935 patents, including Attila Grauzer and/or other named inventors, and/or SHFL's patent attorney, Mark Litman, were aware of the 1992-1993 Luciano ACS Prototype no later than October 23, 2003, the time of filing of the Luciano Declaration. Luciano Declaration, CARD case, Dkt. 86. Attila Grauzer specifically evaluated the Luciano ACS materials set forth in the Luciano Declaration, and set forth opinions from his review of the Luciano Declaration and its exhibits in his own declaration filed on November 6, 2003. Declaration of Attila Grauzer, November 26, 2003, at Dkt. 109, paragraphs 23-26. Grauzer and SHFL patent attorney Mark Litman disclosed the Luciano evidence in more than 20 other shuffler applications between 2004 and 2009, when the '935 patent issued, but failed to disclose the Luciano prior art to the examiner in the '935 application or in any other CIP or divisional application from the '981, '982, and '935 patents.

95. One or more people from SHFL substantially involved in the preparation and prosecution of the '982 and '935 patents, including Attila Grauzer and other named inventors,

and/or SHFL's patent attorney Mark Litman, were aware of the Block '044 patent no later than July 17, 2003, when attorney Litman and named inventor Grauzer included a description of the Block '044 patent in the specification of another unrelated patent application with the serial number PCT/2005/009561 A2 titled "Smart Discard Rack For Playing Cards."

96.     On information and belief, one or more people from SHFL substantially involved in the preparation or prosecution of the '982 and '935 patents, including Mark Litman, Alan Fanuchi, Attila Grauzer, and/or other named inventors working at SHFL, withheld from the USPTO, with the intent to deceive:  (a) information about the Sure Shuffler and other competing card shufflers displayed at the '97 World Gaming Congress and Expo; (b) information about the 1992-1993 Luciano ACS that was obtained no later than October 2003 during the CARD lawsuit; and (c) information about the Block '044 patent.

97.     The information was material because each of these three prior art references established, either by itself or in combination with other information, a *prima facie* case of unpatentability under 35 U.S.C. §§ 102-103 with respect to the claimed inventions of '982 and '935 patents.

98.     Any reasonable examiner would have considered the Sure Shuffler and the other competing card shufflers displayed at the '97 World Gaming Congress and Expo, and the Luciano and Block references critical to the patentability of the inventions claimed in the '982 and '935 patents and would have rejected the claims that issued and were later asserted in the subsequent litigations detailed above.

99.     SHFL has further misused its patent rights by knowingly asserting invalid and unenforceable patent claims, and by misrepresenting the scope of its claims, against each of the defendants described above.  SHFL's overly broad and misleading claim constructions in the

above-described litigation are contrary to the statements that SHFL made to the USPTO during the prosecution and *ex parte* reexamination proceedings of the same patents at issue in such litigations in order to overcome prior art.

100.    SHFL's assertion of knowingly invalid, unenforceable and non-infringed claims was for the purpose, and with the effect of, substantially lessening competition and attempting to create, and creating, a substantial restraint on trade and an actual monopoly in the relevant markets described above.

101.    This misuse further renders the patents at issue unenforceable.

102.    The '982 and '935 (and progeny) patents are thus unenforceable due to inequitable conduct during prosecution, reexamination and litigation.


## COUNT TWO

# Violation of Sherman Act, § 2:  Monopolization of the relevant market

103.    Plaintiffs repeat and incorporate by reference the allegations set forth in each of the preceding paragraphs, and, in particular, paragraphs 13-102.

104.    Prior to its sham litigation and resultant acquisition of CARD in 2004 and the shuffler assets and data of VendingData in 2009, SHFL already had near-dominant market share and market power in the relevant market.

105.    By falsely suing and subsequently acquiring CARD and VendingData, SHFL's market share of the relevant U.S. market increased to virtually 100%, and the resultant market power further increased SHFL's ability to raise prices, restrain and exclude competition, and preclude new entrants from the relevant market.

106.    SHFL's sham litigations against Taiwan Fulgent and TCS Huxley described in preceding paragraphs 82-83 were also part and parcel of SHFL's sham patent infringement

litigation strategy, as set forth in detail in the preceding paragraphs. Those sham litigations and the subsequent departures of those entities from the U.S. market further reduced competition and enhanced SHFL's monopoly power in the relevant market.

107. SHFL's sham litigation against Digideal was part and parcel of the same unlawful strategy to monopolize and maintain SHFL's monopoly of the relevant market and, like SHFL's litigation against CARD, Vending Data, Taiwan Fulgent and TCS Huxley, was predicated on objectively baseless patent infringement claims which were motivated by a desire to impose collateral, anti-competitive injury on each of the preceding entities, their customers and the market itself.

108. By engaging in the above-described predatory acts, SHFL has willfully acquired, maintained, and enhanced its monopoly power in the relevant market. The Defendants dominate the market for card shufflers, having nearly 100% of the market. A few small firms like Shuffle Tech have attempted unsuccessfully to compete with SHFL. The demand for card shufflers is generally limited to professional casinos, the number of which is strictly regulated. Virtually all of these casinos feature card games and virtually all of them possess card shufflers. Accordingly, sales made by Defendants by falsely claiming that Defendants' own products are covered by the '982 and '935 patents, and that the Plaintiffs and others infringe these patents, have caused, and are causing, severe damage to the market for card shufflers, to Plaintiffs, to other potential providers of shufflers, and to other participants in the relevant card shuffler market, such as the casinos and their customers, in the form of lost sales, higher prices, and damages to goodwill.

109. By reason of these continuing violations, Shuffle Tech, Poydras, Digideal, and Aces Up, as well as the casino customers or potential customers of automatic shufflers in the

relevant market, as well as the market itself, have been, and will continue to be, injured in their business and property. Plaintiffs' actual damages exceed $100 million dollars. The commitment damage to the relevant shuffler market is incalculable, in part because it may be impossible to ever effectively replace the competition and potential competition eliminated by SHFL over the many years of its litigate-and-acquire strategy or to compensate SHFL's customers' casinos for their losses by way of higher prices, decreased competition in service and quality, and the benefit of the innovations that could have occurred, but have been stifled by SHFL.

110.    Shuffle Tech, Poydras and Aces Up are entitled to treble damages and to injunctive relief under Section 2 of the Sherman Act and Section 16 of the Clayton Act (15 U.S.C. §§ 2 and 26) to prevent and further restrain predatory conduct by SHFL and to prevent the expansion, maintenance or continuation of SHFL's monopolization of the relevant markets.

111.    Shuffle Tech, Poydras and Aces Up are also entitled to the costs of prosecuting this action, including their reasonable attorneys' fees.

## COUNT THREE

## Violations of Section 7 of the Clayton Act

112.    Plaintiffs repeat and incorporate by reference all of the allegations set forth in the preceding paragraphs and, in particular, paragraphs 13-111.

113.    SHFL's multiple acquisitions of substantially all card shuffler companies and technology, as set forth in detail above, has substantially decreased and eliminated competition and created a monopoly in the relevant market described above. As a result of such acquisitions, SHFL now owns and controls virtually all of the card shufflers in the relevant market and has the

market power to raise prices to supra-competitive levels, to raise artificial barriers to entry, and to exclude any potential competition that may still exist.

114.    SHFL now controls virtually 100% of the relevant U.S. market as a result of its series of sham litigations and acquisitions.

115.    SHFL's acts and conduct have injured and will continue to injure Shuffle Tech, Poydras, Digideal, and Aces Up, as well as SHFL's casino customers, in their business and property including, *inter alia*, Shuffle Tech's, Poydras', Digideal's, and Aces Up's reduced (or eliminated) ability to make sales to customers and to enter into joint ventures, license agreements, and other transactions with customers, potential customers, the eliminated entities, and those who may be intimidated from entering the relevant market.  Such transactions and business arrangements would have, and would, benefit competition, product diversity and consumer choice in the relevant markets.

116.    Shuffle Tech, Poydras and Aces Up are entitled to their actual damages, which exceed $100 million dollars, trebled, plus such equitable, declaratory, and injunctive relief as the court deems appropriate to the circumstances, in addition to their costs, including reasonable attorneys' fees.


## COUNT FOUR

## Violation of Section 43(a) of the Lanham Act

117.    Plaintiffs repeat and re-allege the allegations of the preceding paragraphs 13-116 as though fully set forth herein.

118.    Defendants have made false, deceptive and unlawful threats of patent infringement to Plaintiffs and others engaged in interstate commerce, including the entities previously described, such as:  CARD, VendingData, Taiwan Fulgent, TCS John Huxley and

Digideal. Defendants have attempted to prohibit Plaintiffs, Plaintiffs' customers, licensors, and dealers, including Digideal and Aces Up from engaging in lawful competition regarding the sale and promotion of card shufflers, including by filing sham patent infringement lawsuits against the above entities.

119. Defendants have intentionally misrepresented in interstate commerce that the card shufflers sold, advertised, and promoted by Defendants are protected by valid and subsisting U.S. patents (especially the '982 and '935 patents), even though Defendants knew those patents to be invalid, unenforceable and not infringed because, *inter alia*, invalidating prior art was suppressed during the prosecution of those patents before the USPTO, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

120. At the time that Defendants made such threats and misrepresentations, Defendants knew those threats and misrepresentations were completely and objectively baseless and that the accused infringers' sale and promotion of card shufflers was lawful and non-infringing competition.

121. Defendants' purpose was to injure Plaintiffs, Digideal, CARD, VendingData, and others, and to injure competition.

122. At least the following three prior art references, all known to SHFL beginning in October 1997, but not disclosed by SHFL to the USPTO during prosecution or reexamination, support a *prima facie* case of anticipation and/or obviousness against all '982 and '935 claims asserted against Digideal: (a) the Roblejo Prototypes, (b) the Luciano Prototypes, and (c) U.S. Patent 6,361,044 to Block.

123. Accordingly, and notwithstanding the fact that the patents were allowed to issue as the result of the SHFL's failure to provide a full and complete disclosure to the USPTO

examiner, SHFL knew that the '982 and '935 patents were invalid and unenforceable since the prior art references that anticipated and/or rendered those patents obvious were in SHFL's possession during the prosecution and reexamination of those patents before the USPTO and during the described sham litigations.

124. As reflected in documents SHFL filed with the USPTO and the courts in the multiple sham litigations, these facts were known by SHFL prior to the conduct complained of herein, yet Defendants continued to wrongfully, deceptively and falsely enforce the patent after being aware of these facts. Defendants made their objectively baseless infringement claims with the intent to deceive, mislead, harass, and intimate accused infringers and others in an effort to gain an unlawful and unfair competitive advantage.

125. The Defendants dominate the market for card shufflers, having nearly 100% of the market. A few small firms like Shuffle Tech have been (or are) direct competitors of SHFL. The demand for card shufflers is generally limited to professional casinos, the number of which is strictly regulated. Virtually all of these casinos feature card games and virtually all of them possess card shufflers. Accordingly, sales made by Defendants by falsely claiming that Defendants' own products are covered by the '982 and '935 patents, and that the Plaintiffs and others infringe these patents, have caused, and are causing, severe damage to the market for card shufflers, to Plaintiffs, to other potential providers of shufflers, and to other participants in the relevant card shuffler market, such as the casinos and their customers, in the form of lost sales, higher prices, and damages to goodwill. Defendants have specifically damaged Plaintiffs' reputation in the marketplace by falsely and publicly accusing Plaintiffs' licensee, Digideal, of infringing the invalid '982 and '935 patents.

126.    While difficult to precisely establish, such damages are extensive and are continuing.  Because of the difficulty in ascertaining Plaintiffs' damages, both in the past and in the future, and the irreparable harm caused to Plaintiffs by Defendants' actions, Plaintiffs are entitled to preliminary and permanent injunctions against Defendants to stop further misrepresentations and violations of the Lanham Act, to cease all enforcement of the '982 and '935 patents, and to a declaration that these patents are wholly unenforceable for patent misuse.

127.    Pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117, Plaintiffs are entitled to recover three times the actual damages sustained by them, to recover the costs of this action, and to recover Defendants' profits derived from their misrepresentations and violations of the Lanham Act.  Because this is an exceptional case, Plaintiffs are also entitled to recover their reasonable attorneys' fees.

## COUNT FIVE

## Unfair competition under 815 ILCS 505/2

128.    Plaintiffs repeat and re-allege the allegations of the foregoing paragraphs and in particular paragraphs 13-127 of this Complaint.

129.    Defendants suppressed and concealed invalidating prior art (such as the Roblejo prototypes, the Luciano prototypes, and the Block '044 patent) to cause invalid and unenforceable patents '982 and '935 to issue.  These invalid patents were then used by Defendants in sham patent infringement litigation against Plaintiffs' licensee, Digideal, and others to foreclose competition.  These activities constitute unfair competition and/or unjust enrichment that is prohibited under Illinois statutes (e.g., 815 ILCS 505/2) and common law.

130.    Defendants' actions involves trade practices directed to the marketplace and to consumers, and are likely to cause and, on information and belief, have caused consumer

confusion, thereby harming and deceiving consumers as well as Plaintiffs. This is especially injurious in Illinois because Illinois' Riverboat Gambling Act, enacted in Feb. 1990, establishes the Illinois Gaming Board and authorizes only up to ten casino licenses. All ten licenses have been granted, so essentially the entire universe of potential customers for card shufflers in the entire state of Illinois consists of: the Argosy Casino (Alton), Par-A-Dice Casino (East Peoria), Jumer's Casino & Hotel (Rock Island), Hollywood Casino (Joliet), Harrah's Metropolis Casino & Hotel (Metropolis), Harrah's Joliet Casino & Hotel (Joliet), Hollywood Casino (Aurora), Casino Queen (East St. Louis), Grand Victoria Casino (Elgin), and Rivers Casino (Des Plaines). All of these casinos feature card games using card shufflers. Accordingly, sales made by Defendants by falsely claiming that Defendants' own products are covered by the '982 and '935 patents, and that the Plaintiffs' licensee and others infringe these patents, have caused, and are causing, severe damage to the Illinois market for card shufflers, to Plaintiffs, to other potential providers of card shufflers, and to the casino customers in the card shuffler market in the form of higher prices, lost sales and damages to goodwill. On information and belief, there are no other sellers or lessors of card shufflers in Illinois besides Defendants.

131.    Defendants' improper and unlawful actions justify the award of compensatory and punitive damages, a disgorgement of profits, an accounting, and injunctive and other equitable relief.

132.    The willful and deliberate nature of Defendants' actions justifies the award of damages equal to their profits arising from sales of the offending products and, in addition, justifies the award of enhanced damages.

133.    The willful and deliberate nature of Defendants' actions also justifies the award of Plaintiffs' reasonable attorneys' fees.

## COUNT SIX

## Deceptive trade practices under 815 ILCS 510/2

134.    Plaintiffs repeat and re-allege the allegations of the preceding paragraphs of this Complaint and, in particular, the allegations of paragraphs 13-133.

135.    Defendants' knowingly false representations that the '982 and '935 patents were valid and enforceable created significant misunderstanding in the market for card shufflers since products made under those patents were not in actuality entitled to patent protection.

136.    Defendants also disparaged Plaintiffs' card shufflers by filing a sham patent infringement action, making the false representation that products made under Plaintiffs' patents infringed Defendants' '982 and '935 patents – which Defendants knew were invalid, not infringed and unenforceable.  Such improper use of patents known to be invalid or not infringed to injured competition and competitors constitutes a deceptive trade practice prohibited under Illinois common law and statutes, *e.g.*, 815 ILCS 510/2.

137.    Defendants' conduct involves trade practices directed to the marketplace and to consumers and is likely to cause and, on information and belief, has caused misunderstanding, thereby harming and deceiving consumers as well as Plaintiffs.   The Illinois' Riverboat Gambling Act, enacted in Feb. 1990, established the Illinois Gaming Board and authorized it to grant only up to ten casino licenses.  All ten licenses have been granted, so essentially the entire universe of potential customers for card shufflers in the entire state of Illinois consists of the ten casinos listed above in Count Five.  All of these casinos feature card games and card shufflers. Accordingly, sales made by Defendants by falsely claiming that Defendants' own products are covered by the '982 and '935 patents, and that the Plaintiffs and others infringe these patents, have caused, and are causing, severe damage to the market for card shufflers, to Plaintiffs, to

other potential providers of card shufflers, and to other participants in the card shuffler market, such as casinos, in the form of higher prices, diminished competition, lost sales, price erosion, and damages to goodwill – shutting all potential customers completely out of the market for card shufflers in Illinois.

138.     Defendants' improper actions justify the award of equitable and other relief, including actual and punitive damages.

139.     The willful and deliberate nature of Defendants' actions justifies the award of damages equal to their profits arising from sales of the offending products and, in addition, justifies the award of enhanced damages.

140.     The willful and deliberate nature of Defendants' actions also justifies the award of Plaintiffs' reasonable attorneys' fees.

## Relief sought

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     That the aforesaid acts by SHFL be determined to constitute acts of patent misuse, monopolization and attempts to monopolize in violation of Section 2 of the Sherman Antitrust Act, unlawful acquisitions in violation of Section 7 of the Clayton Act, and unfair and deceptive trade practices under the Lanham Act and above-cited Illinois statutes, and that each of these violations have injured Plaintiff's businesses and property, as well as competition itself in the relevant market.

B.     That the Court determine that each of the claims of the SHFL patents at issue are invalid and not infringed by any of the products of any of the entities against whom such patents were asserted by SHFL including, in particular, the claims asserted against Digideal.

44

C.     That the Court determine that Plaintiffs have been injured in their property and business in an amount of not less than $100,000,000 in compensatory damages and that Plaintiffs will continue to be irreparably damaged in their property and business by the aforesaid unfair, anticompetitive, monopolistic, and deceptive conduct and violations of statutory and common law, unless enjoined by this Court.

D.     That the Court award Plaintiffs their compensatory damages, of not less than $100,000,000, enhanced/trebled as provided in the Sherman, Clayton, and Lanham Acts, and the cited Illinois statutes, plus such injunctive and other relief as may be just and equitable.

E.     That the Court award Plaintiffs' their costs, including attorneys' fees, in preparing and litigating this action.

F.     That the Court, pursuant to the Lanham Act and the above-cited Illinois statutes, 815 ILCS 505/2, and 815 ILCS 510/2 award Plaintiffs all of Defendants' unlawful profits derived from their unfair and deceptive conduct in violation of such statutes.

G.     That the Court declare that SHFL's '982 and '935 patents, and such continuations, continuations-in-part and divisionals thereof as were affected by the inequitable conduct described above are unenforceable by Defendants and those acting in concert or privity with Defendants as a result of SHFL's patent misuse, inequitable conduct and sham litigation, and enjoining any further enforcement of such patents by Defendants and those acting in concert or in privity with Defendants.

H.     Awarding such other and further relief as the Court deems just and equitable under the circumstances of this case.

# Demand for jury trial

Plaintiffs demand a trial by jury under FED.R.CIV.P. 38(b) and the Seventh Amendment to the U.S. Constitution of all issues triable as of right by jury in this action.

April 28, 2015

Respectfully submitted,

/s/ *Jacob D. Koering*
Jonathan Hill
jhill@freeborn.com
Jacob D. Koering
jkoering@freeborn.com
FREEBORN & PETERS LLP
311 South Wacker Drive, #3000
Chicago, IL 60606
Phone: 312-360-6643
Fax: 312-360-6520

Robert A. Rowan (*Pro hac vice pending*)
rar@nixonvan.com
Joseph S. Presta (*Pro hac vice pending*)
jsp@nixonvan.com
Michael E. Crawford (*Pro hac vice pending*)
mec@nixonvan.com
NIXON & VANDERHYE P.C.
901 North Glebe Rd.
Arlington, Virginia 22203
Phone: 703-816-4000
Fax: 703-816-4100

*Attorneys for Plaintiffs*
SHUFFLE TECH INTERNATIONAL, LLC,
ACES UP GAMING, INC., and POYDRAS-TALRICK
HOLDINGS LLC