**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SHUFFLE TECH INTERNATIONAL, LLC,** | ) | |
| **ACES UP GAMING, INC., and** | ) | |
| **POYDRAS-TALRICK HOLDINGS LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 15 C 3702** |
| | ) | |
| **SCIENTIFIC GAMES CORPORATION,** | ) | |
| **BALLY TECHNOLOGIES, INC., and** | ) | |
| **BALLY GAMING, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Shuffle Tech International, LLC, Aces Up Gaming, Inc., and Poydras-Talrick

Holdings LLC have sued Scientific Games Corporation, Bally Technologies, Inc., and

Bally Gaming, Inc. Plaintiffs seek a declaratory judgment that two patents held by Bally

Gaming (the '982 patent and the '935 patent) are invalid, unenforceable, or have been

misused. Plaintiffs also seek damages and injunctive relief for defendants' alleged

violations of section 2 of the Sherman Antitrust Act, section 7 of the Clayton Act, section

43(a) of the Lanham Act, and Illinois unfair competition and deceptive trade practices

laws. Defendants have moved to dismiss pursuant to Federal Rules of Civil Procedure

12(b)(1) and 12(b)(6). For the reasons stated below, the Court dismisses Counts 1, 3,

4, 5, and 6 of plaintiffs' complaint as well as all of plaintiffs' claims against defendant

Scientific Games Corporation but otherwise denies defendants' motion.

**Background**

The Court takes the following facts from plaintiffs' complaint, accepting them as true for purposes of the present motion. *See Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 700 (7th Cir. 2014).

In the interest of both speeding up the process and preventing human error and manipulation, inventors have sought since as early as the late nineteenth century to patent and market technologies designed to automate the process of shuffling playing cards. Early card shufflers required human assistance, but by the 1930s, the United States Patent and Trademark Office (USPTO) had begun issuing patents teaching fully automatic shufflers that did not. Over the last twenty-five years, automatic card shufflers have evolved to include onboard computers that randomize card order and instruct the devices to mechanically sort the cards. Inventors have continued to seek and procure patents covering new and different methods and technologies for automatic card shuffling, including by designing technologies to install and smoothly use shufflers that are embedded in the surfaces of gaming tables.

Despite the long history of invention in this area, the card shuffler market is highly concentrated. Plaintiffs allege that prior to its sale and dissolution, SHFL Entertainment, Inc., had 100% of the United States market for card shuffler units sold and leased to casinos and nearly 100% of the worldwide market. In 2013, Bally Technologies, Inc. acquired SHFL and continued its business of selling and leasing SHFL products to casinos. Bally's wholly owned subsidiary, Bally Gaming, Inc., manufactures Bally equipment and owns SHFL patents, including patents U.S. 6,651,982 (the '982 patent) and U.S. 7,523,935 (the '935 patent). Bally and Bally Gaming are alleged to have

assumed all of SHFL's liabilities and to have continued all of its activities after the merger. Adopting the parties' terminology, the Court will primarily refer to Bally and Bally Gaming collectively as SHFL when describing their alleged actions after acquiring the company.

Shuffle Tech International, LLC is engaged in the development and manufacturing of automated playing card shufflers. Since 2008, Shuffle Tech has manufactured and sold several thousand card shufflers for private consumer use, and the USPTO has granted it at least six patents based on its methods and devices for shuffling playing cards. A few years after it began operating in the personal use market, Shuffle Tech sought to break into the casino shuffler market. From 2010 through 2012, it worked to develop a prototype single-deck shuffler intended for casino use, which a well-known independent testing agency certified as effective in March 2012. Shuffle Tech then set about finding a partner to deliver its product to market.

Shuffle Tech executed a patent license agreement with Poydras-Talrick Holdings LLC for Shuffle Tech's patented card shuffler technology. In September 2012, Poydras sublicensed the patented technology to DigiDeal Corporation. Under the DigiDeal license agreement, DigiDeal was authorized to engineer a series of shufflers (based on Shuffle Tech technology) suitable for mass production and use in casinos. DigiDeal agreed to sell, for $4,000 per unit, at least 800 units in 2013 and 1,200 units per year every year after that until at least 2027, when Shuffle Tech's patents will expire. Shuffle Tech also agreed to indemnify DigiDeal under certain narrowly-defined circumstances. The license agreement provided, in pertinent part:

> [Shuffle Tech] shall defend, at its expense, any third-party action, suit, or
> proceeding against [Shuffle Tech], [Poydras] and/or [DigiDeal] ("Claim") to

the extent such Claim is based upon an allegation that a Licensed Product, as of its delivery date under this Agreement, infringes a valid United States patent or copyright or misappropriates a third-party's trade secret, subject to the following limitations:  (a) [Shuffle Tech] shall have approved in writing the specific engineering and design of said Licensed Product, otherwise the terms of this Indemnification shall not apply, (b) [Shuffle Tech's] liability under this section shall be limited to claims of infringement against features described in Licensed Subject Matter, and shall exclude features not specifically described in Licensed Subject Matter unless said features are specifically approved in writing pursuant to 11.1(a), and (c) [Shuffle Tech's] indemnification pursuant to this section shall terminate upon [Poydras's] exercise of the Right of Option or upon the sale of Licensed Subject Matter pursuant to Sections 3.1–3.3.  [Shuffle Tech] will indemnify [Poydras/DigiDeal] and/or for the judgment amount finally awarded by a court or agreed to in a settlement and reasonable attorneys' fees resulting from a Claim as provided in this Section.  The foregoing states [Shuffle Tech's] entire liability and [Poydras's] and [DigiDeal's] sole and exclusive remedy with respect to any infringement or misappropriation of any intellectual property rights of any other party.

Pls.' Resp. to Defs.' Mot. to Dismiss Ex. A, Dkt. #43-1, at 11.

At the 2012 Global Gaming Expo in Las Vegas, Nevada, held on October 2–4, 2012, DigiDeal unveiled DigiShuffle, the single-deck shuffler prototype it had fashioned pursuant to its agreement with Shuffle Tech.  DigiDeal offered customers increased reliability and lower routine maintenance costs than SHFL offered for its industry-leading DeckMate or DeckMate 2.  In addition, DigiDeal proposed a retail price of $10,995 per unit and a lease price of $350 per month for DigiShuffle, significantly less than SHFL's DeckMate, which had a retail price of $16,995 and a lease rate of $450/month, and SHFL's then-newly announced DeckMate 2, which had a retail price of $20,995 and a lease rate of $525/month.

No more than ten days after DigiShuffle's unveiling, SHFL sued DigiDeal in a Nevada federal court for patent infringement.  SHFL accused DigiDeal of infringing the '982 patent (claims 1–3 and 42–46) and the '935 patent (claims 1, 2, 9, 10, 11, and 14),

both of which involve automatic card shufflers. The sole point of novelty and basis for allowance of the '982 claims was an automatically moveable cover over the shuffler's card elevator. The sole point of novelty and basis for allowance of the '935 claims was a card support surface recessed beneath the top surface of the gaming table.

In January 2014, DigiDeal initiated *ex parte* reexaminations of all of the contested claims of both of SHFL's patents. The USPTO found that previously undisclosed prior art raised 136 substantial new questions of patentability regarding the '982 patent and 86 substantial new questions of patentability regarding the '935 patent. The USPTO rejected as obvious over prior art every claim that SHFL had asserted against DigiDeal under either patent.

DigiDeal and Shuffle Tech later discovered that SHFL's records were replete with evidence of prior art of which SHFL had been aware but that it had failed to disclose when prosecuting the '982 and '935 patents, responding to DigiDeal's pointed discovery requests, or submitting to the *ex parte* reexamination of the patents. Specifically, Shuffle Tech alleges that SHFL's records referred to three crucial pieces of undisclosed prior art. First, the records indicated that at the time it prosecuted its patents in 2002 and 2003, SHFL was aware of, but failed to disclose to examiners, prototypes developed in 1995–1997 by Casino Concepts, Inc. known as "the Roblejo Prototypes." The Roblejo Prototypes anticipated every claim of both the '982 and '935 patents. Second, SHFL's records indicated that at the time it prosecuted its patents, it was aware of, but failed to disclose to examiners, the "Luciano Automatic Card Shuffler Prototype," which anticipated claim 1 of the '935 patent and rendered obvious all of the other claims asserted against DigiDeal under the '982 and '935 patents. Third, SHFL's records

indicated that at the time it prosecuted its patents, it was aware that U.S. patent 6,361,044 ("the Block '044 patent") fully described an automatic card shuffler in its detailed description, anticipating and rendering obvious all claims under the '982 and '935 patents. SHFL did not disclose the Block '044 patent when prosecuting the '982 patent, and although it did identify the Block '044 patent in its '935 application, it buried this identification among irrelevant prior art that the examiner was unlikely to read carefully.

Based on these allegations, plaintiffs contend that SHFL filed suit against DigiDeal with full knowledge that its patents were invalid and unenforceable, for no other reason than to litigate DigiDeal and its partners—the plaintiffs in this case—out of the casino shuffler market.

According to plaintiffs, SHFL's suit against DigiDeal was the latest in a string of frivolous suits and claims that SHFL filed against potential competitors in order to discourage competition. In 2003, Casino Austria Research and Development and its subsidiary, CARD, LLC, sued for declaratory judgment of non-infringement of three SHFL-owned patents. SHFL counterclaimed for infringement of those and other patents. CARD submitted document requests to SHFL seeking all records of prior art, and SHFL responded without disclosing records it possessed referring to the Roblejo Prototypes. SHFL then sought and obtained a preliminary injunction that barred CARD from making, using, selling, or testing its card shuffling device. When CARD discovered (without SHFL's assistance) that SHFL likely knew and possessed documents relating to the Roblejo Prototypes, it successfully moved for dissolution of the preliminary injunction, and SHFL produced the Roblejo documents. The documents revealed that

SHFL was aware of but did not disclose the Roblejo Prototypes when prosecuting the patents in suit.  CARD sought a declaratory judgment that at least four SHFL patents were unenforceable because they were procured by inequitable conduct.  The parties stayed the litigation, which was ultimately terminated less than three months later when SHFL acquired CARD for $50 million in May 2004.  After the merger, SHFL's chief executive officer publicly acknowledged that his strategy for inducing CARD to sell itself to SHFL was to force it to incur unmanageable legal fees to defend against a law suit.

In October 2004, the day after VendingData Corporation announced that it would be releasing a new automatic card shuffler, SHFL filed suit against VendingData in a Nevada federal court for patent infringement.  Although VendingData won at summary judgment, it spent more than $1.6 million to defend itself against the law suit and came to understand that if it refused to sell its technology to SHFL, SHFL would continue to sue repeatedly and force VendingData to expend vast amounts of money and resources on litigation.  Accordingly, VendingData sold its shuffler business to SHFL in March 2009 for somewhere between $2.4–2.8 million and a seven year worldwide non-compete agreement.

In November 2009, SHFL sued Taiwan Fulgent Enterprise Co., Ltd., alleging that Taiwan Fulgent had infringed patents from the same family of patents at issue in the CARD litigation.  In September 2012, SHFL filed a similar suit against gaming equipment distributor John Huxley.  Both of these cases were quickly dismissed on undisclosed terms, and in their wakes, each defendant expeditiously exited the casino shuffler market.

The present suit was filed in April 2015.  Shuffle Tech—together with Poydras

and Aces Up Gaming, Inc., a company retained to assist in the manufacture, sales, and distribution of DigiDeal's shufflers under the license agreement—sued Bally, SHFL's successor in interest. Plaintiffs also named as defendants Bally Gaming (Bally's wholly owned subsidiary and owner of the '982 and '935 patents) and Scientific Games Corporation (Bally's parent company). Plaintiffs allege that by way of deliberate non-disclosures, SHFL procured the '982 and '935 patents by fraud and that SHFL later attempted to use the patents to litigate DigiDeal and the plaintiffs out of the casino shuffler market. Plaintiffs seek a declaratory judgment that both patents are invalid, unenforceable, and have been misused. They also seek damages and injunctive relief based on claims that defendants monopolized the casino shuffler market in violation of section 2 of the Sherman Act, 15 U.S.C. § 2; SHFL's acquisitions of CARD and VendingData violated section 7 of the Clayton Act, 15 U.S.C. § 18; and SHFL and its successors in interest engaged in unfair competition in violation of section 43(a) of the Lanham Act, the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2, and Illinois common law by making marketplace misstatements regarding the validity and potential enforcement of their patents.

Defendants have moved to dismiss plaintiffs' declaratory judgment claim and monopolization claims for lack of subject matter jurisdiction. They have also moved to dismiss plaintiffs' Clayton Act section 7 claims, Lanham Act claim, and state law claims for failure to state a claim. Finally, defendants have moved to dismiss all claims against Scientific Games Corporation for failure to state a claim.

**Discussion**

8

When considering a motion to dismiss a complaint, the Court accepts the facts stated in the complaint as true and draws reasonable inferences in favor of the plaintiff. *Newell Operating Co. v. Int'l Union of United Auto., Aerospace, and Agr. Implement Workers of Am.*, 532 F.3d 583, 587 (7th Cir. 2008).  Although the Federal Rules of Civil Procedure do not require a complaint to include "detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). To survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.  Plausibility requires sufficient "facts to raise a reasonable expectation that discovery will reveal evidence" of defendants' liability.  *Id.* at 556.

The Seventh Circuit has held that "the height of the pleading requirement is relative to circumstances." *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir.2009).  In complex cases like the antitrust action at issue here, in which discovery will be complicated, time-consuming, and expensive, "something beyond the mere possibility of loss causation must be alleged, lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value." *Twombly*, 550 U.S. at 557–58 (internal citations omitted).

Defendants have moved to dismiss all of plaintiffs' claims against them.  They argue that the Court does not have jurisdiction to issue the declaratory relief sought because none of the named plaintiffs have standing to challenge the '982 or '935

patents. In the same vein, defendants assert that Shuffle Tech, Poydras, and Aces Up all lack antitrust standing because the injuries they allege are not protected under the federal antitrust laws. Additionally, defendants argue that plaintiffs' claims under section 7 of the Clayton Act are time barred and that the facts alleged do not give rise to liability under the Lanham Act or Illinois unfair competition or deceptive trade practices laws. Finally, defendants argue that Scientific Games Corporation is not a proper defendant because plaintiffs have alleged unlawful activity on the part of its subsidiaries and have presented no rationale for piercing the corporate veil.

## A.    Claims against Scientific Games Corporation

Although they devote only a footnote to the argument in their opening brief, defendants contend that plaintiffs have failed to state any viable claims against Scientific Games. Plaintiffs contend that Scientific Games is a proper defendant because Bally, Bally Gaming, and Scientific Games comprise a "unitary entity" that reports its income to the Securities and Exchange Commission in a consolidated fashion. Plaintiffs also allege that Scientific Games's officers have made statements reflecting that the three defendants in this case do not operate as distinct corporate entities but instead operate as segments of a single business, each managed by an executive who reports to one chief executive officer. Plaintiffs then list officers of Scientific Games who were officers or employees of SHFL prior to Bally's acquisition of SHFL. Citing *Citizens Electric Corp. v. Bituminous Fire & Marine Insurance Co.*, 68 F.3d 1016 (7th Cir. 1995), and *Maytag Corp. v. Navistar International Transportation Corp.*, 219 F.3d 587 (7th Cir. 2000), plaintiffs seem to contend that Scientific Games's employment of SHFL officers renders it liable for SHFL's pre-merger activities.

10

As an initial matter, plaintiffs' reliance on *Citizens Electric* and *Maytag* is misplaced. *Citizens Electric* does hold that companies can be held liable for the acts of their directors and officers, but plaintiffs have only alleged that SHFL (both before and after it was acquired) violated federal and state laws. Plaintiffs have not made any allegations relating to the actions of Scientific Games personnel. *Maytag* is likewise off-point. Although *Maytag* holds that the surviving corporation in a merger bears the merged firm's liabilities, plaintiffs' complaint is bereft of any allegations that Scientific Games is the surviving corporation. Rather, plaintiffs have alleged that SHFL merged into Bally Technologies, Scientific Games's wholly owned subsidiary. Accordingly, Scientific Games is a proper party only if plaintiffs have sufficiently alleged a basis to hold Scientific Games liable for the unlawful acts of its wholly owned subsidiaries.

Plaintiffs have not done so. Veil-piercing claims are governed by the law of the state of the corporation whose veil is to be pierced. *On Command Video Corp. v. Roti*, 705 F.3d 267, 272 (7th Cir. 2013). Under the law of Nevada (Bally's incorporation state), a parent company may be held liable for its subsidiary if the plaintiff can show that "(1) the corporation is governed and influenced by the people asserted to be its alter egos, (2) there is a unity of interest and ownership such that the two are inseparable, and (3) '[t]he facts must be such that adherence to the fiction of separate entity would . . . sanction a fraud or promote injustice.'" *House of Brussels Chocolates, Inc. v. Whittington*, 124 Nev. 475, 2008 WL 6096451, at *2 (Nov. 3, 2008) (quoting *Ecklund v. Nevada Wholesale Lumber Co.*, 562 P.2d 479, 479–80 (Nev. 1977)). A plaintiff may show unity of interest by showing "that the financial setup of the corporation is only a sham and caused an injustice." *N. Arlington Med. Bldg., Inc. v. Sanchez*

11

*Const. Co.*, 471 P.2d 240, 244 (Nev. 1970). Courts are instructed to consider "(1) commingling of funds; (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as the [parent's] own; and (5) failure to observe corporate formalities." *LFC Mktg. Grp., Inc. v. Loomis*, 8 P.3d 841, 847 (Nev. 2000).

Plaintiffs have made no allegations against Scientific Games directly, and they have made no allegations that Scientific Games is the alter ego of either Bally or BGI. Without allegations giving rise to a plausible basis to hold Scientific Games either directly or derivatively liable, allegations that are missing in the current version of the complaint, Scientific Games is not a proper defendant. Accordingly, the Court dismisses all claims against Scientific Games, with leave to amend.

## B. Declaratory judgment claim

In Count 1 of their complaint, plaintiffs seek a declaratory judgment that the '982 and '935 patents are invalid and unenforceable because they were procured by fraud on the USPTO. Defendants have moved to dismiss this claim for lack of subject matter jurisdiction.

Article III of the Constitution requires an actual "case" or "controversy" between litigating parties before a court may adjudicate a dispute. A party may bring an action under the Declaratory Judgment Act only if an "actual controversy" exists, 28 U.S.C. § 2201(a), "which is the same as an Article III case or controversy." *Arris Grp., Inc. v. British Telecomms. PLC*, 639 F.3d 1368, 1373 (Fed. Cir. 2011) (internal citations omitted) (citing *Aetna Life Ins. Co. v. Hayworth*, 300 U.S. 227, 239–41 (1937)). The party seeking declaratory judgment must show that an Article III case or controversy existed at the time it filed for declaratory relief. *Arris Grp.*, 639 F.3d at 1373 (citing *King*

12

*Pharm., Inc. v. Eon Labs, Inc.*, 616 F.3d 1267, 1282 (Fed. Cir. 2010)). Federal Circuit law controls the question of whether an actual controversy exists when the underlying merits of the declaratory judgment action involve patent infringement or validity. *3M Co. v. Norton Co.*, 929 F.2d 670, 672 (Fed. Cir. 1991).

For many years, the Federal Circuit determined whether there existed a case or controversy sufficient to give rise to declaratory judgment jurisdiction by assessing whether the declaratory judgment plaintiff had a "reasonable apprehension of imminent suit." *See, e.g.*, *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731 (Fed. Cir. 1988). In 2007, however, the Supreme Court rejected the reasonable apprehension of imminent suit test in favor of a more lenient test. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 132 n.11 (2007). The Court adopted a test that asks whether "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at 127. Under *MedImmune*, a proper dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests," such that the dispute is "real and substantial" and "admi[ts] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.*

Defendants argue that Shuffle Tech, Poydras, and Aces Up lack standing to bring a declaratory judgment action because SHFL never sued or threatened to sue any of the plaintiffs on the '982 or '935 patents. Defendants contend that Shuffle Tech does not have an adverse legal interest to SHFL either in its position as a potential entrant

13

into the casino shufflers market or in its position as indemnitor of DigiDeal. Defendants argue that the indemnity relationship between Shuffle Tech and DigiDeal is irrelevant to this case and that the relationship between Shuffle Tech and DigiDeal is, for purposes of this case, a mere relationship with a customer or client. Relying primarily on *Microchip Technologies, Inc. v. Chamberlain Group, Inc.*, 441 F.3d 936 (Fed. Cir. 2006), defendants assert that plaintiffs lack standing because they seek merely to vindicate an economic interest in clarifying their client's rights under its patents.

Plaintiffs rightly point out that *Microchip* was decided prior to the Supreme Court's decision in *MedImmune*, during a time when the Federal Circuit applied the now-rejected "reasonable apprehension of imminent suit" test. Accordingly, the Court places little weight on the Federal Circuit's determination in that case (and defendants' argument relying on it) that a declaratory judgment plaintiff does not have standing to bring suit when it has no more than "an economic interest in clarifying [its] customers' rights under [the] patents, which may have facilitated the sale of [the declaratory judgment plaintiff's] products." *Microchip*, 441 F.3d at 943. Yet even after *MedImmune*, the Federal Circuit has stood firmly by its position that economic injury is insufficient to confer declaratory judgment standing in patent cases. The court has stated that "[a]n 'adverse legal interest' requires a dispute as to a legal right—for example, an underlying legal cause of action that the declaratory defendant could have brought or threatened to bring. In the absence of a controversy as to a legal right, a mere adverse *economic* interest is insufficient to create declaratory judgment jurisdiction." *Arris Grp.*, 639 F.3d at 1374–75 (emphasis in original).

Of course, one such "underlying legal cause of action" is a claim against a party

whom the declaratory judgment plaintiff has indemnified. *Id.* at 1375. Plaintiffs are correct that under both the old "reasonable apprehension of imminent suit" test and the new, more lenient "adverse legal interest" test, the Federal Circuit has recognized that the existence of an indemnity agreement creates standing for a party to bring a declaratory judgment action even where only that party's customers are threatened with a patent suit.

The Federal Circuit has not held, however, that the mere existence of an indemnity agreement guarantees an indemnitor standing irrespective of the agreement's scope. In *Arris*, the Federal Circuit found standing where there was no written indemnification agreement but state law created a high likelihood that the declaratory judgment plaintiff would be required to indemnify its customers in patent litigation. The present case presents the opposite scenario: an indemnification agreement exists, but by agreement between DigiDeal and Shuffle Tech, there is virtually no likelihood that Shuffle Tech will be required to indemnify DigiDeal under the agreement. The license agreement between Shuffle Tech and DigiDeal expressly defines all licensed products, patent rights, technology rights, and technology improvements, and it defines the licensed field of use for all licensed products. The agreement strictly limits its subject matter to patent rights, technology rights, and technology improvements within the licensed field of use and applied to licensed products. The indemnity provision limits indemnity to "claims of infringement against features described in Licensed Subject Matter." It "exclude[s] features not specifically described in Licensed Subject Matter" and excludes "features not specifically described in Licensed Subject Matter unless said features are specifically approved in writing."

15

Shuffle Tech cites its indemnification agreement as creating the type of legal interest that establishes a dispute befitting declaratory judgment, alleging that pursuant to the agreement, "Shuffle Tech and Poydras were ultimately required to expend over $950,000 to defend DigiDeal from Defendants' baseless and anti-competitive patent infringement allegations in the sham litigation at issue in this case." Pls.' Resp. to Defs.' Mot. to Dismiss, Dkt. #43, at 8. But according to the first amendment to the DigiDeal licensing agreement, Shuffle Tech was not "required to expend" money at all. Instead, it *opted* to assist DigiDeal in defending against SHFL's law suit. Recital F of the amendment states that:

> Shuffle Tech has agreed to pay the cost of the present lawsuit from its share of royalties from the project, subject to repayment by way of Rule 11 Sanctions against SHFL if successful. However, the parties acknowledge that Shuffle Tech is not liable for the costs of this lawsuit pursuant to Paragraph 11(b) of the License Agreement because, among other reasons, no claims of infringement have been asserted against functions of the device described in Licensed Subject Matter, and the indemnification agreement specifically excludes features not explicitly described in Licensed Subject Matter that have not been specifically approved in writing pursuant to Paragraph 11(a). The parties acknowledge that although the present litigation will be paid by Shuffle Tech through its conclusion, SHFL and/or others may continue "harassment" litigation against one or all of the Parties as new shuffler products are introduced, and this will have to be considered a general cost of doing business, and that unless litigation is directed toward Licensed Subject Matter that existed as of the time of execution of the 2012 License Agreement, all such cost of future litigation will be borne equally by the parties.

*Id.*, Ex. B, Dkt #43-2, at 5–6. In short, the indemnity agreement does not obligate Shuffle Tech to defend DigiDeal in SHFL's infringement suit. Rather, the parties have made clear that to the extent Shuffle Tech has participated in the SHFL–DigiDeal litigation, it has done so on a voluntary basis. Voluntary involvement in the indemnified

party's litigation does not give the indemnitor the type of adverse legal interest present in *Arris* and necessary to satisfy *MedImmune*.

Without the indemnity agreement to support its argument, Shuffle Tech is left only with its position as a prospective competitor in casino shufflers and SHFL's history of bringing suit to actively block new market entrants. This argument is essentially that at some point in the future, it is possible that SHFL will either sue DigiDeal (or some other future licensee of Shuffle Tech) for infringement on a claim that is actually covered by a Shuffle Tech indemnity agreement or that SHFL will sue Shuffle Tech itself for infringement of the '982 or '935 patent. Even under *MedImmune*'s more lenient test, this sort of inchoate "adverse legal interest" is too speculative to give rise to an actual controversy within the meaning of the Declaratory Judgment Act. The Court therefore dismisses Count 1 for lack of jurisdiction.

## C.    Antitrust claims under Sherman Act § 2

Defendants next argue that Counts 2 and 3 of plaintiffs' complaint should be dismissed because none of the plaintiffs have standing to bring an antitrust action against defendants. In support of this argument, defendants assert that plaintiffs are neither consumers nor competitors in the allegedly-restrained market: Poydras is an investor, Aces Up is a seller and distributor (the complaint does not say whether it sells and distributes shufflers to casinos), and Shuffle Tech makes shufflers for personal rather than casino use. According to defendants, plaintiffs have suffered nothing more than speculative downstream profit loss arising out of a patent license agreement, which is not an antitrust injury. Plaintiffs respond that they need not manufacture casino grade shufflers in order to suffer antitrust injury from SHFL's monopolistic behavior in the

17

casino shuffler market.  Because the DigiShuffle was designed pursuant to Shuffle Tech's license agreement, plaintiffs say, SHFL's suit seeking to prevent DigiDeal from introducing the device to the casino shuffler market was directed squarely at preventing Shuffle Tech from joining the casino shuffler market or introducing products based on Shuffle Tech designs.

In general, patent holders who bring infringement suits to enforce their patents are immune from antitrust liability arising from the filing of suit.  *See Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993).  Under *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965), however, "the enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements necessary to a § 2 case are present."  *Id.* at 174.  Plaintiffs' antitrust claims under section 2 of the Sherman Act are premised on its allegations that SHFL first fraudulently obtained numerous patents (including the '982 and '935 patents) by failing to disclose crucial prior art and then sought to enforce those patents by knowingly filing meritless infringement lawsuits against competitors in order to force them out of the market.  Plaintiffs seek damages pursuant to Clayton Act section 4[1] and injunctive relief pursuant to Clayton Act section 16.

Even if plaintiffs have plausibly alleged a *Walker Process* claim, they can proceed with the claim only if they are properly situated to sue under the antitrust laws.

---

[1] In the complaint, plaintiffs allege that they are "entitled to treble damages and to injunctive relief under section 2 of the Sherman Act and Section 16 of the Clayton Act," but they make no reference to section 4.  Section 4 of the Clayton Act is the provision of the antitrust laws that grants a statutory right of private action to seek actual and treble damages for antitrust law violations, and accordingly it must be the method by which plaintiffs seek to vindicate their alleged rights.

*Local Beauty Supply, Inc. v. Lamaur Inc.*, 787 F.2d 1197 (7th Cir. 1986).  This means, according to the Supreme Court and the Seventh Circuit, that plaintiffs must show two things:  they must have standing to bring an antitrust suit, and they must allege that they have sustained antitrust injury.  *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 nn. 5 & 6; *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993).  The Supreme Court has required plaintiffs to show "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487–88 (1977) (emphasis in original).  "In establishing antitrust injury, courts must first delineate the *type* of interests protected by the antitrust laws, . . . and second, must determine whether the violation was the cause-in-fact of the injury:  that 'but for' the violation, the injury would not have occurred." *Greater Rockford Energy*, 998 F.2d at 395 (emphasis in original).  Standing, meanwhile, is limited to potential plaintiffs who are in the optimal position to vindicate antitrust infractions.  *Id.* (antitrust standing exists where the plaintiff alleges "a direct link between the antitrust violation and the antitrust injury"); *In re Indus. Gas Antitrust Litig. (Bichan v. Chemetron Corp.)*, 681 F.2d 514, 516, 519 (7th Cir. 1982).  Factors courts must consider when deciding whether a plaintiff has standing include "the potential for duplicative recovery, the complexity of apportioning damages, and the existence of other parties that have been more directly harmed." *Cargill*, 479 U.S. at 111 n.6 (citing *Associated Gen. Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 544–45 (1983)).

The Court initially notes that the parties' dispute, as expressed in their briefs,

19

over the Federal Circuit's approach to determining the degree of overlap between standing to bring a declaratory judgment action for patent invalidity and *Walker Process* standing is beside the point.  Although Federal Circuit law governs the merits of antitrust suits arising out of a patentee's conduct enforcing its patent, the Federal Circuit applies "the law of the appropriate regional circuit to issues involving other elements of antitrust law such as relevant market, market power, damages, etc." *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998).  Put differently, the question of whether a plaintiff has sought to enforce a patent obtained by defrauding the USPTO is governed by Federal Circuit law, but all remaining antitrust questions—including standing and antitrust injury—must be resolved "according to the substantive antitrust laws of the regional circuit." *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1362 (Fed. Cir. 2004).

Defendants characterize plaintiffs' alleged injury as a downstream loss of speculative future profits, which defendants argue is not an "antitrust injury." Defendants assert that plaintiffs' only claimed injuries are lost future royalties under the DigiDeal licensing agreement and litigation costs Shuffle Tech has paid to defend DigiDeal in the Nevada action.  Defendants contend that neither of these injuries is the type of injury the antitrust laws are designed to protect and neither places plaintiffs in the "best position to vindicate the antitrust infraction." *Greater Rockford Energy*, 998 F.2d at 395.

As for injury, the cases in which the Seventh Circuit has found plaintiffs to be lacking antitrust injury differ significantly from this one.  In *Local Beauty Supply*, for example, the Seventh Circuit held that a plaintiff did not suffer antitrust injury because

20

the injury alleged was a direct result of *increased* competition in the marketplace caused by defendant's unlawful acts. Awarding damages or an injunction in such circumstances, explained the court, "would be 'inimical to the purpose of these [antitrust] laws.'" *Local Beauty Supply*, 787 F.2d at 1202 (quoting *Brunswick*, 429 U.S. at 488). In *Bichan*, the court held that an employee who claimed he was terminated and blacklisted because he undermined a price fixing scheme did not allege an antitrust injury because the anticompetitive effects of price fixing did not cause his termination. *Bichan*, 681 F.2d at 515. And in *Greater Rockford Energy*, the Seventh Circuit found no antitrust injury where, due to "numerous intervening economic and market factors," defendant's alleged violation of the Gasohol Act was not a but-for cause of the plaintiff's lost sales. *Greater Rockford Energy*, 998 F.2d at 402.

By contrast, the plaintiffs in the present case contend that SHFL's patent abuse limited competition in the casino shuffler market and directly prevented DigiDeal from practicing Shuffle Tech's licensed patents. Putting aside whether the indemnity clause required Shuffle Tech to indemnify DigiDeal for SHFL's suit, plaintiffs contend that SHFL's fraud on the USPTO and subsequent patent enforcement action against DigiDeal was an act of monopolization intended to prevent Shuffle Tech, Poydras, and Aces Up from participating in the casino shuffler market through the license agreement with DigiDeal.

As plaintiffs point out, the Seventh Circuit directly addressed whether a plaintiff in their position suffers antitrust injury *Grip-Pak, Inc. v. Illinois Tool Works, Inc.*, 694 F.2d 466 (7th Cir. 1982). In *Grip-Pak*, a company that sought to engage in the business of producing plastic "six-pack holders" for beer and other canned drinks alleged that the

defendant, which occupied ninety percent of the market for the product, violated the antitrust laws by acquiring every existing patent for plastic six-pack holders, threatening groundless infringement suits to deter would-be competitors, prosecuting bad faith law suits (including one against the plaintiff), acquiring a competitor, dividing markets, and filing a fraudulent patent application. *Id.* at 468. Although the plaintiff in *Grip-Pak* had "designed, and obtained patents on, several models of plastic six-pack holders; [had] entered into several joint ventures looking to eventual production of Grip-Pak holders; [and had] promoted the sale of the holders," it had never manufactured six-pack holders itself. *Id.* at 473. The district court granted summary judgment to the defendant on the ground that the plaintiff had not alleged it had been "injured in its business or property by reason of anything forbidden in the antitrust laws," as section 4 of the Clayton Act, 15 U.S.C. § 15, requires. *Id.* at 468.

Defendants highlight the Seventh Circuit's statement in *Grip-Pak* that "a patentee who licenses the manufacture of the patented product and whose royalties are keyed to his licensee's sales or profits cannot obtain damages caused by an anticompetitive scheme that is directed at the licensee, injures the licensee's business, and by so doing reduces the licensor's royalties." *Id.* at 473. But defendants misread this portion of the opinion, which holds only that a party does not suffer antitrust injury simply by having a licensor-licensee relationship with a party whose sales (and thus the licensor's royalties) decrease as a result of a defendant's anticompetitive conduct. As the court pointed out two paragraphs later:

> The patent license case is an . . . illustration of the reasons behind the doctrine of remoteness of damage. The patent licensor may have suffered no net diminution in his royalties at all. The contraction in the business of the licensee who was the target of an anticompetitive scheme

22

may have led to an expansion in the business of other licensees and hence to an increase in the royalties paid by them to the licensor that offset the decrease in the royalties paid by the first licensee. And if the licensor were allowed to sue, why not everyone else whose fortunes are linked to the victimized licensee-or, if not everyone, at least the licensee's employees, his (other) suppliers, and the merchants who sell to his employees? None of these is more remote from the antitrust violation than the licensor.

But it does not follow from all this that a patent licensor may never get antitrust damages. It is not his status as a licensor but his relationship to the violation that determines his right to sue. If he is the defendant's target, . . . the tort principle of remoteness, absorbed by implication into section 4, would not prevent him from suing. . . .

If the allegations of the complaint are true, which for present purposes we must assume they are, Illinois Tool Works is determined to prevent anyone else from competing with it in the plastic six-pack holder business and, having identified Grip-Pak and its principals as significant potential competitors, is trying to keep it and them out of business. On this theory it is a matter of indifference to Illinois Tool Works whether Grip-Pak manufactures holders or licenses others to do so. The important thing is Grip-Pak's invention. That is what Illinois Tool Works allegedly is trying to destroy. If the inventor, when he is the target of the anticompetitive scheme and not just an innocent bystander, may not sue for damages, anticompetitive behavior may go undeterred by threat of private damage actions. For unless the manufacturers of the product under license have resources specialized to the manufacture of that product, they may not suffer any damages at all from the withdrawal of the product from the market; they may be able to switch without cost to making something else.

*Id.* at 474.

Defendants attempt to distinguish *Grip-Pak* by pointing out that in that case, the plaintiff was actually sued by the defendant, whereas here, the plaintiffs have not been sued or threatened with suit, and the indemnity agreement has not placed them in DigiDeal's shoes. But the fact that the defendant in *Grip-Pak* filed suit against the plaintiff is not what made that plaintiff a target of alleged anticompetitive conduct. Instead, the plaintiff suffered antitrust injury because, according to the plaintiff's

allegations, the defendant was engaged in anticompetitive conduct designed to keep the plaintiff out of the market. *Id.* at 474–75. In the present case, plaintiffs allege that SHFL's suit against DigiDeal was filed with the aim of preventing card shufflers produced under the license agreement from ever making their way into the casino shuffler market. Under *Grip-Pak*, plaintiffs have suffered antitrust injury.

As for antitrust standing, defendants make repeated reference to the concept, but they do not make a clear argument that plaintiffs lack standing to bring its antitrust claims. Defendants seem to have conflated the concepts of antitrust injury and antitrust standing. *See Greater Rockford Energy*, 998 F.2d at 395 ("Lack of standing and antitrust injury often have been invoked interchangeably against a plaintiff even though each concept involves a distinct element of the [antitrust] action."). Defendants' sole argument regarding plaintiffs' standing is that none of the three named plaintiffs is a member of the casino shuffler market and that the party who is best situated to vindicate the purposes of the antitrust laws is DigiDeal, which is not a party to this suit.

As with the plaintiff in *Grip-Pak*, plaintiffs have sufficiently indicated that they intended to enter the casino shuffler market and that they acted on this intent when Shuffle Tech developed its prototype and partnered with Poydras, Aces Up, and DigiDeal. An antitrust suit may be brought where "an antitrust violation snuffs out a potential competitor before he gains a foothold, though he may have invested much money in preparing to enter the violator's market and may have given up lucrative opportunities in other fields. There would be a big gap in the damage remedies of the antitrust laws if the reference to 'its business' in section 4 were read to prevent the recovery of damages by all would-be entrants." *Grip-Pak*, 694 F.2d at 475.

24

Plaintiffs have sufficiently shown that they "intended to enter" the casino shuffler market "and [were] prepared to do so within a reasonable time." *Id.* Because they have sufficiently pleaded facts alleging antitrust injury and supporting antitrust standing, plaintiffs may bring a section 2 claim for damages and injunctive relief pursuant to sections 4 and 16 of the Clayton Act, respectively. The Court declines to dismiss Count 2.

## D. Antitrust claims under Clayton Act § 7

Defendants contend that plaintiffs' claims under section 7 of the Clayton Act are barred by the law's four-year statute of limitations and therefore seek to dismiss Count 3 of Shuffle Tech's complaint for failure to state a claim. Section 7 is the principal federal antitrust statute concerning mergers and acquisitions, stock purchases, and joint ventures. It prohibits acquisitions, both direct and indirect, the effect of which "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. If a party seeks to sue an alleged violator of section 7, it must commence its enforcement action "within four years after the cause of action accrued," or the enforcement action "shall be forever barred." 15 U.S.C. § 15b.

Citing *Z Technologies Corp. v. Lubrizol Corp.*, 753 F.3d 594 (6th Cir. 2014), and *Midwestern Machine Co. v. Northwest Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004), SHFL asserts that a cause of action under Section 7 accrues on the date of the allegedly unlawful merger or acquisition. The underlying acquisitions Shuffle Tech has flagged are SHFL's acquisition of CARD in 2004 and VendingData in 2009, both of which took place significantly more than four years before Shuffle Tech filed this suit on April 28, 2015. Accordingly, defendants say, the Court should dismiss plaintiffs' section 7 claims.

25

Plaintiffs offer two objections to defendants' statute of limitations argument. First, plaintiffs argue that under Seventh Circuit law, an antitrust claim accrues when a plaintiff reasonably discovers it has been injured. Therefore, plaintiffs say, because Shuffle Tech was not a member of the industry before developing its prototypes, plaintiffs could not have discovered their injury—indeed, could not have even sustained one—until that time. Second, plaintiffs argue that even if their claim under section 7 accrued at the time of the mergers, the statute of limitations should be tolled under the equitable doctrine of fraudulent concealment.

Absent equitable tolling, a federal antitrust claim that accrues more than four years prior to a plaintiff's suit is time barred. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). Section 7 claims typically accrue at the time a merger transpires, but the Supreme Court has held that these claims are not strictly limited to challenging initial acquisitions because "'acquisition' as used in § 7 of the Act means holding as well as obtaining assets." *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 240 (1975). As the Seventh Circuit has observed, old activity "is not immunized [by the statute of limitations], if the potential for a reduction in output is created or realized more recently as market conditions change." *U.S. Gypsum Co. v. Indiana Gas Co., Inc.*, 350 F.3d 623, 628 (7th Cir. 2003). The continued retention and use of acquired assets therefore generates a new cause of action when a new use of the acquired assets causes anticompetitive injury within the limitations period. (This doctrine is often referred to as the "hold-and-use" doctrine. *See, e.g.*, *Z Techs.*, 753 F.3d at 595.)

In addition, the Seventh Circuit has held that the statute of limitations governing

26

antitrust actions is subject to the discovery rule. *See In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006). The discovery rule is a federal common law rule that "postpones the beginning of the limitations period from the date when the plaintiff is wronged to the date when he discovers he has been injured." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990). The discovery rule is "read into statutes of limitations in federal-question cases . . . in the absence of a contrary directive from Congress." *Id.*; *see also Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 926 (7th Cir. 2015). Finding no "contrary directive from Congress," the Seventh Circuit has specifically applied the discovery rule to determine the accrual date for purposes of the Clayton Act's statute of limitations. *In re Copper Antitrust Litig.*, 436 F.3d at 789.

Additionally, the Seventh Circuit has permitted tolling of the statute of limitations in antitrust cases based on the equitable doctrine of fraudulent concealment. *See id.* at 790–91. "Fraudulent concealment presupposes that the plaintiff has discovered, or, as required by the discovery rule, should have discovered, that the defendant injured him, and denotes efforts by the defendant—above and beyond the wrongdoing upon which plaintiff's claim is founded—to prevent the plaintiff from suing in time." *Id.* at 791 (internal citations and quotation marks omitted).

To support their argument that plaintiffs' section 7 claims are time-barred, defendants rely on two decisions from other circuits. In *Midwestern Machinery*, the Eighth Circuit affirmed a district court's grant of summary judgment to a defendant accused of violating section 7 by its merger eleven years before the plaintiff filed suit. The plaintiff argued that by engaging in conduct that was only made possible by a prior

27

merger, the defendant was engaged in "continuing violations" of the Clayton Act up to and throughout the limitations period. The plaintiff also argued that the limitations period should be tolled because it could not have calculated its future damages at the time of the merger. Observing that section 7 "exists primarily to arrest, at their incipiency, mergers that could produce anti-competitive results," the Eighth Circuit rejected both arguments. It stated that:

> Unlike a conspiracy or the maintaining of a monopoly, a merger is a discrete act, not an ongoing scheme. A continuing violation theory based on overt acts that further the objectives of an antitrust conspiracy in violation of § 1 of the Sherman Act or that are designed to promote a monopoly in violation of § 2 of that act cannot apply to mergers under § 7 of the Clayton Act. Even if the initial merger violated § 7, it makes little sense to hold that policies were pursued to effectuate the illegal merger as we might in a case involving a conspiracy violating § 1 (e.g., cartel meetings occurred to effectuate a price-fixing agreement) or a case violating § 2 (e.g., ongoing policy of predatory pricing undertaken to effectuate monopolization). Once a merger is completed, there is no continuing violation possible under § 7 that would justify extending the statute of limitations beyond four years.
>
> . . .
>
> Even if the merger itself was unlawful, the continued existence of the merged entity is not a continuing violation: It is simply the natural unabated inertial consequence of the merger. Conducting business is presupposed by the merger itself.

*Midwestern Mach.*, 392 F.3d at 271.

In *Z Technologies*, the Sixth Circuit agreed with the Eighth. Like the plaintiff in *Midwestern Machinery*, the plaintiff in *Z Technologies* sought relief under section 7 on both a "continuing violation" theory and a "hold and use" theory. The court ruled that the continuing violation doctrine does not apply to section 7 claims. The court also concluded that although the statute of limitations restarts when a defendant's new and different use of acquired assets causes antitrust injury after the initial merger, the facts

28

did not show that assets had been "used in a 'new' fashion." *Z Techs.*, 753 F.3d at 598–99, 605.

These cases help illustrate why plaintiffs' fraudulent concealment argument fails. The "fraudulent concealment" that defendants allegedly perpetrated was settling lawsuits against it and acquiring the competitors who brought them, allegedly to prevent anyone from discovering that SHFL had obtained its patents by fraud. Slyly preventing the public from discovering fraud on the USPTO might be the type of inequitable conduct that tolls the statute of limitations for a *Walker Process* claim. It does not, however, prevent discovery that a merger occurred or that it was harmful to competition. This is therefore not the type of conduct that would deceive (and thus delay) a plaintiff with a claim under section 7 for an unlawful merger. Plaintiffs' tolling argument seems really to be a continuing violation argument, and as the Sixth and Eighth Circuits have aptly noted, section 7 simply cannot support such a theory of liability.

The last question regarding the statute of limitations concerns the application of the discovery rule. In this regard, plaintiffs do not contend that during the last four years, new market effects have been felt due to the mergers or the market has changed in such a way as to render old mergers newly anticompetitive. And they do not contend that, at any point in the four years prior to the filing of this lawsuit, defendants undertook measures to change the nature of the prior acquisitions in a way that affected the marketplace or diminished competition. Instead, plaintiffs argue that the earliest possible date that they could have sustained antitrust injury from SHFL's two acquisitions was March 2012, when Shuffle Tech sought to enter the casino shuffler market and developed its prototype for casino use. That, plaintiffs argue, is when they

discovered their injury and thus when the four-year limitations period started to run.

This is not what the discovery rule is for. The discovery rule provides that when a party is injured at the time of a violation, a cause of action accrues for purposes of the statute of limitations when the party discovers its injury. *Cada*, 920 F.2d at 450. It does not provide that a cause of action accrues anytime a prospective plaintiff suffers an injury in the future, even if that party did not exist or suffered no injury at the time of the alleged violation. If this were how the discovery rule worked, plaintiffs entering concentrated markets could bring section 7 suits based on the decades- or centuries-old mergers that initially concentrated them, so long as those plaintiffs sued within four years of entering the market. The statute of limitations would be meaningless.

Defendants argue that the Court should broadly hold that the discovery rule does not apply to section 7 claims. In light of the fact that the discovery rule has so far only been applied to Sherman Act claims brought under Clayton Act section 4 and 16, defendants argue the rule should be applied only in those situations in which it might be difficult to discover that a cause of action accrued—for example, where the antitrust violation arises out of a conspiracy or subtle continuing acts of monopolization. This argument misconstrues the discovery rule as a sort of alternative to tolling, which it is not. The discovery rule does not exist to toll the statute of limitations where antitrust violations are so camouflaged or discreet that injured parties might fail to perceive that a violation has occurred.

But although it may be possible for a cause of action under section 7 to accrue sometime after a merger causes a plaintiff's undiscovered injury, that is not the issue in this case. Plaintiffs claim that SHFL's acquisition of CARD in 2004 and VendingData in

2009 were monopolistic acquisitions that caused anticompetitive harms when they transpired.  At the time SHFL made these acquisitions, plaintiffs were not participants in the casino shuffler market.  Accordingly, plaintiffs do not allege that they were in a position to suffer an injury as a result of the merger.  The discovery rule does not apply where, as here, there was no injury to discover.  The Court therefore dismisses Count 3 as time-barred.

## E.  Unfair competition and deceptive trade practices claims

Finally, plaintiffs assert that defendants violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the Illinois Consumer Fraud and Deceptive Trade Practices Act (CFDTPA), 815 ILCS 505/2, the Illinois Uniform Deceptive Trade Practices Act (UDTPA), 815 ILCS 510/2, and Illinois common law.  Each of these claims is based on one or some combination of three alleged actions taken by defendants:  (1) inequitably securing the '982 and '935 patents; (2) filing "sham" law suits to enforce them; and (3) making "marketplace statements" that undermined competition.

As for marketplace representations, courts have drawn a distinction between representations made in the course of litigation and those made outside of litigation. *See Zenith Elec. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1349 (Fed. Cir. 1985) (noting a difference between a claim whose "gravamen" is marketplace misconduct, rather than abuse of administrative or judicial process).  In their response to defendants' motion to dismiss, plaintiffs say that defendants "completely ignore the Complaint's allegations that Defendants made knowingly false threats and misrepresentations to customers and others in the public marketplace, that their patents were valid and enforceable, that their products were covered by the patents at issue and that the products of Plaintiffs and

31

others infringed those patents, knowing that such statements were false." Pls.' Resp. to Defs.' Mot. to Dismiss at 12. Plaintiffs then list twelve paragraphs in the complaint that purportedly contain allegations of marketplace misrepresentations. A page later, plaintiffs say that the "objectively baseless nature of Defendants' marketplace assertions of patent validity and infringement have been comprehensively pleaded," and they list thirty-eight paragraphs of the complaint that purportedly support this assertion.

Notably, none of the paragraphs to which plaintiffs direct the Court's attention contains an allegation that defendants or their agents made bad faith misrepresentations outside the context of litigation. Many of the paragraphs cited describe SHFL and its attorneys failing to disclose information to patent examiners, failing to comply with discovery requests, and pursuing frivolous lawsuits against competitors in the casino shuffler market. Some describe declarations made by SHFL representatives and attorneys as part of prior litigation. One refers to SHFL's former CEO telling a business periodical that he thought one way to induce the sale of rival companies was by filing suit to force those companies to incur significant legal costs. (Nowhere in the complaint, it should be noted, do plaintiffs allege that this was a misrepresentation. Quite the opposite, in fact: it asserts this was the actual strategy SHFL employed.) Other paragraphs describe SHFL's actions to obtain injunctive relief against other parties. Contrary to plaintiffs' contentions, the only misrepresentations that they have alleged in their complaint are misrepresentations they say SHFL made while prosecuting its patent or pursuing litigation against its competitors. Put another way, plaintiffs have not alleged that defendants made any misrepresentations outside of the litigation or administrative context. The question, then, is whether the Lanham Act,

the CFDTPA, the UDTPA, or Illinois common law protects against misrepresentations made in the course of prosecuting a patent or litigating to enforce it.

Section 43(a)(1) of the Lanham Act prohibits false designations of origin or false or misleading descriptions of goods or services which are likely to cause confusion. 15 U.S.C. § 1125(a)(1). The CFDTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . in the conduct of any trade or commerce." 815 ILCS 505/2. The UDTPA, meanwhile, is violated when, "in the course of his or her business, vocation, or occupation" a person "disparages the goods, services, or business of another by false or misleading representations of fact." 815 ILCS 510/2.

To the extent that plaintiffs' federal and state unfair competition claims are premised on SHFL's inequitable conduct and misrepresentations made in the course of prosecuting the '982 and '935 patents, they have failed to state a claim. "[W]hether alleged inequitable conduct in the prosecution of a patent application constitutes unfair competition" is a question of Federal Circuit law. *Pro-Mold & Tool Co., Inc. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1575 (Fed. Cir. 1996). The Federal Circuit has held that obtaining a patent through inequitable conduct is not a violation of unfair competition laws, because "the established remedy for inequitable conduct is unenforceability of the patent." *Id.* at 1575.

Section 43(a) of the Lanham Act also does not apply to the filing of a lawsuit.

*See Zenith Elec. Corp.*, 182 F.3d at 1349 (holding that "the initiation of an infringement suit is clearly not covered by the text of § 43(a)"). The same can be said of the Illinois statutory and common law plaintiffs have invoked in this case—the proper method to challenge the filing of a meritless lawsuit in Illinois is filing an action for malicious prosecution or abuse of judicial process. *See Havaco of Am., Ltd. v. Hollobow*, 702 F.2d 643, 646 (7th Cir. 1983).

Finally, as for misrepresentations made in the course of litigation, neither the Lanham Act nor Illinois law permits Shuffle Tech's unfair competition claims. Unfair competition claims "based on enforcing a patent in the marketplace, are 'preempted' by federal patent laws, unless the claimant can show that the patent holder acted in 'bad faith' in the publication or enforcement of its patent," *800 Adept, Inc. v. Murex Secs., Ltd.*, 539 F.3d 1354, 1369 (Fed. Cir. 2008), and Shuffle Tech has plausibly alleged that SHFL acted in bad faith. But Shuffle Tech has not alleged any misrepresentations that took place outside the context of administrative or judicial proceedings. Under *Pro-Mold* and *Zenith*, misrepresentations made in the course of litigating a patent infringement suit are not actionable under the Lanham Act. And under Illinois law, misrepresentations made in the course of prosecuting a meritless lawsuit do not give rise to a cause of action at common law or under the CFDTPA or UDTPA because of the litigation privilege, Illinois's "absolute privilege protect[ing] anything said or written in a legal proceeding." *Skopp v. First Fed. Sav. of Wilmette*, 189 Ill. App. 3d 440, 447, 545 N.E.2d 356, 360 (1989); *see also Steffes v. Stepan Co.*, 144 F.3d 1070, 1074 (7th Cir. 1998). Shuffle Tech has therefore failed to state an unfair competition claim under either state or federal law. The Court therefore dismisses Counts 4, 5, and 6 for failure

to state a claim.

## Conclusion

For the foregoing reasons, the Court grants defendants' motion to dismiss Counts 1, 3, 4, 5, and 6 and denies defendants' motion as it pertains to Count 2 [dkt. no. 32]. The Court also dismisses all claims against defendant Scientific Games Corporation.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: October 12, 2015