# EXHIBIT 11

# DEPOSITION OF
# HALVARD H. SOLBERG, JR.

## February 4 - 5, 2004

HIGHLY CONFIDENTIAL

SGC 0000731316

## HALVARD SOLBERG, JR.

Volume: I
Pages: 1-230
Exhibits: 1-25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA
Case No. CV-N-03-0244-ECR-(RAM)
(Consolidated Lead Case Number)
--------------------------------X
CARD, LLC, a Nevada company,          )
    Plaintiff-Counterdefendant,   )
v.                             )
SHUFFLE MASTER, INC., a Minnesota        )
corporation,                    )
    Defendant-Counterclaimant.    )
--------------------------------X
* CAPTION CONTINUED ON NEXT PAGE        )
--------------------------------X
VIDEOTAPED DEPOSITION OF HALVARD H. SOLBERG, JR.
Wednesday, February 4, 2004
9:44 a.m.
Hilton Dedham Place
25 Allied Drive
Dedham, Massachusetts
Reporter: Justina M. deFaria, RMR/CRR

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA
Case No. CV-N-03-0244-ECR-(RAM)
(Consolidated Lead Case Number)
--------------------------------X
CARD, LLC, a Nevada company,          )
    Plaintiff-Counterdefendant,   )
v.                             )
SHUFFLE MASTER, INC., a Minnesota       )
corporation,                    )
    Defendant-Counterclaimant.    )
--------------------------------X
SHUFFLE MASTER, INC., a Minnesota       )
corporation,                    )
    Plaintiff-Counterdefendant,   )
v.                             )
CARD AUSTRIA FORSCHUNGS UND         )
ENTWICKLUNGS, GmbH, d/b/a CARD       )
CASINO AUSTRIA RESEARCH &          )
DEVELOPMENT, GmbH; d/b/a CARD; and      )
d/b/a CARD AUSTRIA, an Austrian       )
Corporation,                   )
    Defendant-Counterplaintiff.    )
--------------------------------X

Page 2

APPEARANCES:

SIDLEY AUSTIN BROWN & WOOD LLP
By Robert B. Morrill, Esq.
555 California Street
San Francisco, California  94104-1715
(415) 772-1200
On behalf of Card and Card Austria

PATENT LAW GROUP LLP
By Brian D. Ogonowsky, Esq.
2635 North First Street, Suite 223
San Jose, California  95134
(408) 382-0480, ext. 202
On behalf of Card and Card Austria

KIRKLAND & ELLIS LLP
By Eric R. Lamison, Esq.
   David S. Olson, Esq.
333 Bush Street
San Francisco, California  94104-2878
(415) 439-1496
On behalf of Shuffle Master, Inc.

Page 3

Also Present:  Jody Urbati, Videographer
   Stuart B. Soffer, IPriori, Inc.
   Jerry Smith, Esq., Shuffle Master

Page 4

1 (Pages 1 to 4)

Legalink San Francisco  (415) 359-2040

HIGHLY CONFIDENTIAL

SGC 0000731317

## HALVARD SOLBERG, JR.

Q. -- that the delay was?

A. No, I cannot.

(Mr. Smith returns to the deposition.)

Q. The -- what role did Mr. Roblejo play in the design of this -- of your 1996 and '97 prototype?

A. In the design?

Q. Yes.

A. He -- I believe he was chairman of the board at that time, and he was present whenever milestones were demonstrated, and he -- his approval was important.

Q. Who prepared the Exhibit 1, Casino Concepts project?

A. Exhibit 1?

Q. Exhibit 1, the proposal.

A. I did.

Q. Are these your ideas contained in Exhibit 1?

A. There's an awful lot of material in Exhibit 1, and some of it probably came from me alone, and some of it was lessons learned from the past, and some of it were other people's idea -- ideas. I saw it as my job to collect the entirety of what was desired by the corporation and to present it in a form and in a -- you know, in its totality that was

Page 85

acceptable in meeting the needs of what they were requesting.

Q. When you say "what they were requesting," you're referring to the finished product?

A. Correct, without --

Q. With respect to the way it operated --

MR. MORRILL: Did you have more to answer, Mr. Solberg?

A. Yes, I think what's important to say is at the time of writing a document like this, the finished product in everyone's mind is slightly different. Every individual has a different picture, a different image of what the finished product will be, because it doesn't exist yet.

And a lot of the ideas that are presented are contradictory; and probably the most difficult part of my job was then, and still is today, is to sort through all of those contradictory desires and ideas and try to assimilate them all into one design that satisfies the majority of everyone's idea that they carry in their head initially.

So that's what this document is an attempt to do, and to do it in a way that is

Page 86

specific enough that it can be signed off and used as a control document for the financial aspects of the project, as well as the technical.

Q. If we could turn to your declaration, which is --

A. My declaration.

Q. -- which is Exhibit -- I believe it's Exhibit 2.

A. Yes.

Q. If you could turn to paragraph 38, which is on page 10.

A. Yes.

Q. You state that you worked with the patent attorney who drafted the '122 patent to Roblejo. Do you see that?

A. Yes.

Q. Who was the patent attorney?

A. Oh, I don't recall his name.

Q. And in what way did you work with the patent attorney?

A. He asked me quite a number of questions. I provided drawings and information, answered his questions, that type of thing.

Q. What -- when you say "drawings," were these

Page 87

drawings that you created?

A. Yes.

Q. And then on 39, you say that Figure 1 of the '122 patent depicts your prototype shuffler, as well as the first prototype shuffler. Do you see that?

A. Do we have a Figure 1 here somewhere?

Q. Sure.

MR. LAMISON: I'll mark as Exhibit 12 a United States patent to Mr. Roblejo.

(Solberg Exhibit No. 12 - United States Patent No. 5,989,122 - was marked for identification.)

BY MR. LAMISON:

Q. If you'd turn to page 2, I think you'll see Figure 1.

A. Yes.

Q. Okay. My question was: Does Figure 1 of the '122 patent depict your production prototype shuffler, as well as the first prototype shuffler, as stated in your declaration?

A. Yeah, I don't -- I don't see anything conceptually that doesn't correspond to both.

Q. When you say "both," you mean both the earlier prototype and your production prototype?

A. Yes.

Page 88

22 (Pages 85 to 88)

Legalink San Francisco (415) 359-2040

HIGHLY CONFIDENTIAL

SGC 0000731338

HALVARD SOLBERG, JR.

that for lack of foundation.

A. Well, I ran the machine at the booth, you know, some percentage of the time. There were other people there so that we could all get a chance to go and enjoy ourselves.

But at the time when I was manning the booth -- and I wasn't alone, I was there with Gola or Roblejo at all -- or Cahan, the three guys who managed the company, there was always one of them at the booth; and I was run -- when I was running the booth -- or running the machine at the booth, it was quite common for one of the three of them to say to people: Come over and take a look, lift the lid up, run the machine with the lid up and things like that. So no, it was quite proudly displayed, yeah. It was not hidden.

Q. Did Casino Concepts attempt to put any sort of confidentiality restrictions on looking at the machine at the Las Vegas show?

A. No.

Q. Exhibit 3, that you have somewhere in the stack in front of you --

A. That's the brochure?

Q. Yes. Let me back up and ask this question:

Page 153

Can you describe to us how the machine was shown within the booth -- how the production prototype shuffler that you developed was shown within the booth at the show?

A. There was a blackjack table with chips and a dealer who was like dressed up with one of those old-timey dealer garters on their arms and things like that; and the machine was sitting there, and it was intended to replicate how -- you know, replicate a little casino environment.

Q. Okay. If you'll turn to page 3 of Exhibit 3 --

A. Yes, that's the table.

Q. -- how does -- is that the table that was used in Las Vegas?

A. Yes.

(Mr. Olson returns to deposition.)

Q. And does Exhibit -- how does the setup in Exhibit 3, page 3, compare with what you had at the show in Las Vegas?

A. Similarly, except that the machine was perpendicular in its -- the front face of the machine, that being the face with the control panel, was parallel with the straight edge of the table

Page 154

where the dealer would be sitting, so that the controls of the machine were visible only to the dealer, but otherwise in the same general location as this photograph.

Q. Okay. If you'll describe the booth to me, were there walls around the booth or were the sides of the booth open?

A. It was one of the curtain-type booths where there was, you know, floor-to-ceiling curtain behind another -- I don't really remember who was next, but there was another -- so looking at the exhibit, to the left, there was another exhibitor; and to the right, I believe it was a corner, but -- it was either a corner or it was another exhibit with no wall.

Q. Okay. So was there a curtain between the table and the production prototype shuffler in the booth and the aisle where people could pass by?

A. No, there was no curtain. On the other side of the shuffler, there was -- there may have been something holding these brochures, I don't really recall; but no, it was not curtained off in any way.

Q. Was the machine, the production prototype, used to shuffle cards during the show?

Page 155

A. Yes.

Q. How frequently?

A. Well, whenever there was anybody around the booth, which was quite a lot.

Q. Do you know if anyone from Shuffle Master ever observed the production prototype machine being used at the Las Vegas show?

A. I was told they did.

MR. LAMISON: I'll move to strike for non-responsiveness.

THE WITNESS: For what?

MR. LAMISON: Non-responsiveness.

THE WITNESS: I responded.

MR. MORRILL: Pay no attention. We'll just go on to the next question.

MR. LAMISON: I'm sorry, Mr. Morrill, but I'm entitled to make my objection.

MR. MORRILL: Of course you are.

MR. LAMISON: And so if you're implying by "pay no attention" that I shouldn't make my objections, I'm entitled to make my objections.

MR. MORRILL: I was not speaking with you, Mr. Lamison. I was telling the witness that we'll go ahead with the questions whenever you're

Page 156

39 (Pages 153 to 156)

Legalink San Francisco (415) 359-2040

HIGHLY CONFIDENTIAL

SGC 0000731355

## HALVARD SOLBERG, JR.

finished talking.

(Mr. Soffer leaves deposition.)

BY MR. MORRILL:

Q. What were you told about someone from Shuffle Master observing the production prototype at the Las Vegas show?

A. I was told that they had come by and looked at it. There was a -- referring to Roblejo and Gola specifically, there was a regular topic of discussion that occurred kind of, you know, when you were out to dinner or whatever, in social -- sort of in the social environments, but still doing business; and that -- those discussions regarding Shuffle Master were particularly about the prospect of being involved with Shuffle Master in some sort of business way, up to and including a buyout opportunity.

There was speculation about how it would be good if Shuffle Master bought them out, those type of discussions. So it was entirely consistent that the machine would have been shown to Shuffle Master, in my opinion --

Q. Do you recall --

A. -- but I was not there.

Page 157

Q. You weren't there. Do you recall who told you that someone from Shuffle Master had come by and looked at the machine?

A. I do not recall being directly told that, but I rather recall coming into a scenario of multiple people having a discussion about the fact that Shuffle Master had come by.

Q. Do you know, were any names named that you can recall about who had come by and looked at the machine?

A. You know, probably, but I can't recall them.

Q. What was -- what experience was there with cards jamming in the production prototype as it was used to shuffle cards at the Las Vegas show?

A. Not -- you know, not very much. We were running plastic cards, so we didn't have significant card jamming at the show.

Q. Mr. Solberg, during Mr. Lamison's questions, he asked you questions about your hourly rate with TekCel?

A. Yes.

Q. And I think you said it was $60 an hour?

A. Yes.

Q. Have you -- that's your hourly rate today?

Page 158

A. For that particular contract.

Q. Okay. Have you, earlier in your work with TekCel, had a different hourly rate?

A. Yes, that hourly rate is a very long-term hourly rate. That's, you know, that's for work exceeding, you know, six straight months of as many hours a week as I can put in. It initiated -- it initiated at 75 an hour; and as the -- and that was for, oh, two or three full -- two or three weeks full time; and as it extended out -- and again, with no hourly limit -- as it extended out into longer periods of time, I dropped the rate. There's some extenuating circumstances on that rate, as well.

Q. Okay. For other consulting work that you have done, have you charged different rates?

A. Yes.

Q. Have you ever charged over $100 an hour?

A. Yes.

Q. Will you please describe that to us?

A. For short-term, very specific engineering work, rates in the 125 an hour are not unusual.

Q. Okay. Is the TekCel rate based on the fact that it's a full-time consulting job for you?

MR. LAMISON: Objection, leading.

Page 159

A. Well, it's not only full time, it's more than full time. It's as many hours as I can put in. They are very flexible in the hours I'm allowed to work, which means that sometimes I don't get in until 2:00 in the afternoon, which means I can do other business the majority of the business day, still go in and work eight, ten, or twelve hours there at this rate. So they've gone out of their way to make it very attractive to me.

Q. Mr. Solberg, do you recall that yesterday that you and I and Mr. Ogonowsky reviewed a large number of documents from your file, as well as from other files?

A. Yes.

Q. Based on that review, did you conclude that some of the dates in your declaration were not accurate?

A. I have made that conclusion now, yes.

Q. I'd like to go through your declaration, which is Exhibit 2, and establish --

A. Give me a moment.

Q. -- which dates you made that conclusion about.

A. Yes, yeah, it was a statement about doing

Page 160

40 (Pages 157 to 160)

Legalink San Francisco  (415) 359-2040

HIGHLY CONFIDENTIAL

SGC 0000731356

## HALVARD SOLBERG, JR.

ERRATA SHEET

Case Name: Card, LLC v. Shuffle Master, Inc.

Witness Name: Halvard H. Solberg, Jr. - Volume I

Deposition Date: February 4, 2004

Page No.Line No.  Change

    I do hereby acknowledge I have read and examined the foregoing pages of testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any changes and/or corrections, if any, appear in the attached errata sheet signed by me.

Halvard H. Solberg, Jr.          Date

                                        Page 229

CERTIFICATE OF NOTARY PUBLIC

    I, Justina M. deFaria, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in stenotype and thereafter reduced to typewriting under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

    Notary Public in and for
    The Commonwealth of Massachusetts

My commission expires:
January 12, 2007

                                        Page 230

58 (Pages 229 to 230)

Legalink San Francisco  (415) 359-2040

HIGHLY CONFIDENTIAL

SGC 0000731374