# EXHIBIT 16

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON


MP GAMES LLC; ALLIANCE GAMING          )
CORP.; BALLY GAMING, INC.,             )
                                       )
              Plaintiffs,              )Case No. C05-1017TSZ
                                       )
      vs.                              )
                                       )
SHUFFLE MASTER, INC.,                  )
                                       )
              Defendant.               )
_____)



DEPOSITION UNDER PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF LAWRENCE LUCIANO

LAS VEGAS, NEVADA

AUGUST 10, 2006






REPORTED BY:  HOLLY J. PIKE, CCR NO. 680, RPR, CSR
              LS&T JOB NO. 1-64415



LITIGATION SERVICES & TECHNOLOGIES

0ff3548e-abd6-400f-9d25-8d8af1633f1a

HIGHLY CONFIDENTIAL                          SGC 0000726352

Page 94

equipment. The ACS unit is an automatic computer integrated unit that is capable of being used with any table card game with up to six decks of cards.

The ACS unit is designed to be installed in a standard play table, which allows the dealer to simulate the normal dealing action from the shoe. Although the ACS shuffling unit is normally hidden from view, it is also possible to place a plexiglass front on the table allowing players to see the unit in operation. The specially designed bar code plastic cards it is possible for the computer to verify every card that enters into or is dealt from the ACS unit. The computer will always know where each card is on the table or at its address in the ACS file.

With an experienced dealer, it's possible to deal and return cards to the ACS unit at a rate of 120 cards per minute or two cards per second. The verification system in the ACS unit means that cards can always be accounted for by the computer and card counting in this case is completely eliminated.

It is also possible, however, in the ACS unit to simultaneously shuffle and deal cards. Although the ACS unit can be used as a stand alone machine, it is designed specifically for progressive gaming applications and contains many built-in security features for this purpose.

Because of the ACS computer compatibility, it can

Page 95

be operated through any random number generator type of control; hence, any playing odds value can be reliably input into the unit. In this respect it is exactly comparable to an ordinary slot machine in its ability to allow for any preset odds level.

Should any further information on the ACS unit be required or should you wish to discuss this specific application for your casino or to see a further demonstration of this unit, please do not hesitate to contact our offices in Somerville, New Jersey. We can be reached at area code 908-722-3222.

Thank you for giving Luciano Packaging Technologies the opportunity to demonstrate to you our automatic card shuffling machine and we look forward to working with you and your casino in the future.

(Deposition Exhibit Number 17 was marked for identification.)

BY MR. CUTRI:

Q. So, Mr. Luciano, is the video that we just saw which has been marked as Deposition -- Luciano Exhibit 16 -- the video that's described as Exhibit K in your declaration, paragraph 14 of your declaration?

A. Yes.

Q. Then Luciano Exhibit 15 is labeled ACS videotape script. Is that what has been attached to your declaration

Page 96

as Exhibit L?

A. Yes.

Q. Turning your attention to Luciano Exhibit 17, there's a reference in your declaration to a letter from Luciano Packaging to Casino Signs, dated December 8, 1993, expressing Luciano Packaging's willingness to work with Casino Signs to market Luciano packaging shuffler.

A. Yes.

Q. Do you see that?

A. Yes.

Q. Is Luciano Exhibit 17 that letter?

A. Yes.

Q. Now, do you know whether or not Casino Signs ever did market the CAS or ACS shuffler?

A. They did not.

Q. Did anyone ever do marketing on the ACS?

A. No.

Q. Do you know why Casino Signs -- or what transpired in terms of them marketing the shuffler?

MS. MAROULIS: Objection. Calls for speculation.

THE WITNESS: No.

BY MR. CUTRI:

Q. What information do you have about the interaction between Luciano Packaging and Casino Signs?

MS. MAROULIS: Objection. Overbroad and vague.

Page 97

THE WITNESS: These -- we had a salesman at the time, and he sent out half a dozen letters and I don't recall to whom he all sent it to, or so, to try and get some traction. And I think he made a follow-up call to each of these individuals, but I don't think there was any interest.

BY MR. CUTRI:

Q. Do you know who the salesman was?

A. His name was Doug White. He worked with us for about a year, Douglas white.

Q. Were those sent to casinos or to --

A. I think they were mostly people that provided gaming technology to the industry.

Q. Do you know any of the names of those companies who received the letters?

A. Progressive Games.

Q. Okay.

A. Casino Signs. I thought there was one that went out to Shuffle Master, but I couldn't track down the actual correspondence. These were the only ones I was able to find for that last case that occurred in '93 when I -- when I made this declaration.

Q. Is the two-page -- on Exhibit 17, there's a reference to a, if you look at 3499, the signature page of that letter, there's a reference to a brochure and two-page attachment. I don't believe there is a brochure, but I'm

25 (Pages 94 to 97)

0ff3548e-abd6-400f-9d25-8d8af1633f1a

HIGHLY CONFIDENTIAL

SGC 0000726376

LAWRENCE LUCIANO - 08/10/06

Page 102

Greenberg patent covered the ACS.

Well, I guess I misstated that. You said that IGT told you that they had purchased the Greenberg patent; is that right?

MS. MAROULIS: Objection. Misstates testimony.

THE WITNESS: That's correct.

BY MR. CUTRI:

Q. When did they tell you that? What was the conversation?

A. I can't recall exactly when.

Q. What was the conversation that you had?

A. They did a lot of patent searches, IGT, and they led us to believe that they were going to be patenting this system, and they did find this Greenberg patent that, you know, closely resembled, you know, our system, although they didn't believe that there was ever a product that was made out of that. They went and purchased the rights to it because they had, you know, the -- I guess they felt it was worthwhile.

Q. Okay. Did Luciano Packaging Technology or IGT ever pursue patent protection for the ACS?

A. Luciano Packaging Technology never pursued patent protection for this. But I don't know about IGT.

Q. Was there ever any discussion of pursuing patent protection --

Page 103

A. Yes.

Q. -- by Luciano.
What was that discussion?

A. My understanding was they were going to patent.

Q. When you say "they," you mean IGT?

A. IGT.

Q. Okay. And then did there come a time when you found out that was not the case?

A. I don't know that it is not the case. I don't know that they didn't, you know, file for, you know, some type of patent protection initially and then dropped it when they dropped the case, the project.

Q. Did you have any discussions with -- with IGT about patenting the ACS?

MS. MAROULIS: Objection. Asked and answered.

THE WITNESS: It was asked and answered.

BY MR. CUTRI:

Q. And did you have any discussions with them?

MS. MAROULIS: Same objection.

THE WITNESS: Yes, we did.

BY MR. CUTRI:

Q. What were the discussions?

A. You know, they said they were interested in getting patent protection for it. They did a lot of patent research. They sent us a lot of patents to review, see if

Page 104

there was any conflicts in any of the -- the other patents. I don't -- but, you know, I mean we -- we were doing work for hire essentially, and it wasn't, you know, something that we could patent.

Q. Why is that?

A. Because it was their technology. They paid for it. Now, at the end of the project, when there were certain debts that were not collected, you know, we felt that they didn't own the rights anymore.

Q. Okay.

A. We didn't pursue a patent at that time. That's all I can say. I don't know why, in retrospect.

Q. Okay.

A. Don't remember.

Q. So you don't remember any discussions about after the project was cancelled concerning patent protection?

A. Right.

MS. MAROULIS: Objection to the extent there were any attorneys involved. That would be within the LPT.

THE WITNESS: Right. There were no attorneys. We never hired a patent attorney to look at it and say --

BY MR. CUTRI:

Q. Right.

A. -- what do you think?

Q. Does L -- do you have any patents, sir?

Page 105

A. A couple.

Q. In what area?

MS. MAROULIS: Objection. Vague. Do you mean as an inventor or owner?

MR. CUTRI: I guess I'll ask for both.

BY MR. CUTRI:

Q. Are you the inventor on any patents?

A. Yes.

Q. Okay. About how many?

A. I believe four.

Q. In what area are you an inven -- in what area are those patents?

A. Lighting, tablet handling, feeding, and pharmaceutical packaging.

Q. What about LPT? Do they own any other patents?

A. No.

MR. CUTRI: Let's go off the record real quick.

THE VIDEOGRAPHER: We're off the record at 11:23 A.M.

(A discussion was held off the record.)

(Deposition Exhibit Numbers 19, 20, and 21 were marked for identification.)

THE VIDEOGRAPHER: We're back on the record at 11:26 A.M.

///

27 (Pages 102 to 105)

LITIGATION SERVICES & TECHNOLOGIES

0ff3548e-abd6-400f-9d25-8d8af1633f1a

HIGHLY CONFIDENTIAL

SGC 0000726378

LAWRENCE LUCIANO - 08/10/06

Page 174

                    CERTIFICATE OF REPORTER
STATE OF NEVADA      )
                     )
COUNTY OF CLARK      )
        I, Holly Pike, a duly commissioned Notary
Public, Clark County, State of Nevada, do hereby
certify:
        That I reported the deposition of
Lawrence Luciano, commencing on August 10, 2006,
at 8:08 A.M.
        That prior to being deposed, the witness was
duly sworn by me to testify to the truth; that I
thereafter transcribed my said shorthand notes into
typewriting; and that the typewritten transcript is a
complete, true, and accurate transcription of my said
shorthand notes.
        I further certify that I am not a
relative or employee of counsel or any of the parties,
nor a relative or employee of the parties involved in
said action, nor a person financially interested in the
action.
        IN WITNESS WHEREOF, I have set my hand in
my office in the County of Clark, State of Nevada, this
26th day of August, 2006.

                    _____
                    Holly Pike, CCR NO. 680

LITIGATION SERVICES & TECHNOLOGIES

0ff3548e-abd6-400f-9d25-8d8af1633f1a

HIGHLY CONFIDENTIAL                                          SGC 0000726396