# EXHIBIT 75

Dickson, Matthew                                January 17, 2017

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Case No. 1:15-cv-3702

_____

RULE 30(B)(6) VIDEOTAPED DEPOSITION OF
POYDRAS-TALRICK HOLDINGS, LLC
As Given By:  MATTHEW DICKSON
January 17, 2017

_____

SHUFFLE TECH INTERNATIONAL, LLC, an Illinois limited
liability company, ACES UP GAMING, INC., a Colorado
corporation, POYDRAS-TALRICK HOLDINGS, LLC, a
Delaware limited liability company,

Plaintiffs,

vs.

SCIENTIFIC GAMES CORPORATION, a Delaware corporation,
BALLY TECHNOLOGIES, INC., d/b/a SHFL Entertainment or
Shuffle Master, a Nevada corporation, and BALLY
GAMING, INC., d/b/a Bally Gaming and Systems, a
Nevada corporation,

Defendants.

_____

APPEARANCES:

    NIXON & VANDERHYE, PC
        By Robert A. Rowan, Esq.
            901 North Glebe Road, 11th Floor
            Arlington, Virginia 22203
             Appearing on behalf of Plaintiffs


    JENNER & BLOCK, LLP
        By David Jimenez-Ekman, Esq.
            353 North Clark Street
            Chicago, Illinois 60654
             Appearing on behalf of Defendants

    Also Present:  Monika Cary, Videographer
                Rick Schultz (telephonically)

Dickson, Matthew                                             January 17, 2017

88

not being manufacturers we relied on our partner.

Q    Meaning you don't think there was pushback; you just said, This looks reasonable to us, and went with it?

A    You know, I don't think that we would have had a lot of knowledge as to how much a shuffler would cost to design.

(Exhibit Number 323 was marked.)

Q    (BY MR. JIMENEZ-EKMAN)  I'm showing you what's been marked as Exhibit 323.

A    Okay.

MR. JIMENEZ-EKMAN:  Excuse me.

THE DEPONENT:  Bless you.

Q    (BY MR. JIMENEZ-EKMAN)  Have you seen Exhibit 323 before?

A    Yes.

Q    And Exhibit 323 bears the title Master Patent and Technology License and Sublicense Agreement.  It starts with the Bates label PLA00010530.  And on the first page there's a -- an effective date of September 13th, 2012.

Will we be able to know what we're talking about if we just call this the master agreement?

A    Yes.

Q    Okay.  So this was a master agreement that

Dickson, Matthew                                    January 17, 2017

89

was executed in September 2012 between PT, Shuffle Tech International and DigiDeal Corporation, correct?

A    Yes.

Q    And as you pointed out, it provided a $500,000 advance royalty to Shuffle Tech.  Now, was the idea behind that, that that money would be used to finish the development of the shuffler?

MR. ROWAN:  Object to the form of the question.

A    The money to Shuffle Tech?

Q    (BY MR. JIMENEZ-EKMAN)  Yeah.

A    No.

Q    Okay.  What was the purpose of the advance to Shuffle Tech?

A    Let's see.  It was really to -- it was an advanced royalty basically.

Q    Okay.

A    It was an amount to secure the patent.

Q    And then there's a separate payment to DigiDeal, correct?

A    Yes.

Q    And that -- that's also $500,000.  And was it the intent that those funds would be used to finish the development of the DigiShuffle?

A    I think they would be substantially used

Dickson, Matthew                                     January 17, 2017

90

to develop the DigiShuffle, yes.

Q      Okay.  So I've got a bunch of your email, and I'll ask you about some of them.  But just as a general matter, the arc of the story -- and maybe I've missed something in the agreement, which is possible; I'm not a contract lawyer.  There seems to be a complaint by DigiDeal that PT was not meeting its funding obligation under the master agreement, right?

A      Okay.

Q      I mean, you saw that in the emails?

A      I think it could be fairly stated that way, yes.

Q      Okay.  I'm not -- I'm going to ask you whether it was true in a second, but that was their position, DigiDeal -- DigiDeal's position was that PT was not complying with the terms of the funding agreement, correct?

A      I would think you could substantially say that that was their position, yes.

Q      Okay.  Now, is there, in this agreement somewhere, as you understood it at least, some pre-condition to the funding or some way in which it would be -- I don't mean this derogatorily, but dribbled out or portioned out?

Dickson, Matthew                                   January 17, 2017

93

understand -- I don't want to press you. I wouldn't let my own witnesses say that it was it unless I was sure that was it. Okay. But looking at the -- or I should say unless the witness was sure that was it.

But looking at the activities and the basic dollar amounts, was this in the ballpark of what you understood would be involved in moving the DigiDeal shuffler forward, both in terms of what needed to be done and how much it would cost?

**A      I think it was generally agreed that half a million dollars could get us a pretty substantial production run at some point, yes.**

Q      And here, at least on this version, Exhibit 322, that production run is contemplated at a hundred units, right?

MR. ROWAN: Object to the form of the question.

Q      (BY MR. JIMENEZ-EKMAN) I'm sorry, 200 units.

**A      Yes.**

Q      And in putting this deal together or in participating in the putting together of this deal, was PT bringing anything to the table besides funding?

MR. ROWAN: Object to the form.

Dickson, Matthew                                            January 17, 2017

94

A    I think at -- generally when I do a business deal, I like to partner up with I think people that are smarter than me and more experienced than me.  Dave Barrick -- well, when you say "PT," so you're talking about our special purpose entity, I guess, right?

Q    Yeah.  Can I withdraw the question, because I think it wasn't clear.  You've got Shuffle Tech that has the IP, correct?

A    Yes.

Q    You've got DigiDeal that has the design expertise and the manufacturing capability, correct?

A    Yes.

Q    In basic terms, you, your partners -- whether it was PT or the individuals -- the main thing I think you were bringing -- tell me if I'm wrong -- was capital to be able to move the project forward?

MR. ROWAN:  Object to the form.

A    I think capital was a substantial contribution on our part.  But I go back to what I said in the past.  I had -- in PT I basically had four other partners:  I had Peter Macy, who was an experienced investment banker in the casino space; I had Danny Davila, who was a world-class gaming stock

Dickson, Matthew                                    January 17, 2017

147

a -- an amount certain to get the product through beta, as you like to call it. But then the -- the nature and the timing of the follow-on payments and where that was to come from was somewhat nebulous.

Q    The initial commitment to get it through beta, as we've talked about, was that $500,000 or some lesser amount?

A    Some lesser amount.

Q    And do you know what lesser amount that was?

A    A quarter million, somewhere -- give or take 50 grand.

Q    Okay. And the remaining of the $500,000 was intended to make the production runs shown on that exhibit?

A    I think so. I think it's a fair --

Q    All right.

A    Sure.

Q    Now, we see from the capitalization statement that at least as of the end of 2014, there wasn't -- there hadn't been a million dollars put into PT, fair?

A    PT was a special purpose vehicle. There is no logical business reason to capitalize a company with excess capital that isn't ready to be deployed

Dickson, Matthew                                    January 17, 2017

148

yet.

Q      Okay.  So as a factual matter looking back, you -- I'm sorry, the investors in PT only put in what needed to be run through PT for the purposes we've been discussing on an as-needed basis, fair?

A      That's a very fair assumption, yes.

Q      Okay.  You see in some of these emails, not necessarily ones sent to you, but some skepticism that, in fact, PT could come up with the rest of the money; it had the ability.

A      Okay.

Q      You're smiling.  What -- what arrangements, if any, did PT have in place to come up with the rest of the money if needed?

A      So Poydras-Talrick was capitalized substantially by Poydras Street Finance.  Poydras Street Finance was our initial foray into the slot machine leasing business.  We subsequently turned Poydras Street Finance -- one of the main investments in Poydras Street Finance into a business that I founded that today is worth in excess of $60 million.  And we did that in three years.

Dave Barrick owns his own -- or had owned his own private jet.  He owned six casinos in Las Vegas and a substantial tract of real estate.

Dickson, Matthew                                    January 17, 2017

359

STATE OF COLORADO)

                    )   ss.        REPORTER'S CERTIFICATE

COUNTY OF DENVER )

            I, Barbara J. Castillo, do hereby certify

that I am a Registered Merit Reporter, Certified

Realtime Reporter and Notary Public within and for

the State of Colorado; that previous to the

commencement of the examination, the deponent was

duly sworn to testify to the truth.

            I further certify that this deposition was

taken in shorthand by me at the time and place herein

set forth, that it was thereafter reduced to

typewritten form, and that the foregoing constitutes

a true and correct transcript.

            I further certify that I am not related to,

employed by, nor of counsel for any of the parties or

attorneys herein, nor otherwise interested in the

result of the within action.

            In witness whereof, I have affixed my

signature this 18th day of January, 2017.

            My commission expires January 18, 2017.


            _____
            Barbara J. Castillo, RMR, CRR
            216 - 16th Street, Suite 600
            Denver, Colorado  80202