LAWRENCE LUCIANO – 08/10/06

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

MP GAMES LLC; ALLIANCE GAMING )
CORP.; BALLY GAMING, INC., )
  )
          Plaintiffs, )Case No. C05-1017TSZ
  )
   vs. )
  )
SHUFFLE MASTER, INC., )
  )
          Defendant. )
_____)

DEPOSITION UNDER PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF LAWRENCE LUCIANO

LAS VEGAS, NEVADA

AUGUST 10, 2006

REPORTED BY:  HOLLY J. PIKE, CCR NO. 680, RPR, CSR
            LS&T JOB NO. 1-64415

LITIGATION SERVICES & TECHNOLOGIES

0ff3548e-abd6-400f-9d25-8d8af1633f1a

HIGHLY CONFIDENTIAL

SGC 0000726352

LAWRENCE LUCIANO - 08/10/06

Page 10

were served personally at Luciano Packaging Technologies. Is that -- is that the case?

A. That's true, yes.

Q. Were you -- do you know whether you were given a copy of this document?

A. I believe I was, yes.

Q. Okay.

A. I didn't really study it, so --

Q. Okay.

A. -- I can't be -- I -- I looked at it briefly. I believe this is the one, but I can't testify to that.

Q. Okay. Do you understand that you're appearing today here pursuant to this subpoena?

A. Yes, I do.

Q. If you turn to what's marked as page 4 on the document, it says Rider A.

A. Yes.

Q. Have you ever seen this page of the document before?

A. Yes. I did, actually.

Q. You understand that this document asks you to produce the documents listed in items 1 through 4?

A. Yes.

Q. Did you do that?

A. To the best of my ability, yes.

Page 11

Q. Okay. Were there any documents that fell into category 1, for example, that you found but did not produce?

A. No.

Q. And what did you mean when you said to the best of your ability?

A. We lost a lot of the documents.

Q. What did you do to find the documents you did have?

A. Crawled around in the attic, basically.

Q. You said the attic; do you mean the attic of the home?

A. Not -- not literally an attic, but, you know, back, you know, into the shelves where we keep old records and -- and file boxes and whatnot.

Q. Okay. On item number 1, "all documents referring or relating to card shuffling devices," I know that your counsel turned over a series of documents related to what we have been calling the Luciano shuffler but I think internally you guys may have called it the ACS or --

A. That's correct. ACS, automatic card shuffler.

Q. Do you have any documents relating to card shufflers other than the ACS?

A. No.

Q. Were there any other card shuffling prototypes developed by Luciano Packaging, other than the ACS?

Page 12

A. No.

Q. Do you understand what I mean when I say "card shuffling"? Is that why you're having difficulty?

A. Well, you know, ultimately we came up with what we consider five production machines, but they were really prototypes, they were working prototypes. Prior to that, we had proof of principal models. But it was based on, you know, the final concept.

Q. Okay. So that was all part of that same project, though?

A. Yes.

Q. Okay. My question was whether there was something outside of that project.

A. That's what I assumed.

Q. Okay. And the answer is you don't have any --

A. No.

Q. -- documents relating to that. Okay. What did you do when you received the subpoena?

A. I looked for all the stuff that -- that I had relating to this project. I had done this once prior, a couple years ago, and I had a whole filing box, and I couldn't find it, frankly.

Q. Did you talk to anyone about this subpoena when you got it?

MS. MAROULIS: Let me just interject that our firm

Page 13

represents Mr. Luciano. So to the extent he discussed anything with us, the communication is privileged and you cannot inquire into them.

But you can say yes or no to this question.

BY MR. CUTRI:

Q. So my question was did you talk to anyone about this subpoena?

A. Yes.

Q. Did you talk to anyone that was not an attorney about this subpoena?

A. Yes.

Q. Who did you talk to?

A. I talked to my secretary to find out if she could find all these documents.

Q. Okay. Anybody else?

A. Yes.

Q. Who else? Again, none attorneys.

A. I called my brother to ask him about it and he said he couldn't talk about it.

Q. Did you have any other conversation with him about that, about the subpoena?

A. No.

Q. Did you talk to anyone else about the subpoena?

A. I believe I talked to one or more of my partners, let them know that I was gathering information that probably

4 (Pages 10 to 13)

LITIGATION SERVICES & TECHNOLOGIES

0ff3548e-abd6-400f-9d25-8d8af1633f1a

HIGHLY CONFIDENTIAL

SGC 0000726355

## LAWRENCE LUCIANO - 08/10/06

Page 18

existence in 1990.

A. '90. Yeah. So he -- he worked for my dad's company, Robert A. Luciano Associates, as a contractor for about three or four years prior to it being -- us incorporating as a group. We didn't change personnel. We just incorporated as a group.

The laws changed in New Jersey governing small consulting groups in that if you derived more than 80 percent of your business, you know, from a -- from a single entity, then you had to be considered an employee and they had to give you benefits and that sort of thing. So we formally incorporated.

Q. What is Robert A. Luciano's role at Luciano Packaging Technologies today?

A. He's retired, but he advises us. He still draws -- draws a fee.

Q. About how many hours a week would you say he works for Luciano Packaging Technologies?

A. Two or three.

Q. Is his consulting business still active?

A. Yes.

Q. About how many hours a week would you say that he works for his consulting business?

MS. MAROULIS: Objection. Calls for speculation.

THE WITNESS: Okay. I would say probably 20. He

Page 19

didn't do anything, you know, for a number of years, but he got a little bored. So he started picking up more clients.

BY MR. CUTRI:

Q. Okay.

A. Okay? He did some expert witness stuff. Now he's getting more active.

Q. Have you ever served as an expert witness before?

A. No.

Q. Do you know what cases your -- or what kind of matters your father has been an expert witness in?

A. Yes.

MS. MAROULIS: Objection. Relevance.

BY MR. CUTRI:

Q. What kind of cases?

If she objects, unless she instructs you not to answer, you have to --

A. Okay.

Q. -- answer.

A. Most -- mostly product liability.

Q. Anything else other than product liability?

A. I don't believe so.

Q. About how many cases has he been an expert witness in product liability?

A. Probably ten.

Q. What types of products are at issue in those

Page 20

cases, if you know?

MS. MAROULIS: Objection. Calls for speculation. Go ahead.

THE WITNESS: Packaging machinery.

BY MR. CUTRI:

Q. Have you ever worked with him on any of those cases?

MS. MAROULIS: Objection. Vague.

THE WITNESS: No.

BY MR. CUTRI:

Q. Have you ever had any involvement at all in any of those cases?

A. No.

Q. Have you had -- ever had any involvement at all with the work that he does as an expert witness?

MS. MAROULIS: Objection. Asked and answered.

BY MR. CUTRI:

Q. I guess I'm asking because you seem hesitant. Seems like there's something you're not clear on.

A. Okay. Well, on occasion, he had asked some people from our group to, you know, put together charts and graphs and that sort of thing, but I can't remember anything specific.

Q. Was that a situation where he would supply the data and information and just ask you guys to create visual

Page 21

aides?

A. Yes.

Q. You mentioned that you had a discussion with your brother about the subpoena.

A. I did.

Q. Have you ever had any discussions with anyone at either MP Games, Alliance, or Bally Gaming?

A. No.

Q. About anything?

A. About anything?

MS. MAROULIS: Objection. Vague and overbroad. First off, he's excluding the attorneys.

THE WITNESS: Okay.

MS. MAROULIS: Why don't you limit your question to the Luciano shuffler or what's in the subpoena.

BY MR. CUTRI:

Q. Well, my question still stands. I'm entitled to know the answer whether you've had a conversation with anyone at all, other than attorneys, at MP Games, alliance, or Bally Gaming.

A. Yes.

Q. And who have you had discussions with?

MS. MAROULIS: Vague as to time.

Is there something you need to discuss off the record?

6 (Pages 18 to 21)

## LITIGATION SERVICES & TECHNOLOGIES

0ff3548e-abd6-400f-9d25-8d8af1633f1a

HIGHLY CONFIDENTIAL

SGC 0000726357

LAWRENCE LUCIANO - 08/10/06

Page 66

a letter from Luciano Packaging to IGT dated May 22.
If I could have this marked as Luciano Exhibit 5, I believe we're up to.
(Deposition Exhibit Number 5 was marked for identification.)
MS. MAROULIS: Counsel, I need a copy.
MR. CUTRI: Oh. I'm sorry. I have your copy right here.
Oh. You know what? I probably should not have marked this, but it was -- because it was already marked in your brother's deposition as Exhibit -- Luciano Dep. Exhibit 3.
MS. MAROULIS: I think we'll mark things again.
MR. CUTRI: Oh. Is that what we're doing? Okay.
MS. MAROULIS: It will probably be easier.
MR. CUTRI: But in any event, this document that I just handed the witness is marked as Dep. Exhibit 3 in Robert Luciano's deposition and it contains documents 03 -- 03433 through 03435.
BY MR. CUTRI:
Q. Is that the document that is referred to in your declaration?
MS. MAROULIS: Let me just make an objection. I think the witness can look at it and see if it's the same date and all, but it's a hard representation to make that

Page 67

this specific copy was attached to the declaration. In other words, he can talk about the content but not about the particular.
MR. CUTRI: Well, if he knows. He did sign the declaration, so.
THE WITNESS: This is accurate. I mean it appears to be.
BY MR. CUTRI:
Q. What's referred to as Exhibit A?
A. What's referred to, yeah, and what we did send to IGT at the time.
Q. Okay. On 03434 of that doc -- I'm still on Exhibit 5, the letter, the second page of that letter under Phase 2, "At the conclusion of acceptable operation of the prototype unit, we are prepared to supply three additional units for endurance testing at your facilities."
A. Yes.
Q. Was that done?
A. No.
Q. What was -- was any of that done?
MS. MAROULIS: Objection. Vague.
THE WITNESS: We built five.
BY MR. CUTRI:
Q. Okay. That was my question.
And did you supply those to IGT for endurance

Page 68

testing?
A. Not all of them.
Q. Okay. Which ones did you supply -- or how many did you supply?
A. Two or three. I can't remember exactly.
Q. Were they identical?
A. Yes.
Q. We'll take a look at what's referred to here as Exhibit B. I'm going to give you what was marked as Luciano Dep. Exhibit 4. In this case, it will be marked as Larry Luciano Dep. Exhibit 6.
(Deposition Exhibit Number 6 was marked for identification.)
BY MR. CUTRI:
Q. And it's SM-WA-003436 through 003438. When you're done taking a look, let me know.
A. Okay.
Q. Is what's been marked as Exhibit 6 the document that's described in your declaration as Exhibit B in paragraph 5?
A. Yes.
Q. On that Exhibit 6, on the second page under item number 3, it's talking about -- well, the document speaks for itself, but it does say, "For these purposes we would like to see an actual demonstration of the following areas,"

Page 69

and letter B is, "an opportunity to personally operate and inspect an actual existing gaming table."
Why did Luciano Packaging Technology want to see an existing gaming table?
A. Because we needed to -- the machine had to physically fit within a gaming table. Okay. And it had to work so as the game was fundamentally not changed; playing in the same manner that it would be played in so as not to alienate the customer who is playing, the players.
Q. Was it IGT's requirement that the shuffler fit inside the gaming table, or was it, if you know?
MS. MAROULIS: Objection. Calls for speculation.
THE WITNESS: The idea was that it would fit inside the gaming table. If there was another way of doing it without it being inside the gaming table but not being visible to the player, then they may have accepted that.
BY MR. CUTRI:
Q. But ultimately the shuffler that you designed was -- did fit within a gaming table?
A. Yes.
Q. Do you know if you guys ended up playing golf at the end of that trip? There's a reference to it at the --
MS. MAROULIS: Objection. Relevance.
BY MR. CUTRI:
Q. Just curious. Your brother couldn't remember.

18 (Pages 66 to 69)

LITIGATION SERVICES & TECHNOLOGIES

0ff3548e-abd6-400f-9d25-8d8af1633f1a

HIGHLY CONFIDENTIAL

SGC 0000726369

LAWRENCE LUCIANO - 08/10/06

Page 90

the Exhibit 15 is what's labeled the ACS videotape script. I'm going to play the video and ask you to confirm that the video that I'm playing is the Exhibit K in your declaration.

I'm also going to ask you to let me know if you see anything described in the video that is inaccurate in terms of what you know the ACS prototype's functionality to be.

(Whereupon, the video was played.)

THE WITNESS: That's not a part of it.

MR. CUTRI: For the record, there's a -- there appears to be some commercial before the actual video gets started, but then the video, itself, starts.

THE WITNESS: This is a bad tape.

MR. CUTRI: Yeah.

THE VIDEO: Luciano Packaging Technologies, Incorporated, integrating high technology packaging systems. This is the Luciano Packaging Technologies automatic card shuffling machine, or more briefly, the ACS unit.

It is an automatic computer integrated unit that is capable of being used with any table card game with up to six decks of cards. In the format you are presently looking at, the prototype ACS unit is set up as an integral part of a standard blackjack or 21 table. However, this particular ACS unit is capable for use with other card games. We will be happy to discuss the additional capabilities to suit your

Page 91

individual casino requirements at a later date.

Jeff, our design engineer who is not a professional dealer, is demonstrating the ease of use and the speed of dealing that can be attained by using the ACS unit. This demonstration shows how easily and quickly even an average person can deal from the ACS unit. At present, Jeff is dealing one full deck of cards at a time at a speed that an experienced dealer could attain of 120 cards per minute or that is two cards per second.

It is possible, however, with the ACS unit to deal more than one full deck of cards at a time depending upon requirements of the game being played. Once the particular game is concluded, the cards are simply stacked and placed into a bin on Jeff's right and returned for reshuffling to the ACS unit. The cards can be reshuffled simultaneously while the dealer is dealing.

In actual operation, the normal chip tray will be placed on the table between the dealing shoe and the return card bin.

The section shown here are examples of the ACS units completely removed from the tables. The center component in the unit is the black circular drum in the center. This is the card filing system. It contains 312 separate individually identified slots, six decks. Each card in each deck is given an individual dedicated address

Page 92

in the drum. To the right there is a bar code reading scanner at the entrance to the ACS unit where the cards are fed in and a second bar code scanner at the exit of the unit where the cards are dealt from the shoe.

Utilizing these bar codes and scanners, it is possible to track every cards' whereabouts, whether in or out of the ACS unit. You see here a close up of the drum, the in feed and out feed system. This is built into a table for ease of operation and ease of service.

The circular drum units shown here are driven by a stepping motor, which is a digital device that is responsive to computer control; hence, enabling the ability for programmed motion patterns; i.e., response to a random number generator.

The ACS units are designed to be lightweight and to fit into a standard 21 table as shown here. Other gaming tables can also be adapted for this unit.

The ACS unit is designed for a correct ergonomics interface with the dealer, that includes the angle of approach for the dealing shoe and the angle mounting in the table for knee room.

As you can see here, we have shown the chip tray, which I had mentioned before, which would normally be located right between the dealer and right above the table.

Here we have a close up view of the actual cards

Page 93

used in the automatic card shuffling unit. As you can see, these cards are printed on both edges with a bar code. This bar code identifies each card individually and, as we mentioned before, as the cards are inserted into the ACS unit, they are read and placed into the ACS unit's memory.

There is also a second bar code scanner at the dealing shoe. Again, the cards are read and the actual cards placed in the ACS unit memory. Until all cards are reloaded and reshuffled in the ACS unit, a new game cannot begin unless the machine has verified that all the cards are there and they are, in fact, the right cards.

Depending upon the game requirements it is possible to modify these controls to suit the particular game application. Although these cards have the look and feel of regular playing cards, they are, in fact, a special plastic laminate card that has been developed to offer the possibility of use for many days without the need for replacement. These specialty designed cards also allow the ACS unit to operate at peak efficiency. Downtime for shuffling and introduction of new card decks will be virtually eliminated through the use of these new cards, since the plastic cards have extreme long life.

Finally, as we take a last look at the automatic card shuffling machine, I would just like to recap the main features of the Luciano Packaging Technologies ACS

24 (Pages 90 to 93)

LITIGATION SERVICES & TECHNOLOGIES

0ff3548e-abd6-400f-9d25-8d8af1633f1a

HIGHLY CONFIDENTIAL

SGC 0000726375

PX82.25

LAWRENCE LUCIANO - 08/10/06

Page 94

equipment. The ACS unit is an automatic computer integrated unit that is capable of being used with any table card game with up to six decks of cards.

The ACS unit is designed to be installed in a standard play table, which allows the dealer to simulate the normal dealing action from the shoe. Although the ACS shuffling unit is normally hidden from view, it is also possible to place a plexiglass front on the table allowing players to see the unit in operation. The specially designed bar code plastic cards it is possible for the computer to verify every card that enters into or is dealt from the ACS unit. The computer will always know where each card is on the table or at its address in the ACS file.

With an experienced dealer, it's possible to deal and return cards to the ACS unit at a rate of 120 cards per minute or two cards per second. The verification system in the ACS unit means that cards can always be accounted for by the computer and card counting in this case is completely eliminated.

It is also possible, however, in the ACS unit to simultaneously shuffle and deal cards. Although the ACS unit can be used as a stand alone machine, it is designed specifically for progressive gaming applications and contains many built-in security features for this purpose.

Because of the ACS computer compatibility, it can

Page 95

be operated through any random number generator type of control; hence, any playing odds value can be reliably input into the unit. In this respect it is exactly comparable to an ordinary slot machine in its ability to allow for any preset odds level.

Should any further information on the ACS unit be required or should you wish to discuss this specific application for your casino or to see a further demonstration of this unit, please do not hesitate to contact our offices in Somerville, New Jersey. We can be reached at area code 908-722-3222.

Thank you for giving Luciano Packaging Technologies the opportunity to demonstrate to you our automatic card shuffling machine and we look forward to working with you and your casino in the future.

(Deposition Exhibit Number 17 was marked for identification.)

BY MR. CUTRI:

Q. So, Mr. Luciano, is the video that we just saw which has been marked as Deposition -- Luciano Exhibit 16 -- the video that's described as Exhibit K in your declaration, paragraph 14 of your declaration?

A. Yes.

Q. Then Luciano Exhibit 15 is labeled ACS videotape script. Is that what has been attached to your declaration

Page 96

as Exhibit L?

A. Yes.

Q. Turning your attention to Luciano Exhibit 17, there's a reference in your declaration to a letter from Luciano Packaging to Casino Signs, dated December 8, 1993, expressing Luciano Packaging's willingness to work with Casino Signs to market Luciano packaging shuffler.

A. Yes.

Q. Do you see that?

A. Yes.

Q. Is Luciano Exhibit 17 that letter?

A. Yes.

Q. Now, do you know whether or not Casino Signs ever did market the CAS or ACS shuffler?

A. They did not.

Q. Did anyone ever do marketing on the ACS?

A. No.

Q. Do you know why Casino Signs -- or what transpired in terms of them marketing the shuffler?

MS. MAROULIS: Objection. Calls for speculation.

THE WITNESS: No.

BY MR. CUTRI:

Q. What information do you have about the interaction between Luciano Packaging and Casino Signs?

MS. MAROULIS: Objection. Overbroad and vague.

Page 97

THE WITNESS: These -- we had a salesman at the time, and he sent out half a dozen letters and I don't recall to whom he all sent it to, or so, to try and get some traction. And I think he made a follow-up call to each of these individuals, but I don't think there was any interest.

BY MR. CUTRI:

Q. Do you know who the salesman was?

A. His name was Doug White. He worked with us for about a year, Douglas white.

Q. Were those sent to casinos or to --

A. I think they were mostly people that provided gaming technology to the industry.

Q. Do you know any of the names of those companies who received the letters?

A. Progressive Games.

Q. Okay.

A. Casino Signs. I thought there was one that went out to Shuffle Master, but I couldn't track down the actual correspondence. These were the only ones I was able to find for that last case that occurred in '93 when I -- when I made this declaration.

Q. Is the two-page -- on Exhibit 17, there's a reference to a, if you look at 3499, the signature page of that letter, there's a reference to a brochure and two-page attachment. I don't believe there is a brochure, but I'm

25 (Pages 94 to 97)

LITIGATION SERVICES & TECHNOLOGIES

0ff3548e-abd6-400f-9d25-8d8af1633f1a

HIGHLY CONFIDENTIAL

SGC 0000726376

LAWRENCE LUCIANO - 08/10/06

Page 98

wondering if the two pages attached here are the two-page attachments.

A. I think this two-page attachment is what -- what was these two pages that are in Exhibit 17. And the brochure was an LPT brochure.

Q. Okay.

A. A corporate brochure.

Q. The --

A. Not a (inaudible) sonic brochure.

Q. The two-page attachment is 3500 and 3501. If you would take a -- and it's titled Some Major Features of the ACS system. If you would take a look through that and confirm that what's described there is an accurate description of the ACS system. Take as much time as you need.

A. Correct. It's accurate.

Q. I'm going to hand you what will be marked as Exhibit 18.

(Deposition Exhibit Number 18 was marked for identification.)

BY MR. CUTRI:

Q. Take a look at Exhibit 18 and tell me whether that is Exhibit N. And actually I should give you -- I'm going to add to Exhibit 18, SM-003507.

MS. MAROULIS: Do you believe that's part of the

Page 99

document --

MR. CUTRI: Yes.

MS. MAROULIS: -- that was Exhibit N?

MR. CUTRI: I do believe so, and my reason for thinking that is, in the front page of the letter, there is a reference, the front page of that letter which is marked as Exhibit 18, there's a reference to the first page of the Greenberg patent being attached to the letter. There's also a reference to a written description, features of the ACS being attached, a video, some special plastic laminated playing cards, as well as a brochure describing Luciano Packaging Technologies.

BY MR. CUTRI:

Q. So now what I put before you as Exhibit 18, do you believe that to be Exhibit N to your declaration?

A. Yes.

Q. Do you know why the first sheet of the Greenberg patent is attached to this document?

MS. MAROULIS: Let me just caution the witness, to the extent there were any discussions with any attorneys or Luciano Packaging, you should not reveal that information.

THE WITNESS: Okay. No.

BY MR. CUTRI:

Q. You don't know why that was attached, then?

A. I --

Page 100

MS. MAROULIS: Is there a question?

MR. CUTRI: Yeah. I'm asking if he knows why.

THE WITNESS: I said no. You know, I could speculate but I'm not --

MS. MAROULIS: Do not speculate.

THE WITNESS: -- supposed to speculate.

BY MR. CUTRI:

Q. What would your -- what would your speculation be?

A. It's pretty well described in the letter, you know, IGT did purchase this patent.

Q. Okay.

A. And that's -- and that's what I know.

Q. How are you -- how do you know that IGT purchased that patent?

A. They told us.

Q. IGT told you that?

A. Yeah.

Q. When you -- there's a reference there to, "It has already been successfully defended against the Nicollette patent." Do you know what has already been successfully defended against the Nicollette patent? Do they mean a shuffler?

A. No. They meant the Greenberg patent.

Q. Was there ever any claim that the shuffler that you developed was covered by any patents?

Page 101

MS. MAROULIS: Objection. Please do not reveal any communication between you and attorneys for Luciano Packaging.

THE WITNESS: I never had any discussion with any attorneys with respect to that. And to my knowledge, there's never been any claim against -- certainly no against LPT.

BY MR. CUTRI:

Q. Okay.

A. Not against Luciano Packaging Technologies. Is that -- is that what you asked?

Q. That's --

A. Was there any kind of claim against LP? No.

Q. Has L -- has LPT ever been involved in any patent lawsuit?

MS. MAROULIS: Objection. Relevance.

THE WITNESS: No.

BY MR. CUTRI:

Q. Has L -- has anyone ever threatened LPT with a patent lawsuit or claimed that something LPT was doing was covered by a patent?

MS. MAROULIS: Objection. Relevance.

THE WITNESS: No.

BY MR. CUTRI:

Q. In what context did IGT tell you that the

26 (Pages 98 to 101)

LITIGATION SERVICES & TECHNOLOGIES

0ff3548e-abd6-400f-9d25-8d8af1633f1a

HIGHLY CONFIDENTIAL

SGC 0000726377

LAWRENCE LUCIANO - 08/10/06

Page 126

Q. Was there anything about Mr. Rowe's explanation that you would change?

A. No.

(Whereupon, the video was played.)

BY MR. CUTRI:

Q. I'd like to pause here. Unfortunately I don't have a version of this that has a time marker. For the sake of the video, I can have the video train on this for a moment just so we can see where we are.

Mr. Luciano, with respect to what's depicted here, is the shuffler depicted inside of a table at this point?

A. Yes.

Q. Was it IGT's request that the shuffler be mounted into a table?

A. Yes.

Q. Is that what you were selling to them?

A. Yes.

Q. I guess we'll take a look in a few minutes at the actual designs, but you did design a table for this shuffler; is that correct?

A. Yes. I didn't design the table itself. What I did was I took their table design and I showed them how it needed to be modified to adapt to house this unit.

Q. Okay.

(Whereupon, the video was played.)

Page 127

BY MR. CUTRI:

Q. I'm going to stop there and ask you to identify who's speaking.

A. That's Richard Smith, my partner. When you asked before why did we make this video, it's evident now that this video was made to send to the customer to let them know what to expect, the level of finish of the machines and so forth.

Q. When you say send to the customer, one of my questions was there a specific customer in mind for this video?

A. My customer being IGT.

Q. He makes reference to a device here where I'll try and rewind a little bit to see if I can get him to say it again.

(Whereupon, the video was played.)

BY MR. CUTRI:

Q. I think the first thing I think Mr. Smith refers to is a Slick 500. Is that an SLC?

A. SLC 500.

Q. What does SLC stand for?

A. I'm not sure what the "S" stands for. It's a logic controller. "LC" is logic controller. It's an Allen Bradley product. It's a programmable logic controller normally referred to as a PLC generically.

Page 128

Remember in the initial document where we said we were going to -- instead of developing a board level controller, we were going to use a PLC. I think I think we wound up developing one, a board level controller using that little giant board. Now I think that was still under development at that time, and we did the basic machine controller using a PLC. The OEM drive is the drive that controls the stepping motor for the central wheel, the card filing wheel.

MR. CUTRI: For the camera's sake, I'm going to ask the videographer to take a quick look at the shot we're looking at.

(Whereupon, the video was played.)

BY MR. CUTRI:

Q. Is there anything that you would add to Mr. Smith's description there?

A. No.

Q. Or change?

A. No.

(Whereupon, the video was played.)

MR. CUTRI: Let's take a quick break and mark some of these.

THE VIDEOGRAPHER: We're off the record at 1:00 P.M.

(A short break was taken.)

Page 129

(Deposition Exhibit Numbers 23, 24, and 25 were marked for identification.)

THE VIDEOGRAPHER: We're back on the record at 1:05 P.M.

BY MR. CUTRI:

Q. The video we just watched, for the record, has been marked as Luciano Exhibit 23. We are now looking at Luciano Exhibits 24 and 25. Mr. Luciano, could you describe to me what Luciano Exhibit 24 -- this was a document produced to me last night.

A. Uh-huh.

Q. It's a one, two, three, four, five page document. The first page says "ACS cabinet front view." The next page lower right says "ACS cabinet side view." Next page says "left door at the bottom." Page after that in the upper right says "Top view." The last page says "Detail B" on the left and "Detail A" on the right. If you would, Mr. Luciano, what does Exhibit 24 depict?

A. This was a design of a sub structure that would get bolted into a table, into a playing table, to support the card shuffler. We would mount on these side half section frames the drawer slides, if you will.

Q. That we saw in the video?

A. That we saw in the video, yeah.

Q. Do the five pages here depict a design for the ACS

33 (Pages 126 to 129)

LITIGATION SERVICES & TECHNOLOGIES

0ff3548e-abd6-400f-9d25-8d8af1633f1a

HIGHLY CONFIDENTIAL

SGC 0000726384

LAWRENCE LUCIANO - 08/10/06

Page 150

A.  The CAMS were used on the solenoids in order to actuate the articulated movement and the discharge.  And on the infeed side, the movement of the card through the system.  It was part of the original design.  I'm not exactly sure what it's doing in the secondary development program honestly.

(Deposition Exhibit Number 33 was marked for identification.)

BY MR. CUTRI:

Q.  Let me show you a document that's been marked as Exhibit 33.  This is a document that was produced to us from apparently your files.  Do you recognize this document?

A.  No.

Q.  It's an article -- do you know why this article was in your files?

MS. MAROULIS:  Objection.  Calls for speculation.

MR. CUTRI:  I'll give you some time to take a look through it.

THE WITNESS:  We were interested in what was going on in the industry.

BY MR. CUTRI:

Q.  How does this relate to that?

MS. MAROULIS:  Objection.  Vague.

BY MR. CUTRI:

Q.  How does this article relate to what was going on

Page 151

in the industry?

A.  Clearly there was a person here who was developing an automatic card shuffler.

Q.  Did you investigate that card shuffler?

A.  No.

MR. CUTRI:  Let's take a break.  We'll go off the record.

THE VIDEOGRAPHER:  We're off the record at 1:52 P.M.

(A short break was taken.)

THE VIDEOGRAPHER:  We're back on the record at 2:02 P.M.

(Deposition Exhibit Number 34 was marked for identification.)

BY MR. CUTRI:

Q.  Mr. Luciano, I'm handing you Deposition Exhibit 34, which is LL0002 through LL0004.  It references is "Meetings at IGT - November 23, 24, 26."  Then on the next page there's a reference to an estimate cost, dated 11/20/1992.  My only question on this document on LL0002, the first page, item 6, electrical controls options 4.3.  It says "Bar code concerns."  Do you know what that is in reference to?

A.  No.  I do know that there was some concern that the lights that we were using, the photo electrics, were not

Page 152

able to inspect red as well as black.  But we were able to resolve that.  So the first cards that got made were black codes on both the black cards and on the red cards.  It was kind of objectionable because they're obviously much more evident.

Q.  You were able though to eventually get red?

A.  Yeah.  We were able to get photo electrics that worked well with both black and red registration marks.

Q.  I was able to inspect one of the shufflers that was at Mind Play -- or Bally actually -- in Seattle.

A.  Really?

Q.  Were you not aware of that?

A.  No.

MS. MAROULIS:  Wait for the question.

BY MR. CUTRI:

Q.  Were you aware at all that there was a shuffler in Bally's possession?

A.  No.

Q.  Have you ever talked with your brother about where the shuffler that he has went to?

A.  He doesn't have it anymore obviously.  I never talked to him about that, no.  But he obviously -- when Bally purchased SDG, they got everything that SDG has.

Q.  Did you have any conversation with him about that?

MS. MAROULIS:  Objection.  Asked and answered.

Page 153

THE WITNESS:  None, no.

(Deposition Exhibit Numbers 35 and 36 were marked for identification.)

BY MR. CUTRI:

Q.  In any event, I was able to take a look at it.  I took some photographs that I want to represent to you were -- it's the -- this was the shuffler I was shown that someone told me was the shuffler that was sent from Luciano Packaging.  This is a photograph taken of the panel.  I've marked this photograph as Exhibit 35.

MS. MAROULIS:  I'm going to object to these exhibits as lacking foundation.  The witness hasn't seen this particular model, doesn't know if it's the same model, if he did, what these photographs represent.

BY MR. CUTRI:

Q.  I'm going to show you what I've marked as Exhibits 35 and 36.  Does that appear to be the Luciano shuffler?

A.  Yes.

Q.  I'm going to represent to you that all the photographs that are shown here are of this same model shuffler that I was shown.

A.  Okay.

Q.  I really only have one ultimate question on these photographs.  What I'd like to do is give you a stack of photographs and see if you can establish for me where in

39 (Pages 150 to 153)

LITIGATION SERVICES & TECHNOLOGIES

0ff3548e-abd6-400f-9d25-8d8af1633f1a

HIGHLY CONFIDENTIAL

SGC 0000726390