Jennifer K. Farrar, Vol.II                CondenseIt!™                February 19, 2003

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

SHUFFLE MASTER, INC., a           )
Nevada corporation,               )
                                  )
                    Plaintiff,    )
                                  )
        vs.                       )  NO. CV-S-02-0438-JCM-PAL
                                  )
VENDINGDATA CORPORATION, a        )
Nevada corporation;               )
CASINOVATIONS, INC., a Nevada     )
corporation; and CASINOVATIONS)
SALES INCORPORATED, a Nevada      )
corporation,                      )
                                  )
                    Defendants.   )
                                  )
AND RELATED CLAIMS.               )
                                  )

30(b)(6) DEPOSITION OF SHUFFLE MASTER, INC.,
REPRESENTED BY JENNIFER K. FARRAR
VOLUME II (Pages 49 - 118)

Taken on Wednesday, February 19, 2003

At 1:51 p.m.

At QUIRK & TRATOS

3773 Howard Hughes Parkway, Suite 500 North

Las Vegas, Nevada

Reported by:  MICHELLE C. JOHNSON, RPR-CRR, CCR NO. 771

---

Page 2

APPEARANCES:

For the Plaintiff:    JOSEPH R. RE
                      Attorney at Law
                      KNOBBE MARTENS OLSON & BEAR LLP
                      2040 Main Street
                      Fourteenth Floor
                      Irvine, California 92614

For the Defendants:   W. WEST ALLEN
                      Attorney at Law
                      QUIRK & TRATOS
                      3773 Howard Hughes Parkway
                      Suite 500 North
                      Las Vegas, Nevada 89109

ALSO PRESENT:    Kimberly Farrar

INDEX

EXAMINATION
WITNESS                          PAGE
JENNIFER K. FARRAR, VOLUME II
  By Mr. Allen (Resumed)           51

EXHIBITS

NUMBER        DESCRIPTION        PAGE

3      Page starting "Useful Accessories"    73
       (VD 00840)

4      "Shuffle Master, Inc. Headcount by    108
       Calendar Year End" (1 page)

INFORMATION TO BE SUPPLIED

(NONE)

---

Page 3

JENNIFER K. FARRAR, having been previously duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified further as follows:

MR. ALLEN: This is be the continuation of the deposition of Jennifer Farrar. And I'll try not to backtrack, but it's difficult to intermix depositions. I'll do the best I can.

MR. RE: Counsel, this is the same deposition. This is a deposition of Shuffle Master; you did not notice Jennifer. We're having a basic misunderstanding. This is one deposition of Shuffle Master. Okay?

MR. ALLEN: Yes, I understand that, Counsel. I'm talking about I would prefer, of course, to continue with one deponent at a time. And we're going to do the best we can. I will continue off where I left off with this deponent before we had to have another deponent in between.

MR. RE: To be technical, they're all the one deponent.

EXAMINATION (RESUMED)
BY MR. ALLEN:

Q. In Shuffle Master's prosecution of the '258

---

Page 4

and '373 patent, did any antitrust concerns arise?

MR. RE: Outside the scope of notice. Don't reveal any communications with your client.

THE WITNESS: There were none that I recall.

MR. ALLEN: Q. I think previously we discussed that you had not reviewed any confidentiality agreements related to the prosecution of the '258 and '373 patents. Is that correct?

A. Correct.

Q. These probably won't be exhibits. I just want to confirm that these are documents you have not seen.

A. Well, I saw them in the course of the document production.

Q. Okay.

A. But I didn't know of them at the time.

Q. All right. Do you know what these are?

A. I know there's one that Joe Lahti signed. Maybe two that Joe Lahti signed. This one was later. This was in '97.

Q. If you didn't produce these, I won't go into it.

During your prosecution of your patents, the '373 and '258 patents, did you ever inquire if there were any confidentiality agreements that might limit

SGC 0000026329

Page 53

was there and I went to the booth.

Q. Why are you at these trade shows?

A. To monitor competitive activity. To meet with people in the industry that only come in for the trade show.

Q. Does Shuffle Master ever see things at the trade show and then do analysis of your patent portfolio --

A. Yes.

Q. -- to decide what else -- okay.

Do they decide what else they can file by way of continuations after that review of things at a trade show?

A. We could. But we haven't been doing that. We mainly just look for infringement.

Q. Do you know if, as a result of your trip to the trade show in or around 1998, if the VendingData shuffler machine caught your attention and caused you to do something with respect to your patents?

MR. RE: Lacks foundation.

MR. ALLEN: Q. Let's talk to your trip to the sharper -- to the convention that had a VendingData shuffler machine.

Who was with you when you went?

MR. RE: The '98 show is what you're asking

Page 54

about?

MR. ALLEN: Yes.

THE WITNESS: What do you mean by who was with me? Who traveled from our Minnesota office? Or who I traveled with?

MR. ALLEN: Q. Did you go by yourself? I'm trying to figure out exactly what happened.

You're at the show; you're looking at competitors' products. You see the Shuffle Master product. What did you do then?

MR. RE: Lacks foundation.

MR. ALLEN: Q. Did you see a Shuffle Master product when you went to the show?

A. I visited our booth, yes.

MR. RE: Why don't you just ask, what did you see? That's an easier way.

MR. ALLEN: Q. Did you visit a VendingData booth?

A. I don't specifically recall. There was 2,000 booths. Might have.

Q. Now you're saying that you're unaware if you actually saw the VendingData machine at the 2000 -- or the '98 -- convention.

A. Right. I never said I saw it. I don't know.

MR. RE: Hence my objection, lacking

Page 55

foundation.

MR. ALLEN: Q. Do you know if anyone else at Shuffle Master saw the VendingData machine at the '98 convention?

MR. RE: Lacks foundation.

MR. ALLEN: Q. Do you know?

MR. RE: Lacks foundation.

THE WITNESS: The engineers probably would have looked at it.

MR. ALLEN: Q. Yeah, I'm talking about Shuffle Master individuals.

A. Right. I might have too. I don't know. There's an awful lot of things to look at.

Q. Do you have any specific recollection of seeing a VendingData product at the Shuffle Master -- or at the '98 show?

A. No.

Q. Do you have any specific recollection of crafting language or suggesting language to be crafted in the '644 application as a result of seeing anything at the '98 show?

A. No.

Q. Do you have any reason to believe that Mark Litman was aware of any VendingData product that was at the '98 convention?

Page 56

A. I don't think he was working with us yet in '98.

Q. Any reason to believe Dorsey & Whitney had any knowledge of VendingData products on display at the show?

A. We didn't invite them.

Q. Is there any particular reason that, for example, following the '742 application down to the '644 application, that so such time elapses between the applications? I mean, is there any strategy there that you would have such time elapse?

A. Why we waited so long to file this one after this one?

It looks like we filed it near the -- probably at the time we paid the issue fee of the '014 or when we got the notice of allowance. I think the '644 was a case that went into quality control in the patent office, and it took an inordinate amount of time from the notice of allowance to the time the case actually issued.

But I think that if you looked at the file history, you would find that we filed this continuation around the time of the notice of allowance of the '742.

Q. You don't have any other Shuffle Master strategy or idea why that delay would be there?

SGC 0000026342