**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SHUFFLE TECH INTERNATIONAL LLC, ACES UP GAMING, INC., and POYDRAS-TALRICK HOLDINGS LLC,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No. 15 C 3702** |
| **SCIENTIFIC GAMES CORPORATION, BALLY TECHNOLOGIES, INC., and BALLY GAMING, INC.,** | ) ) ) ) | |
| **Defendants.** | ) ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Shuffle Tech International LLC, Aces Up Gaming, Inc. and Poydras-Talrick Holdings LLC have filed suit against Scientific Games Corporation, Bally Technologies, Inc., and Bally Gaming, Inc., alleging that their patents are invalid and that they nevertheless knowingly attempted to enforce them in violation of federal antitrust statutes, the Lanham Act, and Illinois law. In a previous ruling, the Court granted defendants' motion to dismiss all but one count of plaintiffs' complaint, a claim in which plaintiffs asserted that defendants have used enforcement of their patents to suppress competition in the market for automated playing card shufflers in violation of section 2 of the Sherman Act and section 4 of the Clayton Act. Defendants have moved for summary judgment on this remaining claim. For the reasons stated below, the Court denies defendants' motion.

## Background

### A.     The parties and the relevant patents

Shuffle Tech International LLC is an Illinois limited liability company that develops and manufactures automatic playing card shuffling machines for use by private consumers and casinos.  In April 2012, Shuffle Tech demonstrated its card shuffler patents and technology to DigiDeal Corporation, a gaming equipment manufacturer. The parties then entered into a licensing agreement along with Poydras, a "special purpose vehicle" created by investors to fund the development and production of Shuffle Tech's product, the DigiShuffle.  Pls.' Resp. to Defs.' Statement of Undisputed Material Facts (SUMF) ¶ 16(b).  In the agreement, Shuffle Tech granted Poydras a license to its patents on the product, and Poydras subsequently granted a sub-license to DigiDeal. The agreement required DigiDeal to engineer, produce, market, and sell the shuffler in exchange for royalty payments to Poydras and Shuffle Tech.  Shuffle Tech agreed to defend DigiDeal against any patent infringement claims involving the licensed technology and to indemnify DigiDeal for any resulting attorneys' fees.  Defs.' SUMF, Ex. 2 at 10.  In September 2013, DigiDeal retained Aces Up to conduct the marketing and sales of the DigiShuffle in exchange for commissions.

In 1983, John Breeding started SHFL Entertainment, Inc., a company whose purpose was to manufacture automatic playing card shufflers for use in casinos.  By 2012, SHFL had released multiple different models of automatic card shufflers and obtained approximately 253 patents related to shuffler technology.  In 2013, Bally Technologies acquired SHFL, and in 2015 Scientific Games acquired Bally Technologies.  Scientific Games is therefore the present owner of SHFL and its patents.

Bally Gaming is a subsidiary of Bally Technologies and therefore now operates under Scientific Games. It is responsible for manufacturing equipment and games for casinos in the United States. In keeping with the parties' briefs, the Court will refer to defendants in this case collectively as SHFL.

The parties' dispute arises out of two of SHFL's patents: the '982 patent and the '935 patent. In April 2002, SHFL filed the application for the '982 patent based on a new model of an automatic shuffler known as the Deckmate 1. According to SHFL, the Deckmate 1 is an advance over other automatic shufflers based on the technology it uses to receive cards and return them to the dealer. The Deckmate 1 is installed under the gaming table, with its upper surface flush with the surface of the table. It also uses an elevator to move the cards from beneath the table where they are randomized to the top of the table for use. The elevator has a cover that moves automatically to return the cards to the dealer.[1] *See* Pls.' Resp. to Defs.' SUMF, Ex. 7-1. Mark Litman, SHFL's outside patent prosecution counsel, prepared and prosecuted the '982 patent. Jennifer Farrar, SHFL's in-house intellectual property counsel, likely would have reviewed the patent application before filing it with the United States Patent and Trademark Office (PTO). The application lists Atilla Grauzer, an engineer at SHFL, as the first inventor. During prosecution, SHFL disclosed many other patents as prior art. The PTO issued the '982 patent in November 2003. In October 2003, SHFL filed an application for what eventually became the '935 patent, also based on the Deckmate 1, a divisional of the

---

[1] The Court summarizes the contents of the relevant patents only for the purpose of resolving SHFL's summary judgment motion, which does not ask the Court to construe any claims in the patents. The Court's description should not be taken as a construction of any patent at issue in this case.

application that became the '982 patent.  The '935 patent issued in April 2009.

**B.      Competition in the automatic shuffler market**

Plaintiffs primarily contend that SHFL failed to disclose relevant pieces of prior art during the prosecutions and reexaminations of the '982 and '935 patents.  The Court therefore provides an overview of these prior art references and SHFL's interaction with them.

### 1.      Nicoletti shuffler

In September 1990, a New Jersey newspaper named The Courier-Post published an article about Adolph Nicoletti and an automatic shuffler he had invented.  Pls.' Resp. to Defs.' SUMF, Ex. 17.  The article described the shuffler as "installed under a blackjack table" and included an image of the installed machine.  *Id.*  It also stated that Nicoletti had conducted a test run of his machine by installing it in a casino in Atlantic City.  The test run ended after one week due to malfunctions.  Breeding testified that he knew of a shuffler in Atlantic City that was "so big it was built under the table and cards would go down inside," but he never saw it and does not know who manufactured it.  Pls.' Resp. to Defs.' SUMF, Ex. 856 (Breeding Dep.) at 97:9–10.  Breeding stated that the patent holder for the machine called him with an offer to sell the technology but that he turned it down.  *Id.* at 97:13–15.

### 2.      Luciano prototype

Around July 1992, Lawrence Luciano developed a prototype of an automatic shuffler for his company, Luciano Packaging, Inc., as a result of a development agreement with International Game Technology, Inc. (IGT).  In November 1993, IGT cancelled the development agreement.  Luciano then began marketing his prototype

shuffler (the Luciano prototype) to casinos and other potential customers. He made a promotional video that showed the prototype in operation, which he provided to anyone in the industry who expressed interest. Pls.' Resp. to Defs.' SUMF, Ex. 1027 (Luciano Dep.) at 92:7–9.

### 3. Roblejo prototype

In October 1997, SHFL participated in the World Gaming Expo in Nevada. Various SHFL executives and employees attended the expo, including Grauzer and Farrar, who was sent there to monitor competitive activity. At the expo, another company named Casino Concepts displayed a prototype of an automatic shuffler invented by Dr. Conrad Roblejo called the Sure-Shuffler (hereafter, the Roblejo prototype). During the expo, Halvard Solberg, who was hired by Casino Concepts to provide technical support at the expo, gave a very detailed demonstration of the Roblejo prototype to individuals he later learned were representatives of SHFL. The demonstration required Solberg to open the top cover and eventually remove side panels in order to answer specific technical questions. An executive at Casino Concepts later wrote a memo to Dr. Roblejo, in which he stated that "during the entire show people from [SHFL] looked at our equipment." Pls.' Resp. to Defs.' SUMF, Ex. 90 at 2. He stated that Casino Concepts representatives spoke with SHFL's original designer, vice president of finance, and other unidentified employees. *Id.*

Farrar says that she visited a Casino Concepts booth at an expo in the early years of her career at SHFL but does not recall if it was in 1997. She observed a machine on the table but did not know what it was or how it operated, as there was no one manning the booth at the time. SHFL's file on the expo contains a copy of a

brochure of the Roblejo prototype displayed at the 1997 expo.  Grauzer testified that he

has never seen the Roblejo prototype at all, much less the interior of the machine.

Defs.' SUMF, Ex. 9 (Grauzer Dep.) at 141:3–12.  Grauzer's files contain a report on the

1997 expo, which discusses the Roblejo prototype and includes a marketing brochure.

*See* Pls.' Resp. to Defs.' SUMF, Ex. 9.  Grauzer maintains that he did not write this

report and could not possibly have done so because it contains non-technical

information as well as bullet points, which he does not know how to create.  Grauzer

Dep. at 109:4–25; Pls.' Resp. to Defs.' SUMF, Ex. 1012 at 115:6–16.  Donald Barnett, a

former SHFL employee, testified during his deposition that Grauzer would have been

the person SHFL relied upon to analyze competition at trade shows.  Pls.' Resp. to

Defs.' SUMF, Ex. 1022 (Barnett Dep.) at 18:7–16.  Barnett stated that Grauzer is the

only individual who would have written a report analyzing competition seen at a trade

show.  *Id.* at 187:9–188:3.  Another former SHFL employee, Robert Pietrosanto, agrees

that Grauzer would have been the only individual working for SHFL at the time who was

qualified to analyze a competitive product.  Pls.' Resp. to Defs.' SUMF, Ex. 1021

(Pietrosanto Dep.) at 33:16–34:3.

### 4.    Block patent

The Block '044 patent, issued by the PTO in March 2002, discloses an automatic

card shuffling and dealing system that includes a shuffling device under the gaming

table and an elevator that delivers the shuffled cards to the table surface.  SHFL

disclosed this patent in the specifications of four patent applications it submitted in July

2003 as well as during the course of the prosecution of the '935 patent  The company

did not disclose the Block '044 patent in the application for the '982 patent.

## 5.    CARD litigation

In 2002, Casino Austria Research and Development in Vienna (CARD) began importing into the United States an automatic shuffler known as the "one2six."  In May 2003, CARD filed suit in federal court in Nevada against SHFL requesting a declaratory judgment that its shuffler did not infringe two of SHFL's patents, neither of which is at issue in this case.  SHFL filed a counterclaim alleging infringement of those patents as well as one other.  During the litigation, CARD argued that SHFL's patents were invalid because they were anticipated by the Nicoletti shuffler, the Luciano prototype, and the Roblejo prototype.  Grauzer submitted a declaration in that case on behalf of SHFL in which he disputed this contention as to each reference.  Both Grauzer and Litman attended the deposition of CARD's technical expert, Joel Greenberg, who opined that the Luciano and Roblejo prototypes anticipated SHFL's patents.  Toward the end of the litigation, either SHFL or its counsel at the time created what the parties here refer to as the shuffler art discs, which contained documents from the CARD litigation and technical information on the pieces of allegedly invalidating prior art.

In June 2004, SHFL and CARD voluntarily dismissed the Nevada case following a settlement agreement in which SHFL acquired CARD.  Litman and Farrar then filed copies of the shuffler art discs in multiple pending patent applications before the PTO.  SHFL did not file a copy of the disc as part of the then-pending '935 application.  It did represent in amendments filed with a different patent application related to shuffler technology that both in-house and outside prosecution counsel for SHFL were "in the time-consuming process of reviewing documents . . . that are the result of litigation between [SHFL] and third parties."  Pls.' Resp. to Defs.' SUMF, Ex. 248 at 12.

**C.    The DigiDeal suit and the present litigation**

In October 2012, DigiDeal displayed the DigiShuffle prototype at a gaming show in Nevada, which SHFL employees attended.  These employees saw the prototype and SHFL then filed suit against DigiDeal in the District of Nevada, alleging that the DigiShuffle infringed the '982 and '935 patents.  The case was assigned to Judge Gloria Navarro.  Shuffle Tech and Poydras both received notice of the suit and obtained counsel in anticipation of litigation.

In July 2013, Shuffle Tech and DigiDeal amended their licensing agreement. The amendment expressly discussed SHFL's lawsuit and stated that Shuffle Tech agreed to pay litigation costs, even though the suit did not fall within the scope of the litigation Shuffle Tech was required to pay for as defined in the original agreement. Defs.' SUMF, Ex. 3 at F.1.  The amendment also stated that Shuffle Tech "shall be entitled to any reimbursement for fees and expenses and/or other damages resulting from [SHFL's infringement suit] payable by SHFL to any" of the parties to the licensing agreement.  *Id.* at 11.1.  An investor at Poydras found an attorney, Marie Kerr, to represent DigiDeal.  For some period of time, DigiDeal, Poydras, and Shuffle Tech held joint strategy sessions to determine the course of litigation, and Shuffle Tech primarily defended DigiDeal in the suit.

In October 2013, however, Mike Kuhn, the president of DigiDeal, instructed attorney Kerr to keep confidential to DigiDeal all information regarding the suit.  Pls.' Resp. to Defs.' SUMF, Ex. 872.  In September 2014, DigiDeal removed Kerr as counsel and replaced her with James Boyle and Nathan Henderson.  In August 2014, DigiDeal filed suit against Shuffle Tech and Poydras in the Eastern District of Washington,

alleging breach of contract, primarily on the ground that Shuffle Tech had failed to uphold its obligation to defend DigiDeal against SHFL.

Meanwhile, in January 2014, DigiDeal initiated re-examination proceedings before the PTO on claims 1–3 and 42–46 of the '982 patent, and claims 1, 2, 9–11, and 14 of the '935 patent. Alan Fanucci acted as lead counsel for SHFL in the reexamination proceedings and received assistance from Howard Shin and Kimball Anderson. In August 2014, the PTO rejected claims 1–3 and 42–46 of the '982 patent based on the Block '044 patent and the Roblejo '122 patent. SHFL then amended its claims to state that the shuffler must be mounted flush with a recessed support surface beneath the table cover and a cover set flush into the shuffler's top surface over the elevator, features not taught by the Block patent. The PTO agreed that the Block patent taught away from SHFL's invention as described in the amended claims, because the Block device prevents anyone from physically touching the cards and does not teach a shuffler that has a top surface mounted flush with the gaming table surface. Defs.' SUMF, Ex. 61E at 4. On May 2015, the PTO confirmed that the claims in the '982 patent were patentable, and it issued a reexamination certificate in July 2015.

During the '935 reexamination, the PTO also rejected some of the claims in the '935 patent after determining that they were obvious based on the Block '044 patent and combinations of the Roblejo '122 patent with other patents. The PTO indicated that the material in the '935 patent was obvious in light of the disclosure in the Roblejo '122 patent of an automatic shuffler and another reference that described a mah-jongg block shuffler mounted to a gaming table and recessed beneath its surface. Defs.' SUMF, Ex. 62C at 14. The PTO also indicated that the Block patent teaches an automatic shuffler

mounted to a gaming table and therefore that it "teaches the limitations deemed to be missing from the prior art during the original prosecution of the '935 patent." Pls.' Resp. to Defs.' SUMF, Ex. 6-1 at 1139. SHFL then cancelled all of the reexamined claims from the '935 patent "in order to expedite the issuance of a reexamination certificate." Defs.' SUMF, Ex. 62E at 5.

In April 2015, plaintiffs filed the present suit against SHFL, alleging misconduct in its enforcement of the '982 and '935 patents. In count 1, plaintiffs request a declaratory judgment that SHFL fraudulently withheld information from the PTO in order to acquire the '982 and '935 patents and attempted to enforce these patents so as to restrict trade in the market for automated shufflers. Plaintiffs allege in count 2 that SHFL initiated sham litigation in order to sustain market power in violation of section 2 of the Sherman Act and section 16 of the Clayton Act. In count 3, they allege that SHFL has acquired many card-shuffler companies and technologies in order to consolidate market power in violation of section 7 of the Clayton Act. Plaintiffs allege in count 4 that SHFL knowingly misrepresented the validity of their patents in violation of the Lanham Act. In count 5, they allege that the conduct outlined above constitutes unfair competition in violation of Illinois statute. Plaintiffs allege in count 6 that the same conduct constitutes deceptive trade practices under Illinois statute.

In June 2015, SHFL filed a notice of concurrent proceedings with the PTO in which it attached a copy of the complaint in this case. The notification indicated that SHFL had determined it had no obligation to submit the references mentioned in plaintiffs' complaint because it had already determined that they were either cumulative, already made of record, or not a patent or publication. In July and August 2015, the

PTO issued reexamination certificates for the '982 and '935 patents.

In October 2015, this Court granted SHFL's motion to dismiss counts 1, 3, 4, 5, and 6 but denied the motion as to count 2.  Plaintiffs then filed an amended complaint for count 2, in which they alleged that SHFL violated the Sherman Act and the Clayton Act by procuring its patents using fraud on the PTO and then engaging in sham litigation by asserting baseless claims against other companies.  *See* dkt. no. 50.

In January 2016, DigiDeal moved for summary judgment in the Nevada litigation over the DigiShuffle.  The court granted the motion in March 2016, and SHFL appealed. DigiDeal has chosen to not defend the judgment and has forfeited its right to brief the issues.  That appeal is still pending.  *See SHFL Entm't, Inc. v. DigiDeal Corp.*, No. 2:12-CV-01782-GMN-VCF, 2016 WL 1257861 (D. Nev. March 30, 2016).  In April 2016, DigiDeal moved for attorneys' fees under 35 U.S.C. § 285 on the ground that the case was exceptional.  It argued that SHFL did not conduct an adequate investigation into the DigiShuffle before filing its counterclaim for infringement and that SHFL aggressively pursued substantively unsupportable patent claims.  The magistrate judge assigned to the case, Judge Ferenbach, recommended that Judge Navarro deny the motion for fees.  *See* Defs.' SUMF, Ex. 72.  Judge Ferenbach first stated that "[i]n order to succeed, Digideal was required to show that no reasonable litigant could realistically have expected success on the merits" of SHFL's claims.  *Id.* at 2 (internal quotation marks omitted).  Judge Ferenbach concluded that DigiDeal failed to do so and it was "thus reasonable for SHFL to bring th[e] infringement action and defendant against Digideal's counterclaims."  *Id.* at 3.  Judge Navarro adopted the report in full.  *See* Defs.' SUMF, Ex. 73 at 2.

**Discussion**

SHFL has moved for summary judgment on plaintiffs' remaining claim, count 2. It contends that plaintiffs are precluded from arguing that the suit against DigiDeal qualifies as sham litigation based on the ruling by Judges Ferenbach and Navarro and that SHFL's litigation against DigiDeal was not objectively baseless. SHFL also contends that plaintiffs have failed to provide evidence from which a reasonable juror could infer that SHFL had specific intent to defraud the PTO.

When considering a motion for summary judgment, the Court views the record in the light most favorable to the non-moving party and draws all inferences in its favor. *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017). Summary judgment is appropriate where the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017). A genuine issue of material fact exists "when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**A.     Issue preclusion**

SHFL argues that plaintiffs should be precluded from asserting that SHFL improperly used its patents to attempt to acquire monopoly power by bringing a baseless suit against DigiDeal, because Judge Navarro ruled that the suit against DigiDeal was not objectively baseless when denying its motion for attorneys' fees.

The doctrine of issue preclusion—otherwise known as collateral estoppel— "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." *Taylor v. Sturgell*, 553 U.S. 880,

892 (2008) (internal quotation marks omitted). The purpose of the doctrine is to conserve judicial resources and minimize the possibility of inconsistent decisions by "precluding parties from contesting matters they have had a full and fair opportunity to litigate." *Id.* Whether issue preclusion is appropriate is a question of law. *Matrix IV, Inc. v. Am. Nat'l Bank & Trust Co. of Chicago*, 649 F.3d 539, 547 (7th Cir. 2011). For issue preclusion to apply, (1) the issue sought to be precluded must be the same as that involved in the prior litigation; (2) the issue must have been actually litigated; (3) the determination of the issue must have been essential to the final judgment; and (4) the party against whom estoppel is invoked must be fully represented in the prior action. *Id.* The parties focus their arguments on whether the issue SHFL attempts to preclude is the same as that decided by the district court in Nevada and whether plaintiffs were fully represented in the prior action.

### 1. Similarity of the issues

SHFL contends that the key issue that plaintiffs attempt to litigate is identical to one already decided by Judge Navarro. The company argues that plaintiffs allege a single violation "of section 2 of the Sherman Act, by alleging that in sham litigation SHFL asserted fraudulently obtained patents" in violation of *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965). Defs.' Mem. in Support of Mot. for Summ. J. at 10. SHFL argues that Judge Navarro's ruling on DigiDeal's motion for fees conclusively determined an issue essential to plaintiffs' claim of sham litigation in SHFL's favor: whether SHFL's suit against DigiDeal was objectively baseless.

SHFL is correct that Judge Navarro's ruling on DigiDeal's motion for fees conclusively decided an issue that is identical to a necessary element of plaintiffs' claim

for sham litigation.  Plaintiffs claim that SHFL violated section 2 of the Sherman Act by engaging in a "pattern of sham litigation, asserting objectively baseless claims to enforce patents . . . with the intent to directly interfere with and adversely affect the business operations of competitors."  Am. Compl. ¶ 1.  "Those who petition government for redress are generally immune from antitrust liability" based on those efforts.  *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993).  Immunity is not available, however, for "sham" activities—i.e., activities that are used in an attempt to interfere directly with a competitor's business relationships.  *Id.*  In *Professional Real Estate*, the Supreme Court established a two-part definition for what qualifies as "sham" litigation:  (1) "the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits"; and (2) the litigant must have a subjective intent to directly interfere with a competitor's business.  *Id.* at 60.  Thus if plaintiffs wish to argue that SHFL's suit against DigiDeal was a sham, they must demonstrate that no reasonable litigant could have expected success on the merits of that suit.

This is precisely the argument that Judge Ferenbach considered and rejected when evaluating DigiDeal's motion for attorneys' fees under 35 U.S.C. § 285.  DigiDeal argued that the case SHFL brought against it was "exceptional" in that it "st[ood] out from others with respect to the substantive strength of [SHFL's] litigating position."  Defs.' SUMF, Ex. 72 at 2.  Judge Ferenbach stated that, to merit an award of fees, DigiDeal must "show that no reasonable litigant could realistically have expected success on the merits."  *Id.* (internal quotation marks omitted).  He then concluded that DigiDeal failed to make that showing.  *Id.*  Judge Navarro later adopted Judge

Ferenbach's recommendation in its entirety. Thus Judge Navarro has already determined that the suit against DigiDeal was not objectively baseless, which is identical to one of the elements required to prove sham litigation. Therefore plaintiffs may be precluded from pursuing this theory if the other requirements of issue preclusion are met.

But plaintiffs' claim does not rest solely on their allegation that SHFL engaged in a pattern of sham litigation. They also contend that SHFL wrongfully enforced "patents that were fraudulently procured" from the PTO. Am. Compl. ¶ 1. Case law from other circuits indicates that this type of claim—known as a *Walker Process* claim—is based on a different type of "sham" activity. In the patent context, a sham litigation claim is based on the theory that a patentee has abused the court system by pursuing infringement lawsuits it knows to be meritless. By contrast, a *Walker Process* fraud claim is based on the theory that a patentee has abused the patent system by using fraud to obtain an otherwise invalid patent. *See C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1367–69 (Fed. Cir. 1990) (considering as two separate theories a claim of *Walker Process* fraud and a claim of sham litigation); *Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1045 (9th Cir. 2009) (same). And the standard for *Walker Process* fraud is significantly different from the standard for sham litigation. To prove *Walker Process* fraud, a plaintiff must show "first, that the antitrust-defendant obtained the patent by knowing and willful fraud on the patent office and maintained and enforced the patent with knowledge of the fraudulent procurement; and second, all the other elements necessary to establish a Sherman Act monopolization claim." *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016).

Therefore plaintiffs are not required to demonstrate that SHFL's counterclaims against DigiDeal were objectively baseless in order to pursue their claim of fraud on the PTO. And SHFL has not pointed to any issue relevant to the requirements of a *Walker Process* claim that was decided by Judges Navarro or Ferenbach. Thus the issues in dispute under the claim of *Walker Process* fraud are not the same as those previously decided by the district court in Nevada.

In summary, Judge Navarro already ruled on a key issue relevant to plaintiffs' theory of sham litigation: whether the suit against DigiDeal was objectively baseless. Therefore plaintiffs may be precluded from pursuing this theory if the other requirements of issue preclusion are met. The issues decided by Judge Navarro are not relevant to plaintiffs' allegations of *Walker Process* fraud and therefore plaintiffs are not precluded from proceeding with their antitrust claim on this theory.

**2.     Party representation**

The parties next focus on whether plaintiffs were adequately represented in the earlier litigation. Ordinarily issue preclusion cannot be used against someone who was not a party to the original suit because he has not had a full and fair opportunity to litigate the issues that were previously decided. *Taylor*, 553 U.S. at 892. But the Supreme Court has recognized six exceptions, under which an individual who was not a party to the earlier ruling may nevertheless be bound by its holding. Issue preclusion can apply against a nonparty when:

(1) the nonparty agrees to be bound by the determination of the issues in the prior action;

(2) the nonparty has a pre-existing substantive legal relationship with a party to

the judgment;

(3) the nonparty was adequately represented in the prior action by someone with the same interests;

(4) the nonparty assumed control over the prior action in which the judgment was rendered;

(5) the nonparty is being used by one who was party to the judgment as an attempt to relitigate by proxy; and

(6) a special statutory scheme expressly forecloses successive litigation by nonparties, if the scheme is consistent with due process.

*Id.* at 893–95.  Although plaintiffs were not parties to the DigiDeal litigation, SHFL contends that they should be precluded from re-litigating the issue of sham litigation because they have a pre-existing substantive legal relationship with DigiDeal by virtue of their licensing arrangement and they assumed control over the DigiDeal litigation.

### a.    Pre-existing legal relationship

SHFL first argues that plaintiffs were fully represented by DigiDeal in the Nevada litigation based on their pre-existing legal relationship with DigiDeal under the licensing agreement.  The Supreme Court has not provided significant guidance on the types of legal relationships that are sufficient to justify issue preclusion against a nonparty.  But the Court in *Taylor* provided a non-exhaustive list of qualifying relationships, including "preceding and succeeding owners of property, bailee and bailor, and assignee and assignor."  *Taylor*, 553 U.S. at 894.  These examples demonstrate the common feature that justifies nonparty issue preclusion based on a pre-existing legal relationship:  each party, by virtue of their legal agreement, has a specific relationship to the same piece of

property.  *See id.* ("These exceptions originated as much from the needs of property law as from the values of preclusion by judgment.").  Under such circumstances, it follows that when a court issues a ruling regarding the legal status of a piece of property, those with related interests should also be bound by that determination.

That is not the situation here.  Plaintiffs and DigiDeal do share a property-based relationship regarding the technology and patents underlying the licensing agreement. But Judge Navarro's ruling which SHFL now attempts to use to justify preclusion does not concern the legal status of the technology and patents.  Instead, Judge Navarro ruled on the merits of the litigation SHFL brought against DigiDeal, and plaintiffs do not share a legal property-based relationship with DigiDeal regarding this suit.  *See Duckett v. Fuller*, 819 F.3d 740, 746 (4th Cir. 2016) (noting that this exception is reserved for legal, property-based relationships); *Amos v. PPG Indus., Inc.*, 699 F.3d 448, 451 (6th Cir. 2012) (the term "pre-existing substantive relationships" "refers primarily to relationships arising from property law").  Thus the needs of property law do not require this Court to preclude plaintiffs from arguing that the lawsuit against DigiDeal was a sham.

SHFL argues that, because plaintiffs relied on their contractual relationship with DigiDeal to survive a motion to dismiss in the present case based on lack of standing, they cannot now "shed that relationship to avoid a finding of privity here."  Defs.' Mem. in Support of Mot. for Summ. J. at 14.  SHFL is correct that a party who has assumed a position in a legal proceeding cannot later assume a contrary position, especially if it would prejudice the opposing party.  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  This rule, however, is based on the doctrine of judicial estoppel, and it also

requires that the court accepted the earlier position such that its acceptance of the new position would lead to inconsistent determinations. *Id.* at 750. And SHFL is incorrect in its contention that this Court determined that plaintiffs have standing to pursue their antitrust claim based solely on the licensing agreement. In fact, in ruling on SHFL's motion to dismiss, the Court specifically cited Seventh Circuit precedent which indicates that "[i]t is not [an entity's] status as a licensor but [its] relationship to the violation that determines [its] right to sue." Dkt. no. 48 at 23 (citing *Grip-Pak, Inc. v. Ill. Tool Works, Inc.*, 694 F.2d 466, 474 (7th Cir. 1982)). In sum, this Court's ruling on SHFL's motion to dismiss does not require a finding that the licensing agreement supports the application of issue preclusion against plaintiffs.

### b. Control over litigation

SHFL also contends that plaintiffs were fully represented in the DigiDeal suit because Shuffle Tech assumed control over the litigation. All parties agree that Shuffle Tech had an obligation under the licensing agreement to defend DigiDeal against certain patent infringement claims; Shuffle Tech agreed to pay for DigiDeal's defense costs in the Nevada case; Poydras found Kerr, the counsel hired to defend DigiDeal; and Shuffle Tech "defended the suit for a time." Pls.' Resp. to Defs. SUMF ¶ 66. The Supreme Court has previously indicated that this level of influence over the proceedings justifies preclusion against a nonparty to the suit. *See Montana v. United States*, 440 U.S. 147, 155 (1979) (finding control where nonparty required that suit be filed, reviewed and approved the complaint, paid the attorneys' fees and costs, directed multiple appeals, submitted an amicus brief, and effectuated abandonment of one of the appeals).

But here the relevant ruling came in the course of DigiDeal's motion for attorney's fees filed after it prevailed in the Nevada case. The evidence shows that plaintiffs relinquished their control over the DigiDeal litigation well before the company filed its motion for fees in April 2016. In October 2013, Kuhn instructed attorney Kerr to keep all communication regarding the lawsuit confidential to DigiDeal itself. Pls.' Resp. to Defs.' SUMF, Ex. 872. Then, in August 2014, DigiDeal sued plaintiffs alleging that they had breached the licensing agreement, in part due to their claimed failure to defend DigiDeal in the Nevada suit. In September 2014, DigiDeal replaced Kerr with James Boyle and Nathan Henderson. Pls.' Resp. to Defs.' SUMF, Ex. 811. Boyle testified that he has never communicated with anyone affiliated with Shuffle Tech, except possibly to clarify the relationship between Shuffle Tech and DigiDeal as it relates to the underlying technology. Pls.' Resp. to Defs.' SUMF, Ex. 1014 (Boyle Dep.) at 19:18–25. The only communication he remembers with Joseph Presta, plaintiffs' counsel in this case, is a phone call from Presta to introduce himself and to say that he would be handling the suit in this district. Defs.' Resp. to Pls.' Statement of Additional Facts (SAF), Ex. 105 at 10:21–11:14. At most, Boyle recalls someone, possibly Presta, communicating to him that Shuffle Tech might possess some references that would support Boyle's argument that SHFL's patents were invalid. *Id.* at 13:13–14:5. But Boyle stated that he never did anything with this information. *Id.* at 14:5–7. Thus there is no basis to support a finding that plaintiffs still exercised any control over the DigiDeal litigation by the time the motion for fees was filed in April 2016.

SHFL argues that any loss of control was due to plaintiffs' own misconduct in failing to meet their obligation to defend the suit under the licensing agreement. Even if

this is true, however, the control exception to the prohibition against nonparty issue preclusion rests on a party's actual control of the litigation, not its theoretical ability to exercise control.  The fact that plaintiffs may have lost control over the litigation only through their own malfeasance does not alter the conclusion that they lacked control when the motion for fees was filed and ruled upon.  The Court therefore cannot find that plaintiffs were adequately represented in the Nevada litigation at that time.

### 3.  Summary

Because Judge Navarro did not rule on any issue relevant to plaintiffs' *Walker Process* fraud claim, plaintiffs are not precluded from pursuing this theory of sham activity by SHFL.  Although Judge Navarro did rule in SHFL's favor on a key aspect of plaintiffs' claim of sham litigation, plaintiffs were not adequately represented by DigiDeal in that suit during the relevant time period and therefore they are not precluded from pursuing their theory of sham litigation.  The Court therefore denies SHFL's motion for summary judgment to the extent it is based on issue preclusion.

## B.  Fraudulent intent

SHFL next contends that plaintiffs have failed to present sufficient evidence from which a reasonable jury could find that it intended to deceive the PTO when it omitted certain references from the prosecutions and reexaminations of the two patents.  In doing so, SHFL challenges the admissibility of the report by plaintiffs' expert, Robert Armitage.  The Court therefore considers this evidentiary question before evaluating the substance of SHFL's motion.

### 1.  Admissibility

Armitage has provided plaintiffs with an extremely detailed opinion spanning

approximately 300 pages, in which he offers opinions on a wide range of topics spanning the patent process in general and the details of this case. *See* Defs. Resp. to Pls.' SAF, Ex. 98 (Armitage Report). SHFL has challenged hundreds of Armitage's statements by grouping them into seven major categories of objections. *See* Defs.' Resp. to Pls.' SAF, Ex. 97. The statements in the report, however, can largely be divided into three different categories: (1) general statements regarding the patent prosecution process; (2) statements regarding what reasonable in-house and external IP counsel would do and be aware of throughout the prosecution process; and (3) whether individuals in this case must have known about the omitted references and therefore intended to deceive the PTO. The first two types of opinions are admissible; the latter is not.

Armitage's general statements regarding the patent application process are admissible. *See, e.g.*, *The Meds. Co. v. Mylan Inc.*, No. 11-CV-1285, 2014 WL 1758135, *5 (N.D. Ill. May 2, 2014). Armitage has served as the general patent counsel of Eli Lilly and Company, the leader of Vinson & Elkins's corporate intellectual property practice, and the chief intellectual property counsel at The UpJohn Company. His extensive experience with the patent process qualifies him to provide testimony regarding its standard procedures. And this background information is relevant and admissible to help the jury determine what SHFL employees should have been doing at each stage of the process.

Armitage may also testify regarding the typical behavior of in-house and external IP counsel based on the same experience just cited. Courts permit parties to offer expert testimony on the relevant standard of care to aid the jury in determining whether

the defendant failed to comply. *See, e.g.*, *Lees v. Carthage Coll.*, 714 F.3d 516, 522–23 (7th Cir. 2013). This is particularly so in this case because whether SHFL employees failed to comply with the usual responsibilities of their positions is not an ultimate issue of law in this case. *See Smith v. I-Flow Corp.*, No. 09 C 3908, 2011 WL 12556366, *5 (N.D. Ill. May 3, 2011) (Kennelly, J.). Instead, plaintiffs offer this as circumstantial evidence of SHFL's intent to defraud the PTO. SHFL challenges many of Armitage's statements on the basis that he failed to identify his methodology and that the statements constitute unfounded speculation. But Armitage's extensive experience as in-house and external intellectual property counsel is the basis (and an adequate basis) for these opinions, and SHFL is free to argue on cross-examination that his experience is limited. Further, the Court disagrees with SHFL's contention that Armitage's opinion on this topic is inadmissible because Armitage worked for large corporations and SHFL is a much smaller operation. This argument goes to the weight of Armitage's opinion, not its admissibility. In sum, plaintiffs may rely on Armitage's opinions regarding the standard behavior of counsel participating in prosecution of a patent.

But Armitage may not offer an opinion regarding whether the SHFL employees in this case must have known about the significance of the omitted references and therefore acted with the intent to deceive the PTO. This is because "an expert may not testify or opine that [an individual] actually possessed the requisite mental state." *United States v. Winbush*, 580 F.3d 503, 512 (7th Cir. 2009). Instead, the expert must "leave[ ] for the jury the ultimate conclusion that the defendant intended to commit" the alleged conduct. *United States v. Parkhurst*, No. 16-3102, 2017 WL 3141058, *6 (7th Cir. July 25, 2017). At times, Armitage's opinion goes too far in offering conclusions

regarding the intent of SHFL employees.  For example, he opines:

> Ms. Farrar or Mr. Grauzer should have disclosed or caused to be
> disclosed such information from the 1997 World Gaming Congress and
> Expo Tradeshow to the USPTO because each of these individuals was
> substantively involved with the prosecution of these patent filings and in
> the proper discharge of the job responsibilities to SHFL, absent cultivated
> ignorance, they would have had knowledge of such information and
> knowledge of its materiality.

Armitage Report ¶ 226.  The opinion regarding what Farrar and Grauzer must have

known (and other similar opinions) is inadmissible, as it goes beyond Armitage's ability

to testify only "in general terms about facts or circumstances from which a jury might

*infer*" intent and instead concludes that SHFL intended to deceive the PTO.  *Winbush*,

580 F.3d at 512 (emphasis added).  The Court therefore will not rely on any similar

statements when evaluating SHFL's motion for summary judgment.

 Finally, SHFL raises a number of other objections to Armitage's report that are

worth addressing, if only briefly.  SHFL argues that many of Armitage's statements

improperly instruct the jury on the relevant law.  But many of the statements that SHFL

challenges on this basis are merely statements describing the steps of the patent

prosecution process and are not inappropriate opinions regarding the law that applies in

this case.  *See, e.g.*, Armitage Report ¶ 24.  To the extent that Armitage purports to

opine regarding the law applicable to the case, the Court does not rely on any such

statements in making its summary judgment determination.

SHFL also argues that many of Armitage's statements require technical

engineering expertise, which he does not possess.  Many of the sections of Armitage's

opinion that SHFL places in this category are not actually statements regarding

technical aspects of any reference but rather represent an offer to make such

statements if asked.  *See, e.g.*, *id.* ¶ 180.  Thus these statements do not assist the

Court in determining whether plaintiffs can survive summary judgment. Further, when Armitage makes a statement that does rely on technical analysis, he specifically states that he relies on the "technical conclusions expressed by Mr. Curley in his expert report." *Id.* ¶ 188. Charles Curley, plaintiffs' other expert, has substantial engineering education and experience, and SHFL has not challenged the admissibility of his opinions. *See* dkt. no. 143 (Curley Decl.) ¶ 5. Armitage may properly rely on Curley's conclusions when offering his own opinion.

In sum, the Court will consider Armitage's statements regarding the patent process and the reasonable and proper behavior for intellectual property counsel, as well as his analysis of the patents in this case within those contexts. The Court will not consider any statements that the individuals in this case should or must have known about the omitted references and their materiality.

## 2. Standard for intent

As discussed above, in order to establish a claim of *Walker Process* fraud, plaintiffs must show that SHFL obtained its patents by knowing and willful fraud on the patent office and maintained and enforced the patent with knowledge of the fraudulent procurement. *TransWeb*, 812 F.3d at 1306. SHFL argues that, in analyzing its motion for summary judgment, the Court should apply the standard established in *Therasense, Inc. v. Beckton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011). Under this standard, a plaintiff who argues that the patentee defrauded the PTO by withholding material information "must prove by clear and convincing evidence that the [patentee] knew of the reference, knew that it was material, and made a deliberate decision to withhold it." *Therasense*, 649 F.3d at 1290. Further, a court may not infer intent solely from an

omitted reference's materiality. *Id.* Rather, "the specific intent to deceive must be the single most reasonable interference able to be drawn from the evidence." *Id.* (internal quotation marks omitted).

In *Therasense*, however, the Federal Circuit evaluated what a plaintiff must prove in order to establish a claim for inequitable conduct, not *Walker Process* fraud. Although such a showing may "spawn antitrust . . . claims" such as a *Walker Process* claim, the two are distinct. *Id.* at 1289. The Federal Circuit has noted that, as a result of *Therasense*, "the showing required for proving inequitable conduct and the showing required for proving the fraud component of *Walker Process* liability may be nearly identical." *TransWeb*, 812 F.3d at 1307. But Federal Circuit decisions addressing *Walker Process* claims in the wake of *Therasense* do not cite to that decision when outlining the standard. *See, e.g.*, *Giuliano v. SanDisk LLC*, No. 2016-2166, 2017 WL 3188452, *2 (Fed. Cir. July 27, 2017); *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1358–59 (Fed. Cir. 2011). Although the standards appear to be largely the same, cases discussing *Walker Process* fraud omit the requirement that fraudulent intent must be the "single most reasonable inference" that can be drawn from the evidence. *See Giuliano*, 2017 WL 3188452, at *2; *Unigene*, 655 F.3d at 1358–59. The Court will therefore use the standard outlined in those cases considering *Walker Process* claims, without deciding whether it is identical to the one outlined in *Therasense*.

To overcome summary judgment on a *Walker Process* claim, the "omission alleged to be fraudulent must evidence a clear intent to deceive the examiner and thereby cause the PTO to grant an invalid patent." *Giuliano*, 2017 WL 3188452, at *2 (internal quotation marks omitted). The plaintiff must provide independent and clear

evidence of deceptive intent. *Id.* Because direct evidence of intent is rarely available, intent may be inferred "from clear and convincing evidence of the surrounding circumstances." *Id.*

### 3. Evidence of intent

Plaintiffs allege that SHFL defrauded the PTO by intentionally omitting four material references—the Nicoletti shuffler, the Luciano prototype, the Roblejo prototype, and the Block '044 patents—from the prosecution of the '982 patent, the prosecution of the '935 patent, and the reexaminations of both patents. Plaintiffs allege that each of these references anticipated the devices disclosed in those patents and therefore the PTO would not have issued the patents if it had been aware of the references. The parties' arguments therefore depend largely on whether SHFL knew of these references and their alleged materiality during the periods in which the prosecutions and reexaminations occurred. *See id.* at *3-4.

### a. Prosecution of the '982 patent

Plaintiffs contend that SHFL omitted mention of these four references during prosecution of the '982 patent, which took place from April 2002 until November 2003, knowing that the references were material. But plaintiffs have failed to provide sufficient evidence from which a reasonable juror could determine that SHFL was aware of the Nicoletti or Luciano references. The only evidence plaintiffs have to support their allegation that SHFL was aware of the Nicoletti shuffler is Breeding's testimony that some individual tried to sell him a shuffler in Atlantic City that "was built under the table and cards would go down inside." Breeding Dep. at 97:9–10. But Breeding testified that he never saw the machine and did not know who owned it. *Id.* at 97:8, 12–15.

Thus there is no evidence that this machine was in fact the Nicoletti shuffler.  And plaintiffs do not present any other evidence that anyone at SHFL ever saw the machine. A reasonable juror could not infer from Breeding's testimony that any employee at SHFL involved in the prosecution of the '982 patent knew of the Nicoletti reference and intentionally withheld it from the PTO.  The same is true of the Luciano prototype.  The only evidence that plaintiffs cite to is a declaration by Luciano in which he states that by November 1993 he had released a video of his prototype and was actively marketing his shuffler to other companies and casinos.  Pls.' Resp. to Defs.' SUMF, Ex. 109 at 4. But again, plaintiffs have no evidence which suggests that anyone at SHFL viewed the videotape or spoke with Luciano regarding the shuffler.

Plaintiffs have presented evidence from which a reasonable jury could infer that SHFL was aware of the Roblejo prototype during prosecution of the '982 patent.  Both Grauzer and Farrar agree that they attended the 1997 expo where the Roblejo prototype was displayed, although they both deny having seen the machine in operation.  An employee for the company that owned the machine testified that he gave a very detailed demonstration of the prototype to SHFL employees, which included removing side panels and answering specific technical questions.  Also, SHFL has in its files a report analyzing competition at the expo which discusses the Roblejo prototype, and plaintiffs have presented evidence from which a reasonable jury could infer that it was written by Grauzer, who was also the lead inventor of the '982 patent.  But plaintiffs have failed to provide evidence from which a reasonable jury could infer that SHFL intentionally omitted mention of this reference with fraudulent intent.  Curley opines that the examiner of the '982 patent granted the patent based on its novel disclosure of an

automatically moveable cover on the elevator for raising the shuffled cards and that the Roblejo prototype also discloses this feature. Curley Decl. ¶ 32; Pls.' Resp. to Defs' SUMF, Ex. 3 at 274. But there is no evidence that anyone at SHFL was aware that the Roblejo prototype contained an automatically moveable cover. "[O]ne cannot assume that an individual, who generally knew that a reference existed, also knew of the specific material information contained in that reference." *Giuliano*, 2017 WL 3188452, at *4. Therefore a reasonable jury could not conclude that SHFL omitted this reference with the intent to defraud the PTO.

The Court finds, however, that plaintiffs have presented evidence from which a reasonable jury could infer that SHFL acted with fraudulent intent when it failed to disclose the Block '044 patent during prosecution of the '982 patent. First, a reasonable finding could be made that those involved in the prosecution of the '982 patent were generally aware of the Block '044 patent, because SHF disclosed this reference in four other patent specifications filed during the same time period. Armitage Decl., Ex. AA50.

A reasonable jury could also conclude that SHFL was aware of the materiality of the Block '044 patent to the '982 prosecution. Armitage states in his declaration that two of the four patent applications in which SHFL cited the Block '044 patent were continuations-in-part (CIP) of the application for the '982 patent. Dkt. no. 142 (Armitage Decl.) ¶ 21 & Ex. AA50. This supports an inference that the Block patent was also relevant to the '982 patent. *See Giuliano*, 2017 WL 3188452 at *4. Further, SHFL stated in the specification of its '099 patent—a patent that was not a CIP of the '982 patent but dealt with automatic shuffling technology—that the Block '044 patent "describes a top of a card table with a card-dispensing hole there through and an

arcuate edge is covered by a transparent dome shaped cover." Armitage Report ¶ 427.

And during prosecution of the '982 patent, the PTO initially rejected a number of the

claims based on other pieces of prior art that also taught the use of a cover over an

elevator. Armitage Report ¶¶ 417–21. In response, SHFL distinguished its invention by

stating that it alone disclosed an automatically moveable cover. *Id.* Thus a reasonable

jury could infer that SHFL was aware both that the Block '044 patent disclosed a cover

and that the cover was a key feature of the '982 patent.

Although SHFL's citation to Block in the '099 patent did not expressly mention an

automatically moveable cover, Curley opines that Block clearly discloses this feature.

*See* Curley Decl. ¶¶ 24–27. Further, the description of the preferred embodiment of the

Block '044 patent states that it has a motor that "is operable to cause the cover to cover

and uncover the card dispensing hole in response to a signal from a computer." Defs.'

SUMF, Ex. 85 at 6:47–50. And during reexamination of the '982 patent, the PTO found

that the Block '044 patent did in fact disclose an automatically moveable cover.

Armitage Report ¶ 537. Thus plaintiffs have offered evidence of "some nexus between

the disclosures of the [Block '044 patent] and the (claimed) point of novelty" of the '982

patent. *See Chamberlain Grp., Inc. v. Techtronic Indus. Co., Ltd.*, No. 16 CV 6097,

2017 WL 3493799, *4 (N.D. Ill. Aug. 14, 2017) (considering a claim of inequitable

conduct). A reasonable jury could therefore conclude that SHFL knew that the Block

'044 patent disclosed an automatically moveable cover, a key feature of the '982 patent,

and yet failed to disclose this reference to the PTO.

For the reasons stated above, a reasonable jury could conclude that SHFL failed

to disclose the Block '044 patent during prosecution of the '982 patent with the intent to

deceive the PTO.

### b.    Prosecution of the '935 patent

Plaintiffs next contend that SHFL fraudulently omitted the Nicoletti, Luciano, and

Roblejo references during the prosecution of the '935 patent, which lasted from October

2003 until April 2009.

Plaintiffs have presented evidence from which a reasonable jury could conclude

that SHFL was aware of all three of these prior art references and their materiality prior

to that date.  In 2003, SHFL sued CARD for infringement of three of its shuffler

technology patents.  In response, CARD argued that the patents were invalid as

anticipated by the Nicoletti Shuffler, the Roblejo prototype, and the Luciano prototype.

Thus a reasonable jury could determine that SHFL was aware that these references

were relevant to its shuffler technology.  Grauzer was also aware of the Luciano and

Roblejo prototypes because he submitted an expert declaration in which he explained

how these references do not anticipate SHFL's patents.  Pls.' Resp. to Defs.' SUMF, Ex.

110 (Grauzer Decl.) ¶¶ 23–31.  Further, plaintiffs have presented evidence that, near

the end of the suit, SHFL prepared multiple discs containing all the documents from the

CARD litigation discussing these references as well as information regarding their

operation and that Farrar and Litman discussed these disks.  Pls.' Resp. to Defs.'

SUMF, Exs. 97, 98A, 120, 763; Armitage Decl., Ex. AA32.1.  Although SHFL submitted

copies of the discs to the PTO in connection with a number of then-pending patent

application, it did not submit the disc in connection with the '935 prosecution.  Armitage

Decl., Ex. AA56.

SHFL's selective disclosure of the discs can support an inference of deceptive

intent. *See Giuliano*, 2017 WL 3188452, at *3. SHFL contends it chose not to disclose the discs in the '935 prosecution because the references on the discs were only relevant to shufflers using the compartment method, as demonstrated by the fact that the CARD litigation was based on different patents from those at issue in this case. SHFL argues that the device disclosed by the '935 patent does not use this method. But Curley opines that the '935 patent does in fact cover the compartment shuffling method. Curley Decl. ¶¶ 80–82. Thus plaintiffs have offered evidence that SHFL chose not to disclose these references in the '935 prosecution despite the fact that the device in the '935 patent possessed the same features as other devices in which SHFL disclosed the discs.

Further, plaintiffs have provided evidence from which a reasonable jury could find that SHFL knowingly misrepresented the state of the prior art to the PTO during prosecution. Armitage compared SHFL's statements during prosecution of the '935 patent regarding the features that made it unique over prior art with Curley's technical analysis of the features in the omitted references. He concludes that SHFL made a number of statements during prosecution regarding the novelty of the device in the '935 patent that were directly contradicted by the references that SHFL had in its possession as a result of the CARD litigation. Armitage Decl., Exs. AA53 & AA55. This lack of candor can support an inference of fraudulent intent. *Regeneron Pharm., Inc. v. Merus N.V.*, 864 F.3d 1343, 1351 (Fed. Cir. 2017). A reasonable jury could therefore conclude that SHFL intended to defraud the PTO by omitting these references from prosecution.

SHFL argues that plaintiffs cannot introduce evidence of the CARD litigation and other infringement suits by SHFL related to its shuffler technology as this would violate

the prohibition in Federal Rule of Evidence 404 against the use of prior bad acts to show that a person acted similarly in this case. But plaintiffs do not use evidence of prior litigation to demonstrate SHFL's character. Plaintiffs offer evidence of these suits in order to demonstrate SHFL's knowledge of the three references and its intent to deceive the PTO. Rule 404 permits use of prior acts for these two purposes. *See* Fed. R. of Evid. 404(b)(2). Thus evidence of the CARD litigation is admissible.

Finally, SHFL contends that it did not disclose either the Roblejo or Luciano prototype during prosecution of the '935 patent because they would have been cumulative of other references it had already disclosed. In doing so, SHFL points to testimony by the inventors of the Roblejo prototype that the prototype was fully disclosed by the Roblejo '122 patent and a statement by Luciano that the Greenberg '082 patent largely covers his design. *See* Defs.' SUMF, Ex. 11 at 88:16–24; Ex. 7 at 222:7–24; Ex. 25 ¶ 39; Ex. 18 at 1. SHFL disclosed both the Roblejo '122 patent and the Greenberg '082 patent during the prosecution of the '935 patent. But Curley opines that both the Roblejo and Luciano prototypes contain features that were not disclosed by the references provided to the PTO. Curley Decl. ¶¶ 34–36, 56. SHFL also contends that the Luciano prototype does not constitute prior art because it was not in use before the application date for the '935 patent. But Luciano testified that he was actively marketing his prototype by November 1993—almost 10 years before SHFL's application—which is enough to create a genuine dispute regarding whether the Luciano prototype constitutes prior art. A reasonable jury could conclude that SHFL's explanations lack credibility and that its omissions, selective disclosure, and misrepresentations support a finding of intent to defraud.

### c. Reexamination of both the '982 patent and the '935 patent

Finally, plaintiffs contend that SHFL engaged in fraud on the PTO during reexamination of both the '982 patent and the '935 patent by failing to disclose the Nicoletti, Roblejo, and Luciano references. Reexamination of both patents began in January 2014, almost ten years after the CARD litigation and SHFL's creation of the discs containing the prior art. Thus for the same reasons discussed above, a reasonable jury could conclude that SHFL was aware of the references prior to reexamination.

Further, plaintiffs have provided sufficient evidence to support a finding that SHFL acted with fraudulent intent in omitting the references. Armitage again opines that, in an effort to distinguish its inventions as patentable, SHFL made a number of statements during prosecution that are directly contradicted by the omitted references. *See* Armitage Decl., Exs. AA62–63, AA66–68. A reasonable jury could infer from this lack of candor that SHFL omitted these references with the intent to defraud the PTO into granting an otherwise invalid patent.

### Conclusion

For the foregoing reasons, the Court denies SHFL's motion for summary judgment [dkt. no. 131]. A trial date has already been set. The case is set for a telephone status hearing on September 19, 2017 at 9:00 a.m. for the purpose of discussing the possibility of settlement. Counsel are to jointly call chambers (312-435-5618).

_____
MATTHEW F. KENNELLY
United States District Judge

Date: September 1, 2017