# Exhibit 24

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

MP GAMES LLC; ALLIANCE GAMING    )
CORP.; BALLY GAMING, INC.,       )
                                 )
              Plaintiffs,        )Case No. C05-1017TSZ
                                 )
     vs.                         )
                                 )
SHUFFLE MASTER, INC.,            )
                                 )
              Defendant.         )
_____)

DEPOSITION UNDER PROTECTIVE ORDER

==VIDEOTAPED DEPOSITION OF LAWRENCE LUCIANO==

LAS VEGAS, NEVADA

AUGUST 10, 2006

REPORTED BY:  HOLLY J. PIKE, CCR NO. 680, RPR, CSR
              LS&T JOB NO. 1-64415

DEPOSITION OF LAWRENCE LUCIANO, taken at 1640 West Alta Drive, Suite 4, Las Vegas, Nevada, on Thursday, August 10, 2006, at 8:08 A.M., before Holly Pike, Certified Court Reporter, in and for the State of Nevada.

APPEARANCES:

For the Plaintiffs:

        QUINN EMANUEL
        BY:  VICTORIA F. MAROULIS, ESQ.
        555 Twin Dolphin Drive
        Suite 560
        Redwood Shores, California 94065
        (650-801-5000)
        victoriamaroulis@quinnemanuel.com

HIGHLY CONFIDENTIAL

SGC 0000726671

Q. Is what's been marked as Exhibit 6 the document that's described in your declaration as Exhibit B in paragraph 5?

A. Yes.

Q. On that Exhibit 6, on the second page under item number 3, it's talking about -- well, the document speaks for itself, but it does say, "For these purposes we would like to see an actual demonstration of the following areas,"

0069

and letter B is, "an opportunity to personally operate and inspect an actual existing gaming table."

Why did Luciano Packaging Technology want to see an existing gaming table?

A. Because we needed to -- the machine had to physically fit within a gaming table. Okay. And it had to work so as the game was fundamentally not changed; playing in the same manner that it would be played in so as not to alienate the customer who is playing, the players.

Q. Was it IGT's requirement that the shuffler fit inside the gaming table, or was it, if you know?

MS. MAROULIS: Objection. Calls for speculation.

THE WITNESS: The idea was that it would fit inside the gaming table. If there was another way of doing it without it being inside the gaming table but not being visible to the player, then they may have accepted that.

BY MR. CUTRI:

Q. But ultimately the shuffler that you designed was -- did fit within a gaming table?

A. Yes.

Q. Do you know if you guys ended up playing golf at the end of that trip? There's a reference to it at the --

MS. MAROULIS: Objection. Relevance.

BY MR. CUTRI:

Q. Just curious. Your brother couldn't remember.

0070

A. I don't remember either.

Q. Okay. Moving on to paragraph 6.

(Deposition Exhibit Number 7 was marked for identification.)

BY MR. CUTRI:

Q. I'll hand you what will be marked as Luciano Exhibit 7. I don't have any questions on this document except whether Luciano Exhibit 7 is Exhibit C as described in your declaration.

A. Yes.

Q. That's all for that document, then. Turning to Exhibit D, I will mark you -- I will hand you Exhibit 8.

(Deposition Exhibit Number 8

HIGHLY CONFIDENTIAL

0089

A.    Where am I looking?

MS. MAROULIS:  Is this Exhibit J to your declaration?

THE WITNESS:  Oh, okay.  Yeah.

BY MR. CUTRI:

Q.    So is Exhibit 14 Exhibit J to your declaration?

A.    Yes.

Q.    Take a look and read through paragraph 14 of your declaration.

MR. CUTRI:  While you're doing that, do you mind if I go off the record so I can set up this video?

MS. MAROULIS:  Fine.

THE VIDEOGRAPHER:  We're off the record at 10:50 A.M.

(A discussion was held off the record.)

(Deposition Exhibit Numbers 15 and 16 were marked for identification.)

THE VIDEOGRAPHER:  We are back on the record at 10:53 A.M.

BY MR. CUTRI:

Q.    Mr. Luciano, during the break, I was asking you to review paragraph 14, and what I'd like to do now is show you the video, which has now been marked as Luciano -- Larry Luciano Exhibit 16.  And I've also given you Larry Luciano Exhibit 15, which is 3494 through 3496, and I'm going to --

0090

the Exhibit 15 is what's labeled the ACS videotape script. I'm going to play the video and ask you to confirm that the video that I'm playing is the Exhibit K in your declaration.

I'm also going to ask you to let me know if you see anything described in the video that is inaccurate in terms of what you know the ACS prototype's functionality to be.

(Whereupon, the video was played.)

THE WITNESS:  That's not a part of it.

MR. CUTRI:  For the record, there's a -- there appears to be some commercial before the actual video gets started, but then the video, itself, starts.

THE WITNESS:  This is a bad tape.

MR. CUTRI:  Yeah.

THE VIDEO:  Luciano Packaging Technologies, Incorporated, integrating high technology packaging systems. This is the Luciano Packaging Technologies automatic card shuffling machine, or more briefly, the ACS unit.

It is an automatic computer integrated unit that is capable of being used with any table card game with up to six decks of cards.  In the format you are presently looking

SGC 0000726719

at, the prototype ACS unit is set up as an integral part of a standard blackjack or 21 table. However, this particular ACS unit is capable for use with other card games. We will be happy to discuss the additional capabilities to suit your

0091

individual casino requirements at a later date.

Jeff, our design engineer who is not a professional dealer, is demonstrating the ease of use and the speed of dealing that can be attained by using the ACS unit. This demonstration shows how easily and quickly even an average person can deal from the ACS unit. At present, Jeff is dealing one full deck of cards at a time at a speed that an experienced dealer could attain of 120 cards per minute or that is two cards per second.

It is possible, however, with the ACS unit to deal more than one full deck of cards at a time depending upon requirements of the game being played. Once the particular game is concluded, the cards are simply stacked and placed into a bin on Jeff's right and returned for reshuffling to the ACS unit. The cards can be reshuffled simultaneously while the dealer is dealing.

In actual operation, the normal chip tray will be placed on the table between the dealing shoe and the return card bin.

The section shown here are examples of the ACS units completely removed from the tables. The center component in the unit is the black circular drum in the center. This is the card filing system. It contains 312 separate individually identified slots, six decks. Each card in each deck is given an individual dedicated address

0092

in the drum. To the right there is a bar code reading scanner at the entrance to the ACS unit where the cards are fed in and a second bar code scanner at the exit of the unit where the cards are dealt from the shoe.

Utilizing these bar codes and scanners, it is possible to track every cards' whereabouts, whether in or out of the ACS unit. You see here a close up of the drum, the in feed and out feed system. This is built into a table for ease of operation and ease of service.

The circular drum units shown here are driven by a stepping motor, which is a digital device that is responsive to computer control; hence, enabling the ability for programmed motion patterns; i.e., response to a random number generator.

The ACS units are designed to be lightweight and to fit into a standard 21 table as shown here. Other gaming tables can also be adapted for this unit.

HIGHLY CONFIDENTIAL                                                    SGC 0000726720

The ACS unit is designed for a correct ergonomics interface with the dealer, that includes the angle of approach for the dealing shoe and the angle mounting in the table for knee room.

As you can see here, we have shown the chip tray, which I had mentioned before, which would normally be located right between the dealer and right above the table.

Here we have a close up view of the actual cards

0093

used in the automatic card shuffling unit. As you can see, these cards are printed on both edges with a bar code. This bar code identifies each card individually and, as we mentioned before, as the cards are inserted into the ACS unit, they are read and placed into the ACS unit's memory.

There is also a second bar code scanner at the dealing shoe. Again, the cards are read and the actual cards placed in the ACS unit memory. Until all cards are reloaded and reshuffled in the ACS unit, a new game cannot begin unless the machine has verified that all the cards are there and they are, in fact, the right cards.

Depending upon the game requirements it is possible to modify these controls to suit the particular game application. Although these cards have the look and feel of regular playing cards, they are, in fact, a special plastic laminate card that has been developed to offer the possibility of use for many days without the need for replacement. These specialty designed cards also allow the ACS unit to operate at peak efficiency. Downtime for shuffling and introduction of new card decks will be virtually eliminated through the use of these new cards, since the plastic cards have extreme long life.

Finally, as we take a last look at the automatic card shuffling machine, I would just like to recap the main features of the Luciano Packaging Technologies ACS

0094

equipment. The ACS unit is an automatic computer integrated unit that is capable of being used with any table card game with up to six decks of cards.

The ACS unit is designed to be installed in a standard play table, which allows the dealer to simulate the normal dealing action from the shoe. Although the ACS shuffling unit is normally hidden from view, it is also possible to place a plexiglass front on the table allowing players to see the unit in operation. The specially designed bar code plastic cards it is possible for the computer to verify every card that enters into or is dealt from the ACS unit. The computer will always know where each card is on the table or at its address in the ACS file.

HIGHLY CONFIDENTIAL

SGC 0000726721

PX82B.8

Q. Is that you speaking as well?

A. No. That's Don Rowe.

0126

Q. Was there anything about Mr. Rowe's explanation that you would change?

A. No.

(Whereupon, the video was played.)

BY MR. CUTRI:

Q. I'd like to pause here. Unfortunately I don't have a version of this that has a time marker. For the sake of the video, I can have the video train on this for a moment just so we can see where we are.

Mr. Luciano, with respect to what's depicted here, is the shuffler depicted inside of a table at this point?

A. Yes.

Q. Was it IGT's request that the shuffler be mounted into a table?

A. Yes.

Q. Is that what you were selling to them?

A. Yes.

Q. I guess we'll take a look in a few minutes at the actual designs, but you did design a table for this shuffler; is that correct?

A. Yes. I didn't design the table itself. What I did was I took their table design and I showed them how it needed to be modified to adapt to house this unit.

Q. Okay.

(Whereupon, the video was played.)

0127

BY MR. CUTRI:

Q. I'm going to stop there and ask you to identify who's speaking.

A. That's Richard Smith, my partner. When you asked before why did we make this video, it's evident now that this video was made to send to the customer to let them know what to expect, the level of finish of the machines and so forth.

Q. When you say send to the customer, one of my questions was there a specific customer in mind for this video?

A. My customer being IGT.

Q. He makes reference to a device here where I'll try and rewind a little bit to see if I can get him to say it again.

(Whereupon, the video was played.)

BY MR. CUTRI:

Q. I think the first thing I think Mr. Smith refers to is a Slick 500. Is that an SLC?

HIGHLY CONFIDENTIAL

SGC 0000726739