**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Shuffle Tech International, LLC, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>Scientific Games Corporation, et al.,<br><br>        Defendants. | Civil Action No. 1:15-cv-3702<br><br>Honorable Matthew F. Kennelly |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
THEIR POST-TRIAL MOTION FOR RELIEF
UNDER FEDERAL RULES OF CIVIL PROCEDURE 50 AND 59**

Craig C. Martin
David Jiménez-Ekman
Timothy J. Barron
Rachel S. Morse
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Tel: 312.222.9350

Attorneys for Defendants

September 4, 2018

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................iii

INTRODUCTION ...........................................................................................................1

ARGUMENT ...................................................................................................................4

I.  DEFENDANTS ARE ENTITLED TO JUDGMENT AS TO ACES UP, POYDRAS, AND SHUFFLE TECH, EACH OF WHOM LACKS ANTITRUST STANDING. ................4

    A.  Applicable Legal Standard. .............................................................................5

    B.  Aces Up, Poydras, and Shuffle Tech Lack Antitrust Standing. .........................6

        1.  Aces Up Lacks Antitrust Standing. .............................................................6

        2.  Poydras Lacks Antitrust Standing. ..............................................................8

        3.  Shuffle Tech Lacks Antitrust Standing. .......................................................9

II.  THE COURT SHOULD ALTER OR AMEND THE DAMAGE AWARD PURSUANT TO RULE 59 OR, ALTERNATIVELY, ENTER JUDGMENT FOR DEFENDANTS AS A MATTER OF LAW PURSUANT TO RULE 50. .................................................11

    A.  Damages Here Are Too Speculative. ...............................................................12

    B.  The Damages Bear No Relation To Plaintiffs' Damages Testimony. ...............16

    C.  The Court Should Order A New Trial Due To Trial Errors. ............................20

III. DEFENDANTS ARE ENTITLED TO JUDGMENT AS TO DIGIDEAL BASED ON THE FINDINGS IN THE NEVADA LITIGATION. ............................................20

    A.  The Nevada Court Heard DigiDeal's Allegations Of Fraud On The Patent Office And Decided That SHFL's Patent Litigation Was Not Unreasonable. ............................21

    B.  The Nevada Court's Rulings Foreclose DigiDeal's Sham Litigation Claim. ....................22

    C.  The Nevada Court's Rulings Foreclose DigiDeal's *Walker Process* Claim.....................24

IV. THE COURT SHOULD ENTER JUDGMENT FOR DEFENDANTS OR ALTER OR AMEND THE LIABILITY FINDING. ......................................................25

    A.  The Court Should Enter Judgment For Defendants, Or A New Trial, Because The Court Erred Regarding The Intent Elements Of The Claims. ...........................25

        1.  The Court Erred In Not Applying *Therasense* ..........................................26

2. The Court Erred In Instructing On Intent. ....................................................................26

3. The Evidence Of Improper Intent Was Insufficient. ....................................................28

B. Alternatively, The Court Should Enter Judgment As A Matter Of Law For
Defendants On Liability Pursuant To Rule 50(b). .............................................................29

CONCLUSION.........................................................................................................................30

# TABLE OF AUTHORITIES

CASES

*1st Media, LLC v. Electronic Arts, Inc.*, 694 F.3d 1367 (Fed. Cir. 2012) .........................27, 29, 30

*Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983).............................................................................5, 6, 7, 9, 11

*Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) .........................................................5, 7

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993)........................6

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ..............................................5

*Bruso v. Truck Drivers & Helpers Local 170*, No. 85-3130-MA, 1987 WL 6974 (D. Mass. Feb. 2, 1987).........................................................................................................18

*Bubar v. AMPCO Foods, Inc.*, 752 F.2d 445 (9th Cir. 1985)..........................................................9

*Bucklew v. Hawkins, Ash, Baptie & Co., LLP.*, 329 F.3d 923 (7th Cir. 2003) ..............................16

*CSC Holdings, Inc. v. Redisi*, 309 F.3d 988 (7th Cir. 2002)..........................................................14

*e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637 (7th Cir. 2011) .........................................16

*Enterprise Refining Co. v. Sector Refining, Inc.*, 781 F.2d 1116 (5th Cir. 1986).........................19

*ERBE Elektromedizin GmbH v. Canady Technology LLC*, 629 F.3d 1278 (Fed. Cir. 2010) .......................................................................................................................27

*Freedom Holdings, Inc. v. Cuomo*, 592 F. Supp. 2d 684 (S.D.N.Y. 2009), *aff'd*, 624 F.3d 38 (2d Cir. 2010).........................................................................................................7

*G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762 (2d Cir. 1995) ................................................7

*Gambino v. Koonce*, 757 F.3d 604 (7th Cir. 2014).......................................................................24

*Gilldorn Savings Ass'n v. Commerce Savings Ass'n*, 804 F.2d 390 (7th Cir. 1986)....................23

*Giuliano v. SanDisk LLC*, 705 F. App'x 957 (Fed. Cir. 2017)......................................................27

*Grip-Pak, Inc. v. Illinois Tool Works, Inc.*, 651 F. Supp. 1482 (N.D. Ill. 1986) ..........................16

*Grip-Pak, Inc. v. Illinois Tool Works, Inc.*, 694 F.2d 466 (7th Cir. 1982) ..............................10, 11

*Hoult v. Hoult*, 157 F.3d 29 (1st Cir. 1998).................................................................................24

*In re Fort Wayne Telsat, Inc.*, 665 F.3d 816 (7th Cir. 2011).......................................................23

*In re Innovative Construction Systems, Inc.*, 793 F.2d 875 (7th Cir. 1986) ...................................20

*International Business Machines Corp. v. Platform Solutions, Inc.*, 658 F. Supp. 2d 603 (S.D.N.Y. 2009) ..........................................................................................7

*International Financial Services Corp. v. Chromas Technologies Canada, Inc.*, 356 F.3d 731 (7th Cir. 2004) ...................................................................................20

*Jamison Co. v. Westvaco Corp.*, 526 F.2d 922 (5th Cir. 1976) ....................................19

*Kimberly-Clark Worldwide Inc. v. First Quality Baby Products LLC*, No. 14-cv-1466, 2016 WL 8201779 (E.D. Wis. Sept. 30, 2016) ...............................................26

*LaSalle National Bank v. Massachusetts Bay Insurance Co.*, No. 90 C 2005, 1997 WL 619856 (N.D. Ill. Sept. 30, 1997) ..............................................................18, 19

*Lupia v. Stella D'Oro Biscuit Co.*, 586 F.2d 1163 (7th Cir. 1978) ..................................4

*Mid-American Tablewares, Inc. v. Mogi Trading Co., Ltd.*, 100 F.3d 1353 (7th Cir. 1996) ...............................................................................................................16

*Miller v. Neathery*, 52 F.3d 634 (7th Cir. 1995) .........................................................27

*Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816 (7th Cir. 2015) .............8

*Nelson v. City of Chicago*, 810 F.3d 1061 (7th Cir. 2016) ..........................................20

*Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370 (7th Cir. 1986) .............................................................................................13, 14

*Schutter Candy Co. v. Stein Brothers Paper Box Co.*, 338 F.2d 558 (7th Cir. 1964) ...................14

*Seiko Epson Corp. v. Abacus 24-7 LLC*, 866 F. Supp. 2d 1248 (D. Or. 2011) ............26

*Serfecz v. Jewel Food Stores*, 67 F.3d 591 (7th Cir. 1995) ...........................................5

*Southwest Suburban Board of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374 (7th Cir. 1987) ..........................................................................5, 8, 11

*Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245 (Fed. Cir. 2000) ............................27, 30

*Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226 (7th Cir. 1982), *aff'd*, 465 U.S. 752 (1984) ...................................................................................................17

*Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) ....................26, 29

*Trading Technologies International, Inc. v. eSpeed, Inc.*, No. 04 C 5312, 2008 WL 345604 (N.D. Ill. Feb. 5, 2008) ........................................................................19

iv

*Ustrak v. Fairman*, 781 F.2d 573 (7th Cir. 1986)..........................................................................16

*Wells v. City of Chicago*, 896 F. Supp. 2d 725 (N.D. Ill. 2012) ........................................17, 18, 19

*Westlake Services, LLC v. Credit Acceptance Corp.*, No. CV 15-07490, 2017 WL
    8948263 (C.D. Cal. Dec. 28, 2017) .......................................................................................26

*Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499 (7th Cir. 1992)........................................................11

*Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416 (7th Cir.
    2005) ........................................................................................................................................13

**STATUTES**

**OTHER AUTHORITIES**

11 Joseph P. Bauer, *Federal Antitrust Law* § 78.7 (2017)............................................................8

2A Phillip E. Areeda, et al., *Antitrust Law* ¶ 335e2 (4th ed. 2014) ..................................................6

# INTRODUCTION

Plaintiffs have received a massive $315 million windfall that is unwarranted as a matter of fact and erroneous as a matter of law. Plaintiffs base their antitrust case upon a lawsuit in Nevada they say was improper, but these Plaintiffs were never sued there and merely had contractual relationships with the party that was—DigiDeal. The claimed damages arise out of wildly speculative estimates of future sales that no market competitor has ever come close to achieving, and that are particularly fantastical given that DigiDeal had sold or leased in its entire existence exactly three units world-wide. And the damages awarded by the jury bear no resemblance to the testimony Plaintiffs' own expert gave about the appropriate amount for each Plaintiff and the proper allocation of damages among them. The result is a verdict untethered to evidence, irreconcilable with settled case law, and inconsistent with sound economics.

First, the evidence at trial confirms that Aces Up, Poydras, and Shuffle Tech lack antitrust standing, and the judgments for these parties—$45 million, $75 million, and $135 million, respectively—must be set aside. Market competitors like DigiDeal may sue under the antitrust laws, but those who merely have contracts with a competitor cannot. Under established principles and well-settled case law, prospective distributors and marketers like Aces Up, investors like Poydras, and licensors like Shuffle Tech—just like employees, utilities, and other suppliers of inputs to competitors—lack antitrust standing. They have the wrong injury (if any), as they seek not vigorous competition generally, but instead the success of a particular competitor with whom they have a contractual relationship. They are the wrong parties, because they are not competitors or consumers in the card-shuffler market and have suffered (if anything) only indirect and derivative harm. And they were not the direct target of any alleged anticompetitive conduct: the targeting alleged in this case was the Nevada litigation, and that lawsuit was against DigiDeal alone. Plaintiffs are miscast as private attorneys general seeking to correct a supposed antitrust

harm and reap trebled damages. The lethal cannon of trebled damages may be wielded only by those who suffer direct and immediate anticompetitive harm, not by everyone who has a contractual relationship with a competitor or who has an interest—even a strong interest—in the success of that competitor's product. Because antitrust standing remains a threshold issue, the Court should address it now.

Second, the massive damages awards are the product of the sort of rank speculation that the Seventh Circuit forbids. DigiDeal competed in the marketplace for 18 months following the filing of the Nevada lawsuit, and during that time it sold only three shufflers world-wide. Notwithstanding this clear record of failure, Plaintiffs claim DigiDeal would have been more successful than any other competitor in the shuffler market ever, including the Defendants, selling or leasing 1200 shufflers a year. Not so. The numbers are based not on independent market analysis, objective testing, or even the actual sales made by DigiDeal. Rather, the damages calculations come from a single expert, whose sales projections were plucked from a distribution contract agreed upon by the Plaintiffs and DigiDeal not to project actual sales, but instead to define the level of sales above which a distributorship would become exclusive. Plaintiffs conceded (with considerable understatement) that the process for generating those numbers was "not scientific," and was not the product of any reasoned market assessment. And although Plaintiffs promised to bolster the expert's testimony at trial, the promised evidentiary support never came. Hopes and dreams may provide inspiration, but they cannot support a damages award.

Compounding the problem, the damages actually awarded by the jury bear no relation even to the pie-in-the-sky calculations of Plaintiffs' expert. He testified to specific ranges of damages that could be awarded to each party and a precise allocation among the parties, but the jury returned awards that do not remotely resemble these numbers. In the case of Shuffle Tech, for example, the expert testified about a range of appropriate damages, with a high estimate of $23.9 million.

The jury awarded Shuffle Tech nearly double that amount—$45 million (trebled to $135 million). The awards are not based on evidence.

Third, the judgment for DigiDeal should be set aside because DigiDeal's own claims (assigned to Shuffle Tech) are precluded by the Nevada litigation, and DigiDeal is not entitled to a second bite at the apple. DigiDeal litigated in Nevada the same issue it raised here—that SHFL engaged in baseless litigation after allegedly committing fraud on the patent office. The Nevada court expressly rejected that argument, concluding that, notwithstanding DigiDeal's allegations, it was "reasonable for SHFL to bring this enforcement action." There is no basis to side-step that conclusion. Lack of finality is no barrier, because the Nevada fees decision was "final" in every relevant sense. DigiDeal's later loss on its merits appeal changes none of that; indeed, it would be unjust to invoke DigiDeal's loss on the merits to free it from the consequences of its loss on fees. Likewise, DigiDeal's *Walker Process* claim cannot save the day. The preclusive effect of the Nevada decision cannot be confined to sham litigation, since DigiDeal's *Walker Process* claim required the jury to find not simply that SHFL obtained its patents by fraud but also that SHFL had improperly *enforced* them, the *very thing* the Nevada Court concluded SHFL did not do.

Fourth, the Court's instructional errors permitted the jury to find liability without the evidence that specific intent requires. The Court declined to apply the Federal Circuit's demanding intent standard of *Therasense*; declined *agreed* instructions providing the meaning of the required intent in the context of Plaintiffs' claims; and then relieved Plaintiffs of much of their burden by refusing to instruct the jury on the distinct subjective-intent element of the sham litigation claim. The all-too-predictable result was a jury finding of intent divorced entirely from the legal standard.

Defendants renew their motion for judgment as a matter of law under Rule 50, or alternatively, to alter or amend the verdict, for a remittitur, or for a new trial pursuant to Rule 59.

# ARGUMENT

## I. DEFENDANTS ARE ENTITLED TO JUDGMENT AS TO ACES UP, POYDRAS, AND SHUFFLE TECH, EACH OF WHOM LACKS ANTITRUST STANDING.

The evidence presented at trial confirms that under bedrock principles and abundant case law, Aces Up, Poydras, and Shuffle Tech lack antitrust standing. To have antitrust standing, which is a threshold requirement to bring suit, a party must have suffered antitrust injury, *i.e.*, injury to competition, and it must be the proper party to assert an antitrust claim. Generally, competitors and consumers may sue, but the law does not permit parties with a mere contractual relationship with a competitor to do so. Thus, DigiDeal, the entity that actually competed in the market and that was sued for infringement, has standing. But under well-established precedent, DigiDeal's prospective marketer and distributor (Aces Up), its investor (Poydras), and its licensor (Shuffle Tech) do not. These parties were not competitors or consumers in the relevant market, they were not alleged to have been the direct target of any anticompetitive conduct (the Nevada lawsuit did not even name them as parties), and their only connection to the anticompetitive harm is a contractual relationship with the excluded competitor.

Nor is it enough that the parties had expressed an interest in working together to support DigiDeal. There is nothing special about the inputs these firms are providing: ideas, money, and a distribution system are like other inputs to a competitor's product, such as labor, supplies, and physical plant. No one would think that every employee, supplier, or landlord could sue under antitrust laws for treble damages because they happen to have a contractual relationship with the actual market competitor. And the case law confirms that they cannot. "[T]he circuits all view the treble damages suit as too lethal a cannon to put in the hands of anyone who has suffered only an 'indirect,' 'secondary,' or 'remote' injury." *Lupia v. Stella D'Oro Biscuit Co.*, 586 F.2d 1163, 1168 (7th Cir. 1978). Judgment should be awarded to the Defendants in connection with each of

these Plaintiffs, who have not met their burden of establishing standing.

## A.  Applicable Legal Standard.

In *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 538-43 (1983) ("*AGC*"), the Supreme Court held that in order to have antitrust standing, a plaintiff must pass two threshold tests.  First, the plaintiff must have suffered an "antitrust injury"—that is, an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also AGC*, 459 U.S. at 539.  Most critical to this inquiry is "the connection between the purpose of the antitrust laws (protecting market competition) and the alleged injury."  *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 597 (7th Cir. 1995).

Second, a plaintiff must be the proper party to bring the action.  After all, "Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property."  *Blue Shield of Va. v. McCready*, 457 U.S. 465, 477 (1982).  Courts grant antitrust standing to "those who, as consumers or competitors, suffer immediate injuries with respect to their business or property, while excluding persons whose injuries were more indirectly caused by the antitrust conduct."  *Serfecz*, 67 F.3d at 598 (quotation marks omitted).

The Court in *AGC* articulated several factors relevant to determining whether a plaintiff is the proper party to bring a damages action under the antitrust laws:

> (1) the causal connection between the antitrust violation and the plaintiff's injury;
> (2) the nature of the plaintiff's injury and the relationship between the plaintiff's injury and the type of activity sought to be redressed under the antitrust laws; and
> (3) the speculative nature of the plaintiff's claim for damages and the potential for duplicative recovery or complex apportionment of damages.

*Serfecz*, 67 F.3d at 595-96 (citing *AGC*, 459 U.S. at 537-46).  Standing must be addressed on a plaintiff-by-plaintiff basis, *see, e.g.*, *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning*

*Ass'n*, 830 F.2d 1374, 1376-78 (7th Cir. 1987), and at any time in the litigation, including after trial, *see* 2A Phillip E. Areeda et al., *Antitrust Law* ¶ 335e2 (4th ed. 2014).

**B.      Aces Up, Poydras, and Shuffle Tech Lack Antitrust Standing.**

Under settled law, DigiDeal has antitrust standing; its prospective distributor and marketer, its investor, and its licensors do not.  The evidence showed DigiDeal was the competitor—it entered the automatic shuffler market to manufacture, market, and sell the DigiShuffle.  *See, e.g.*, Kuhn Dep. 61:22-23.  Shuffle Tech held patents, which it licensed to Poydras.  Tr. 2135:07-12; DTX1085 ¶ 2.1.  Poydras sublicensed the technology to DigiDeal and provided seed money.  Tr. 2135:7-12; DTX1085 ¶ 4.2.  Aces Up, a marketer and distributor, contracted with DigiDeal to "actively develop markets for and promote sales of" the DigiShuffle in 13 states.  PX695 ¶¶ 1.1, 5.1.  The question is whether these contractual relationships allow Plaintiffs to piggy-back off DigiDeal's alleged competitive harm.  As case law and common sense make clear, they do not.

**1.      Aces Up Lacks Antitrust Standing.**

As to the first inquiry under *AGC*, Aces Up, the prospective marketer and distributor of the DigiShuffle, has suffered no antitrust injury because any harm it experienced was not "of the type the antitrust laws were intended to forestall." *AGC*, 459 U.S. at 540.  Antitrust laws protect "*competition*, not *competitors*." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993).  That is why antitrust standing is typically limited to consumers or competitors in the impacted market. *See AGC*, 459 U.S. at 539.  Aces Up is neither.  Aces Up had an interest only in a *particular* market competitor's success, not in competition writ large. *Id.* at 540.  Like the plaintiff union held to lack antitrust injury in *AGC*, Aces Up's "primary goal is to enhance [its] earnings," a "goal [that] is not necessarily served, and indeed may actually be harmed, by uninhibited competition." *Id.* at 539.  Because DigiDeal failed, Aces Up was not able to profit from its relationship with DigiDeal.  That may be injury, but it is not antitrust injury.

Aces Up is not a proper party. It is neither a consumer nor a competitor in the automatic shuffler market. Permitting Aces Up to sue for its alleged derivative harm would raise precisely the concerns about "speculative" damages, "complex apportionment," and "duplicative" damages that *AGC* identified. *Id.* at 545. Aces Up's claim for damages is speculative, entirely driven by lofty aspirations about the would-be market success of the DigiShuffle. *See infra*, Section II.A. And the apportionment and duplicative-recovery concerns are real: determining the size of Aces Up's share of the DigiDeal pie is complicated because Aces Up's relationship with DigiDeal was not exclusive—"there would be other distributors" of the DigiShuffle, who are unknown and not even part of this lawsuit. Tr. 2319:4-6; 2069:24-25; *see also McCready*, 457 U.S. at 474.

Indeed, the case law is clear: distributors cannot sue under the antitrust laws. For example, in *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 766-67 (2d Cir. 1995), the Second Circuit affirmed the district court's dismissal of distributors' claim on antitrust injury grounds, where the actual target of the anticompetitive conduct was the company whose product the plaintiffs had contracted to distribute. When the targeted company went under, the plaintiffs' contract was terminated. *See id.* at 766. The Second Circuit concluded this "[m]erely derivative injur[y]" was insufficient, holding that "a party in a business relationship with an entity that failed as a result of an antitrust violation has not suffered the antitrust injury necessary for antitrust standing." *Id.*; *see also Int'l Business Machs. Corp. v. Platform Sols., Inc.*, 658 F. Supp. 2d 603, 610-11 (S.D.N.Y. 2009) (distributor lacked antitrust standing because injuries "all were derivative of [defendant's] actions vis-à-vis [other parties]"); *Freedom Holdings, Inc. v. Cuomo*, 592 F. Supp. 2d 684, 694 (S.D.N.Y. 2009) (plaintiffs distributors and importers "would lack antitrust standing").

Moreover, the evidence at trial demonstrated that even among distributors, Aces Up's claim for standing is particularly weak, because Aces Up was *not even formed* until the second half of 2013, *after* SHFL had *already sued* DigiDeal. Tr. 2080:17-20. Aces Up's memorandum

of understanding with DigiDeal came even later.  Tr. 2080:21-24.  SHFL thus could not possibly have "targeted" Aces Up when it sued DigiDeal in October 2012.  Indeed, Aces Up essentially came to the nuisance.  Allowing Aces Up to sue would create perverse incentives, encouraging parties to glom onto a potential antitrust injury after it was clear litigation would follow, opening wide the courthouse doors to all manner of Johnny-come-lately aspirants seeking treble damages.  That is precisely the result the case law seeks to avoid.

### 2. Poydras Lacks Antitrust Standing.

Poydras—an investor of seed capital—likewise fails the antitrust injury test because it is neither a consumer nor a competitor.[1]  Poydras has no interest in competition writ large.  It succeeds if DigiDeal does, and consequently its interest is only in DigiDeal's success.  Any harm it suffered is not an *antitrust* injury.

Nor is Poydras a proper plaintiff here.  The rule that investors, like Poydras, lack antitrust standing "is perhaps the oldest standing rule under the antitrust laws," one recognized by treatises and across the circuit courts.  11 Joseph P. Bauer, *Federal Antitrust Law* § 78.7 n.264 (2017) (collecting cases).  As an investor in DigiDeal, the "company that was the target of, and was injured by, an antitrust violation," Poydras suffered only (at best) a "derivative injury," insufficient to confer antitrust standing.  *Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816, 818-21 (7th Cir. 2015) ("the firm may have a cause of action against the injurers but the firm's owner does not"); *see also Sw. Suburban*, 830 F.2d at 1378 ("Merely derivative injuries sustained by employees, officers, stockholders, and creditors of an injured company do not constitute 'antitrust injury' sufficient to confer antitrust standing.").

Permitting investors to bring suit when the real injured party is the company in which the

---

[1] To the extent the court also views Poydras as a licensor, Poydras likewise lacks standing to sue for the reasons discussed in Section I.B.3, *infra*.

investment was made would raise the twin concerns identified in *AGC*: "the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." 459 U.S. at 544. Indeed, if Poydras is allowed to sue here, there would be no stopping *any* investor from running into court for treble damages—an outcome at odds with both policy and precedent.

Even among investors, Poydras's claim for standing is particularly weak, for at least two reasons that came out at trial. First, Poydras claimed additional damages on behalf of an *unformed* entity that might one day have entered the scene. Tr. 2163:5-2164:6; *see Bubar v. AMPCO Foods, Inc.*, 752 F.2d 445, 453-54 (9th Cir. 1985) (holding no antitrust standing for minority stockholders in unformed corporation). This non-existent entity, which was envisioned to help purchasers with financing, was even farther removed from any antitrust violation than Poydras itself because its existence remained contingent, and its link to the Poydras entity here remained unclear. *See AGC*, 459 U.S. at 534 ("indirect, remote, and consequential" harm insufficient). Yet the Plaintiffs included damages for this non-existent entity as part of Poydras's damages claim, Tr. 2285:2-23, and the verdict does not segregate damages between the real Poydras and the dream Poydras, Dkt. 291. Second, as with Aces Up, Poydras was not sued by SHFL, and there was no evidence at trial that SHFL even knew about Poydras, let alone targeted it when it sued DigiDeal. Tr. 2382:14-25.

### 3. Shuffle Tech Lacks Antitrust Standing.

Like Aces Up and Poydras, Shuffle Tech, a licensor to be paid a royalty for the technology, lacks an antitrust injury because it was neither competitor nor consumer, and its interests were tied not to competition qua competition, but to the success of a particular competitor (DigiDeal). Its alleged injury was not the result of a failure of competition, but the failure of its chosen competitor.

Nor is Shuffle Tech the proper party to bring this action (except insofar as it is standing in DigiDeal's shoes because of the assignment of claims). As a general matter, a "licensor is denied standing even though its patent . . . royalty is a percentage of the revenues of a licensee whose

product-market revenues were reduced by the defendant's antitrust violation." Areeda, *supra*, ¶ 351a. Indeed, the Seventh Circuit held in *Grip-Pak, Inc. v. Illinois Tool Works, Inc.*, 694 F.2d 466, 473 (7th Cir. 1982), that "a patentee who licenses the manufacture of the patented product and whose royalties are keyed to his licensee's sales or profits cannot obtain damages caused by an anticompetitive scheme that is directed at the licensee, injures the licensee's business, and by doing so reduces the licensor's royalties." That is just this case.

*Grip-Pak*, decided before *AGC*, left open the possibility that a licensor may nevertheless have antitrust standing "[i]f he is the defendant's target." *Id.* at 474. In *Grip-Pak*, the alleged anticompetitive conduct included a lawsuit filed against the licensor and its principals. Grip-Pak thus had standing because the antitrust defendant, "having identified Grip-Pak and its principals as significant potential competitors, [wa]s trying to keep it and them out of business." *Id.*

The evidence at trial confirmed that there was no targeting of the sort that *Grip-Pak* envisioned—or of any sort. Grip-Pak could sue under the antitrust laws because *it* was the defendant in a suit brought to deter competition. Here, the only defendant in the Nevada action was DigiDeal, not Shuffle Tech. Moreover, SHFL's CEO, Gavin Isaacs, gave uncontested testimony that he had never heard of Shuffle Tech (or Poydras or Aces Up) at the time that he authorized SHFL's lawsuit against DigiDeal. Tr. 2382:14-25. And the evidence showed that Shuffle Tech *purposefully concealed* its role in the DigiShuffle project. *See* DTX3063 ("they are unlikely to connect this to Shuffle Tech. It is in all of our interest to prevent them from reaching that conclusion right away"); Tr. 2193:19-2195:9.

Nor is it correct to conceive of "targeting" as aimed at a *product* or as somehow affecting a group of entities who are viewed as collectively supporting that product's launch. For one thing, that reasoning cannot be reconciled with the Supreme Court's decision in *AGC*, which came a year after *Grip-Pak* and which confirmed that indirect injury felt by parties who are neither competitors

nor consumers is not enough for antitrust standing. *AGC*, 459 U.S. at 539. Moreover, such a capacious reading of "targeting" in the *Grip-Pak* exception would itself swallow the general rule announced in that very case, allowing *every* licensor and investor and distributor to bring an antitrust suit—a result clearly foreclosed by *Grip-Pak* itself, not to mention *AGC*.

Ultimately, allowing these Plaintiffs to sue stretches antitrust standing beyond the breaking point. Both the Supreme Court and the Seventh Circuit have been vigilant in limiting antitrust standing to those entities who have suffered direct injuries, and that is so even when other parties have bound their success to that of the directly injured party. As the Seventh Circuit observed in *Grip-Pak*, "if the licensor were allowed to sue, why not everyone else whose fortunes are linked to the victimized licensee—or, if not everyone, at least the licensee's employees, his (other) suppliers, and the merchants who sell to his employees? None of these is more remote from the antitrust violation than the licensor." 694 F.2d at 474; *see Sw. Suburban*, 830 F.2d at 1378 (rejecting "derivative injuries" of "employees, officers, stockholders, and creditors").

## II. THE COURT SHOULD ALTER OR AMEND THE DAMAGE AWARD PURSUANT TO RULE 59 OR, ALTERNATIVELY, ENTER JUDGMENT FOR DEFENDANTS AS A MATTER OF LAW PURSUANT TO RULE 50.

As the Seventh Circuit cautioned in *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499 (7th Cir. 1992), "'people who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence.' Compensatory damages must rest on 'a just and reasonable estimate of the damage based on relevant data.' Allowance for uncertainty is one thing, and rank speculation another." *Id*. at 505-06 (citations omitted).

This Court recognized the shortcomings in Plaintiffs' damage proof before trial, and Plaintiffs promised to bolster their claim with evidence. They did not make good on that promise. At trial, the damages claim was based only on unsupported optimism and rank speculation, not evidence. Moreover, the verdict did not match Plaintiffs' speculative proof: Plaintiffs' expert

testified about specific ranges of damages for each party and a specific allocation among the parties, but the jury's verdict bears no resemblance to that testimony.

To remedy these errors, the Court should alter or amend the verdict pursuant to Rule 59 to allow no more than a nominal award, or such remitted award as the Court may determine; or order a new trial. In the alternative, the Court may enter judgment for Defendants as a matter of law pursuant to Rule 50(a), which Defendants renew pursuant to Rule 50(b), because the admissible evidence was insufficient to support judgment for Plaintiffs. *See* Dkt. 279.

### A. Damages Here Are Too Speculative.

***Background***. It is important at the outset to put Plaintiffs' damages testimony in context.

First, it is undisputed that in the 18 months DigiDeal competed in the marketplace, it never sold or leased a single DigiShuffle in the United States or North America. Plaintiffs consummated three sales of the DigiShuffle, all overseas. Tr. 447:23-448:3.

Second, it is undisputed that the only support for potential sales was generalized optimism. The jury heard of Aces Up's "leads," "verbal commitments," Tr. 2089:2-4, and "expressions of interest." The supposed leads were all *from 2012*, Tr. 2333:2-15, and not one of them resulted in a sale. *See also* 2069:7-23; PX725; PX2132. No witness from a U.S. casino allegedly interested in the DigiShuffle testified—their interest was presented as hearsay testimony of representatives of the Plaintiffs. Plaintiffs called two customer witnesses—one of them (Mr. Daines) did not purchase, Daines Dep. at 28:16-28:21, and the other (Mr. Mirchandani) bought two shufflers for use in the Philippines but called the DigiShuffle defective on customs forms, Mirchandani Dep. at 249:9-11, 72:15-72:24, 73:2-73:24.

Third, it is undisputed that Plaintiffs' expert Lynde estimated sales or leases of 1200 per year, or up to 17,700 shufflers over the entire term, based on exclusivity quotas in distribution agreements. The Master Patent and Technology License Agreement ("MLA") established the

minimum quotas required for Poydras and DigiDeal to retain contractual exclusivity. Tr. 365:25-366:3; PX728. It was not a sales estimate. The quota was itself speculative, as Plaintiffs admittedly performed no "precise methodology to come up with these specific numbers." Tr. 2318:4-11, 2318:15-18. When asked whether DigiDeal verified the numbers, DigiDeal's Kuhn stated "[n]o, not scientific study by any means. No." T. Kuhn Dep. 192:25-193:3. Even Lynde conceded his revenue projections were "very uncertain," Tr. 2330:5-13, and that "a number of other companies…ha[d] [previously] failed in the prototype stage" when attempting to launch an automatic shuffler, Tr. 2320:9-12. Despite being aware of the shortcomings of these self-serving estimates, Lynde performed no "econometric or mathematic procedures to his numbers and any other data to figure out in particular whether [the MLA exclusivity targets] had been properly derived." Tr. 2318:19-2319:6.

*__Argument__*.  With these undisputed facts as background, the jury's damage award should be set aside because it ignores governing law and economic principles.

The law is clear: damages must be based on economic reality, not a plaintiff's wishful thinking. *See Zenith Elec. Corp. v. WH-TV Broad. Corp*., 395 F.3d 416, 419-20 (7th Cir. 2005). In *Olympia Equipment Leasing Co. v. Western Union Telegraph Co*., 797 F.2d 370, 381-83 (7th Cir. 1986), an antitrust case, the Seventh Circuit held that "when a small, inexperienced firm created largely to exploit opportunities to save taxes extrapolates a multi-million dollar future from a few months of success, courts must be on guard against the more than possibility that the extrapolation ignores economic reality." The Court reversed a $12 million Sherman Act judgment (after remittitur) that bore no relation to economic reality. *Id.* at 382.

Other controlling decisions have rejected damages based on similar speculative proof. In *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 994-95 (7th Cir. 2002), the Court held that although lost-revenues damages are "by their very nature incapable of mathematical precision," damages

calculations cannot be based on "numbers pulled from thin air." The Seventh Circuit also has rejected damage awards where, as here, the plaintiff failed to show the loss caused by defendants' breach. *See Schutter Candy Co. v. Stein Bros. Paper Box Co.*, 338 F.2d 558, 560 (7th Cir. 1964).

The jury's damage award runs afoul of these well-established legal principles. This Court has already recognized Lynde's reliance on the exclusivity quota was the "softest spot" of his analysis. Dkt. 230 at 4. Plaintiffs and Lynde promised to buttress the model with evidence. As summarized by this Court, Lynde claimed he would support his conclusion that the exclusivity quota "represented a reasonable (or reasonably conservative) estimate of the sales plaintiffs actually would have been able to make" with: "reference to [1] initial commitments and feedback that plaintiffs received from potential customers; [2] sales data showing the market share achieved by another automatic card shuffler supplier" and [3] "a study and business plan" prepared by a consulting firm retained by one of the Plaintiffs. *Id.* at 5-6. Plaintiffs did not make good on that promise, and if Lynde's testimony was soft before, it was mush at trial.

***Initial commitments and feedback.*** There were no sales commitments: no U.S. casino committed to purchase a DigiShuffle over the 18 months DigiDeal was free to operate. There was no supportive "feedback" from customers: Plaintiffs did not call a single customer interested in buying or leasing a DigiShuffle in the U.S. They called only two witnesses—both from abroad— and only one of whom purchased (and found the product to be "defective").

Having failed to prove commitments or positive feedback, Plaintiffs supported their hopes of future sales with their own recitation of anecdotal hearsay that potential customers were interested in the DigiShuffle. *E.g.*, Tr. 236:6-12 (Toyama: "big casinos were very interested"); Tr. 2050:20-2052:4 (Taylor: conversations with "friends in the casinos" regarding their interest in shufflers generally). Those self-reported expressions of interest are akin to "numbers pulled from the air" and, at any rate, do not support projecting sales of 1200 units per year. Moreover, the

timing of the "expressions of interest" demonstrates their irrelevance. The expressions of interest were solicited in 2012. DigiDeal was free to sell its product well into 2014. No witness testified as to progress in turning any supposed interest into sales. Moreover, this is not a situation where the jury was faced with a party that *intended* to enter the market; instead, DigiDeal actively competed in the market for 18 months; it just failed in its efforts.

*Sales data from other products***.** Pre-trial, Lynde purported to rely on sales performance of Vending Data. Dkt. 219 at 1; Dkt. 219-1 at Ex. 15. At trial, Plaintiffs produced no evidence of sales by Vending Data, nor did Lynde address it. Lynde projected success for DigiDeal that was rosier than the experience of Vending Data, any other market competitor, or Shuffle Master itself.[2]

*Study and business plan***.** Lynde relied on a draft Riskwise report that identified 600 potential placements. PX754. The report used the same anecdotal "leads" data that Aces Up had generated, Tr. 2067:10-16, based on "verbal conversations," Tr. 2089:2-4, and supposed "expressions of interest," Tr. 2333:2-15, that never translated into sales. Plaintiffs provided no admissible testimony that any casino *would* purchase any shuffler. And, if credited, the leads address only 5% of the damages claim. The other 95% lacks even this speculative support.

Thus, Lynde failed to support his projection with anything other than guesswork. The resulting jury award rests on an "extreme degree of speculation." *Mid-Am. Tablewares, Inc. v. Mogi Trading Co*., 100 F.3d 1353, 1368 (7th Cir. 1996). In *Mid-American*, the Seventh Circuit rejected an award of damages based on similar hopeful, long-term projections of future sales. The

---

[2] Evidence of Vending Data's sales would have undermined the damages claim. Vending Data placed 528 multi-deck shufflers in 2002, Dkt. 219-1 at Ex. 15, well below Lynde's projection of 1200 single-deck shufflers per year through 2028. Moreover, Lynde ignored the sales data that *was* introduced at trial—Shuffle Master sold 1,373 DeckMate and DeckMate 2 machines between 2013 and 2017, Tr. 1367:23-1368:7, while Lynde assumed that Plaintiffs would have gotten 5,200 new sales or leases in that same time period, Tr. 2327:20-2328:7. The only other testimony was that "Ten Stix" sold roughly 250 competing shufflers over a 10 year period. Tr. 1348:07-1348:21.

court faulted plaintiff's expert because his "figures reflect little more than an adoption of [plaintiff's] sales forecasts, with a little bit of trimming here and there." *Id.* As in *Mid-American*, the damages award here was based not on any track record of sales—there was none—but instead "on one speculative inference heaped upon another." *Id.*; *see also Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923, 933 (7th Cir. 2003) (holding "proof of damages requires—proof").

Even if the plaintiff establishes liability, where the plaintiff fails to prove its injury, the damages award cannot stand. Pursuant to Rule 59, the Court should alter or amend the verdict to a nominal amount, such as $1, or remit the damages to such other amount as the Court deems proper; or, the Court should order a new trial on damages. *See, e.g.*, *Ustrak v. Fairman*, 781 F.2d 573, 578-81 (7th Cir. 1986); *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 647-48 (7th Cir. 2011). Alternatively, the Court could enter judgment for Defendants on their request for relief pursuant to Rule 50 due to Plaintiffs' failure of damage proof as a matter of law for the reasons stated herein and in the pre-verdict motion for judgment as a matter of law. Dkt. 279. Plaintiffs failed to prove damages with reasonable certainty and failed to prove causation and disaggregate losses attributable to non-actionable causes, entitling Defendants to judgment. *See Grip-Pak, Inc. v. Ill. Tool Works, Inc.*, 651 F. Supp. 1482, 1501, 1505 (N.D. Ill. 1986).

## B. The Damages Bear No Relation To Plaintiffs' Damages Testimony.

The jury's award was far afield from even the speculative testimony Plaintiffs presented. Lynde testified about specific ranges of damages he believed the contracts compelled for each Plaintiff, but the jury's awards ignored this evidence by millions or tens of millions for each Plaintiff. "In reviewing an award of compensatory damages," a court may set aside an award if "there is no rational connection between the award and the evidence." *Wells v. City of Chicago*, 896 F. Supp. 2d 725, 739 (N.D. Ill. 2012) (Kennelly, J.) (quoting *David v. Caterpillar, Inc.*, 324 F.3d 851, 864 (7th Cir. 2003)); *see also Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226,

1243-44 (7th Cir. 1982) (granting remittitur where jury's antitrust verdict exceeded Plaintiffs' expert's projections), *aff'd*, 465 U.S. 752 (1984). Here, there is no "rational connection" between the evidence and the awards. As a result, the Court should reject the damages award and order a new damages trial as to all Plaintiffs or remit the damages award as appropriate.

First, the verdict ignores the undisputed evidence regarding the allocation of damages among the parties that Lynde testified was required. Plaintiffs' damages theory depends on a specific ratio among the awards to each of the Plaintiffs: Lynde "modeled the cash flows for each" Plaintiff according to its contractual role. Tr. 2283:21-23. Those specific roles, and the resulting revenue, were defined by the MLA (among Shuffle Tech, Poydras, and DigiDeal) and Distributor Agreement (between DigiDeal and Aces Up). Tr. 2270:17-2271:21. The agreements provided for *fixed* amounts to be given to each Plaintiff for each sale or lease, DTX0461-006, PX695.4 & .8, and Lynde calculated damages for each Plaintiff based on these relationships and the per unit royalty (for Shuffle Tech and Poydras), discounted purchase price (for Aces Up), and manufacturing profit (for DigiDeal) that each party would receive, Tr. 2283-87. Lynde explained the parties' contractual obligations led to the precise lost profits he estimated in his model. Tr. 2270-98. Using this information, he extrapolated future lost profits using a "high" and "low" multiplier and calculated the precise damages each Plaintiff suffered based on the fixed relationships between the parties. There was no evidence that revenue or profit amounts could or would deviate from those fixed amounts and result in more profit for one participant and less for another. In closing argument, Plaintiffs' counsel argued the evidence required damages to be assessed "in accordance with the contract." Tr. 2767:2-10; *see* Ex. A to this Brief (Plaintiffs' demonstrative damages summary).

The jury's award bears no relation to what the expert testified the evidence *required*:

| Entity | Lynde Testimony | | Award |
|---|---|---|---|
| | **Low** | **High** | |
| Shuffle Tech | $19,376,124 (18.42%) | $23,939,761 (17.16%) | $45,000,000 (43.86%) |
| Poydras | $37,637,847 (35.79%) | $50,902,986 (36.50%) | $25,000,000 (23.81%) |
| DigiDeal | $29,598,611 (28.15%) | $38,958,308 (27.93%) | $20,000,000 (19.05%) |
| Aces Up | $18,549,702 (17.64%) | $25,674,080 (18.41%) | $15,000,000 (14.29%) |
| *Total* | $105,162,284 (100%) | $139,475,135 (100%) | $105,000,000 (100%) |

Dkt. 298. Lynde's testimony reflected damages for Shuffle Tech could range only from $19.4 to $23.9 million. The jury awarded $45 million. Lynde applied the contracts and calculated damages for Poydras ranging from $37.6 to $50.9 million. The jury awarded $25 million. Lynde testified DigiDeal incurred damages from $29.6 to $39 million. The jury awarded $20 million. Lynde assessed Aces Up's damages at between $18.5 and $25.7 million. The jury awarded $15 million. For each Plaintiff, no award was within millions of dollars of the range Lynde provided. And no testimony supported a range or fixed ratio other than those provided by Lynde.

Where no evidence supports the damages awarded by the jury, it cannot be said that the damages were proved "with reasonable certainty." Tr. 2724:15-16. Courts reject jury verdicts not supported by evidence regarding the amount of loss the plaintiff suffered. *See Wells*, 896 F. Supp. 2d at 740. The same principle applies to multi-party relationships. In *Bruso v. Truck Drivers & Helpers Local 170*, 1987 WL 6974, at *5 (D. Mass. Feb. 2, 1987), plaintiff beer salesmen sued when new owners of a beer company reduced their commissions, and the parties stipulated at trial to the plaintiffs' prior and newly reduced income. The court set aside the jury's award because the allocation among the multiple plaintiffs had no basis in the evidence. Likewise, in *LaSalle National Bank v. Mass. Bay Insurance Co.*, 1997 WL 619856 (N.D. Ill. Sept. 30, 1997), husband and wife plaintiffs sued on an insurance policy insuring against fire loss at their home. Plaintiffs prevailed on liability. The jury awarded damages to the wife but none to the husband, although the evidence showed the husband alone had ownership interest in the home. The district court set aside the verdict as to each plaintiff as unsupported by evidence. *Id.* at *3; *see also Trading Techs.*

*Int'l, Inc. v. eSpeed, Inc.*, 2008 WL 345604, at *1-2 (N.D. Ill. Feb. 5, 2008) (overturning jury award in excess of ratio set forth in evidence: "the simple fact that the total damages award is reasonable does not justify an apportionment of damages unsupported by substantial evidence").

Second, the damages award to Shuffle Tech is without basis for additional reasons. Even accepting Lynde's speculative testimony, his *highest* estimate of Shuffle Tech's loss was $23,939,761. Tr. 2296:18-20. The jury awarded Shuffle Tech $45 million, more than $21 million above the highest estimate of damages, or nearly twice the high end of damages that Lynde testified would be appropriate. The Shuffle Tech award is unsupported by any evidence. Dkt. 289.

The Shuffle Tech award cannot stand. Courts routinely set aside damage awards that exceed the damages proved at trial. In *Enterprise Refining Co. v. Sector Refining, Inc.*, 781 F.2d 1116 (5th Cir. 1986), plaintiff's expert testified damages were $422,220. The jury awarded more than $600,000. The Fifth Circuit set aside the award, because a verdict in excess of an amount supported by the evidence cannot stand. *Id.* at 1120. Likewise, in *Jamison Co. v. Westvaco Corp.*, 526 F.2d 922 (5th Cir. 1976), the jury returned a verdict that exceeded the maximum recovery supported by the evidence. The court overturned the award, stating "[i]f a complete and careful study of the record finds us confused in determining how the jury arrived at its decision, we must conclude that the jury was confused in its efforts" and reverse. *Id.* at 936.

Here, there is "no rational connection," *Wells*, 896 F. Supp. 2d at 739 (Kennelly, J.), between the verdict and the evidence, which, as shown above, was itself speculative. "[W]here an award is not rationally connected to the evidence, the district court … ha[s] the authority (1) to order a remittitur, if the plaintiff is willing to accept that remedy, or (2) to order a new trial limited to damages, if the plaintiff is not willing to accept a remittitur." *Int'l Fin. Servs. Corp. v. Chromas Tech. Canada, Inc.*, 356 F.3d 731, 739 (7th Cir. 2004); *see also In re Innovative Const. Sys., Inc.*, 793 F.2d 875, 887-89 (7th Cir. 1986) (upholding remittitur where damages based on

foundationless sales projections). The Court should reject the award and order a new trial as to all Plaintiffs' damages. Alternatively, the Court should remit the Shuffle Tech damages to no more than $23.9 million, reserving Defendants' other challenges as to that award.

### C. The Court Should Order A New Trial Due To Trial Errors.

This Court has the authority under Rule 59 to grant a new trial where an erroneous evidence ruling prejudiced the party seeking relief. *See Nelson v. City of Chicago*, 810 F.3d 1061, 1066-70 (7th Cir. 2016). Aside from the issues Defendants argued in the Rule 50(a) motion, which they renew in this motion, the Court erred in excluding testimony on design-around. (Defendants previously objected to the Court's damage instructions and other evidentiary rulings that they maintain were erroneous. The Court has ruled, and Defendants do not repeat their arguments here.)

Prior to trial, the Court precluded testimony regarding Plaintiffs' ability to mitigate their damages by "designing around" SHFL's patents. Dkt. 188 at 16-20. The Defendants continue to disagree with that ruling. But at trial, Plaintiffs twice opened the door to the design-around theory and Defendants should have been permitted to offer such evidence. Plaintiffs did so once by interrogating Mr. Grauzer on how he would react to an infringement lawsuit, Tr. 880:17-22, and again during Mr. Malackowski's examination by suggesting that Plaintiffs had *no other option* to avoid legal fees than to agree to the stay in Nevada, Tr. 2596:6-2598:25 (DigiDeal had a "gun to its head" due to the legal fees in Nevada). Under Federal Rules of Evidence 402 and 403 and the common law rule of completeness, Defendants should have been permitted to tell the jury that Plaintiffs contemplated changing the DigiShuffle to avoid infringement, disproving Plaintiffs' "no other option" argument. Tr. 2611:20-2619:24.

### III. DEFENDANTS ARE ENTITLED TO JUDGMENT AS TO DIGIDEAL BASED ON THE FINDINGS IN THE NEVADA LITIGATION.

Even apart from the damages flaws, DigiDeal's claims—asserted here by Shuffle Tech as

assignee—are barred by collateral estoppel. DigiDeal alleged in the Nevada proceedings that SHFL engaged in baseless litigation after committing fraud on the patent office. After hearing accounts of the alleged fraud, the Nevada court rejected that argument, concluding that it was "reasonable for SHFL to bring this enforcement action." DigiDeal cannot litigate again in Illinois what it tried but failed to achieve in Nevada. One bite at the apple is all the law allows.

## A. The Nevada Court Heard DigiDeal's Allegations Of Fraud On The Patent Office And Decided That SHFL's Patent Litigation Was Not Unreasonable.

There can be no disagreement about what happened in Nevada. The Nevada Court heard DigiDeal's allegations that SHFL had defrauded the patent office, considered those allegations, and held that SHFL's litigation conduct was neither unreasonable nor in bad faith.

First, DigiDeal placed before the Nevada Court allegations of fraud on the patent office, just as it did here. DigiDeal argued in its opening brief that SHFL "failed to disclose any of that prior art [which was cited in the reexaminations] to the USPTO in its initial prosecution of the Asserted Patents." DTX0177-005. DigiDeal returned to that argument in reply, asserting "SHFL had intentionally failed to disclose prior art—of which it had knowledge." DTX2147-008. DigiDeal claimed SHFL's fraud occurred both during the original examination of the patent and during the reexamination of the patent, and it did so invoking much the same evidence it has relied on here. In short, in Nevada, DigiDeal argued that it was entitled to fees precisely because SHFL had initiated litigation based on a patent obtained and maintained through fraud. *See* DTX0177-005 (citing fees cases based on failure to disclose or misrepresenting material prior art to the PTO).

Second, the Nevada Court expressly considered the question of fraud on the patent office in its fees decision. Although recognizing that many of DigiDeal's allegations regarding SHFL's "conduct before the U.S. Patent Office" were raised for the first time in a reply brief, the Nevada Court expressly noted that "[i]n this instance, this court has considered Digideal's additional

arguments and has determined that, even with this additional information, this action does not present an 'exceptional case' that warrants an award of attorneys' fees." DTX2152-003.

Third, the Nevada Court held that SHFL's pursuit of its patent claims was not objectively baseless. It ruled that SHFL's claims "possessed substantive strength" and that it had "used reasonable litigation methods." DTX2152 (italics and initial capitalization omitted). The Nevada Court likewise explained that "[i]t was thus reasonable for SHFL to bring this infringement action" and "SHFL did not litigate this action in an unreasonable manner." *Id*.

**B.     The Nevada Court's Rulings Foreclose DigiDeal's Sham Litigation Claim.**

This Court has already ruled that the issue resolved in the Nevada litigation is identical to the issue presented in the sham litigation claim. This Court noted that "if plaintiffs wish to argue that SHFL's suit against DigiDeal was a sham, they must demonstrate that no reasonable litigant could have expected success on the merits of that suit." Dkt. 165 at 15. The Court then held: "This is precisely the argument that Judge Ferenbach considered and rejected." *Id*. And again: "Judge Navarro had already determined that the suit against DigiDeal was not objectively baseless, which is identical to one of the elements required to prove sham litigation." *Id*. at 16.

The Court nonetheless identified two bases for declining to apply collateral estoppel to the sham litigation claim. First, at summary judgment, this Court held that "plaintiffs were not adequately represented by DigiDeal in the [Nevada] suit during the relevant time." *Id*. at 22. Defendants continue to maintain those parties were adequately represented in the Nevada litigation for the reasons previously argued. But whatever the merits of that finding as to Shuffle Tech, Aces Up, and Poydras, there can be no serious question that DigiDeal was adequately represented in Nevada, since it was the litigant in that action and adequately asserted its own interests. While not a direct party here, DigiDeal assigned its claims to Shuffle Tech, and the jury awarded damages to DigiDeal in a separate line on the verdict form. If DigiDeal is estopped from pursuing its claims

22

here, so is Shuffle Tech as DigiDeal's assignee. *See In re Fort Wayne Telsat, Inc.*, 665 F.3d 816, 820 (7th Cir. 2011) (assignee is in privity with assignor for purposes of claim preclusion).

Second, in a ruling on a motion in limine, the Court suggested that the decision of the Nevada Court was not final. Dkt. 255 at 2-3. For issue preclusion purposes, however, the fee order is the relevant prior ruling. After the Nevada Court entered summary judgment for DigiDeal, Nevada Dkt. 143, DigiDeal sought nearly $1.4 million in fees, and the trial court extended the time for SHFL to appeal until the fees issue was resolved. Nevada Dkt. 154. The fees motion was hotly contested—both the judges and the parties knew what was at stake. After full briefing, the Nevada Court denied the fee motion and SHFL appealed the summary judgment decision. Nevada Dkt. 170. DigiDeal never filed a cross-appeal. The fee order is thus final.

While not disputing this chronology, this Court concluded that the fee order was non-final because the merits judgment in Nevada was appealed and vacated. Respectfully, that is contrary to Seventh Circuit law. An order is "final" for collateral estoppel purposes when it is "sufficiently firm to be accorded conclusive effect," and the Seventh Circuit has identified the factors relevant to that inquiry: "that the decision was not 'avowedly tentative,' that the hearing was adequate and the parties were fully heard, that the court supported its decision with a reasoned opinion, and that the decision was appealable or had been appealed." *Gilldorn Sav. Ass'n v. Commerce Sav.*, 804 F.2d 390, 393 (7th Cir. 1986). Here, the fees decision was final: it was not tentative; the parties were fully heard; the court issued a reasoned decision; and that decision was in fact appealable but never appealed. The subsequent vacatur of the merits decision changes none of that.

There is, moreover, no reason that vacatur of the merits ruling should affect the finality of the fee order. The merits judgment and the fees order are separate and independent judgments. Once DigiDeal elected not to appeal, the order denying DigiDeal its fees was final, and nothing in SHFL's successful merits appeal changes that. To be sure, if fees had been *granted*, vacating the

23

merits decision might undermine the basis of the fee order, because DigiDeal would no longer be a prevailing party. But that reasoning does not apply where (as here) fees were *denied*. Indeed, applying that reasoning would be unjust, as SHFL's *victory* on the merits would be invoked to *eliminate* its victory in the fee dispute. That simply makes no sense.

Finally, the issue in the Nevada Court was "necessarily decided." *Cf.* Dkt. 255 at 3 n.1 (suggesting that the Court had not yet resolved this issue). A finding in prior litigation "is 'necessary' if it was central to the route that led the factfinder to the judgment reached, even if the result could have been achieved by a different, shorter and more efficient route." *Hoult v. Hoult*, 157 F.3d 29, 32 (1st Cir. 1998); *see also Gambino v. Koonce*, 757 F.3d 604, 609-10 (7th Cir. 2014). Here, the issue resolved by the Nevada Court was not "incidental or collateral" to its fees ruling. The Nevada Court *predicated* its fees decision on the reasonableness of Shuffle Master's lawsuit after the issues had been joined, the Court had given them its full attention, and the Court addressed the issues squarely. Collateral estoppel bars DigiDeal's sham litigation claim.

### C.     The Nevada Court's Rulings Foreclose DigiDeal's *Walker Process* Claim.

Collateral estoppel likewise bars DigiDeal's *Walker Process* claim. At summary judgment, this Court concluded otherwise, holding that there was an identity of issues for sham litigation, but not for *Walker Process*. According to the Court, while "a sham litigation claim is based on the theory that a patentee has abused the court system by pursuing infringement lawsuits it knows to be meritless," a "Walker Process fraud claim is based on the theory that a patentee has abused the patent system by using fraud to obtain an otherwise invalid patent." Dkt. 165 at 16.

Respectfully, that was error. This Court has noted a *Walker Process* claim has *two* elements: (1) that the defendant "obtained the patent by knowing and willful fraud on the patent office," and (2) that the defendant "maintained and enforced the patent with knowledge of the fraudulent procurement." Dkt. 165 at 16. Each element must be proved. This Court's summary

judgment opinion, however, addressed the effect of the Nevada ruling upon only the first element. Defendants continue to disagree with the Court's conclusion as to that issue, but the critical point here is that the Court's opinion did not address the second element—the "enforcement" of the wrongfully obtained patent—and that second element is precluded by the Nevada Court's rulings.

The reason for preclusion is clear. The only "enforcement" of a "fraudulently obtained patent" asserted *in this case* is the claim that Defendants knowingly enforced the patents at issue in the Nevada litigation. By finding that the claims in the Nevada litigation had "substantive strength" and that Defendants used "reasonable methods" to enforce them, and by doing so after having been presented with supposed evidence that SHFL had failed to disclose material prior art to the PTO, defrauded the PTO, and brought an unreasonable litigation alleging infringement of fraudulently obtained patents, *the Nevada Court necessarily rejected the proposition that the Defendants knowingly enforced an invalid patent*. It cannot be reasonable litigation to enforce a patent that one knows to have been fraudulently obtained, and a litigant cannot have a reasonable expectation of success on a fraudulently procured patent.

In short, the Nevada litigation was the foundation of both the sham litigation theory and the *Walker Process* theory—in the circumstances of this case and for purposes of this issue, they rise and fall together. Thus, the Nevada Court's holding that "it was reasonable for SHFL to bring this enforcement action" and that SHFL "did not litigate this action in an unreasonable manner" are irreconcilable with both of DigiDeal's claims here, and both claims are now foreclosed.

## IV.    THE COURT SHOULD ENTER JUDGMENT FOR DEFENDANTS OR ALTER OR AMEND THE LIABILITY FINDING.

### A.    The Court Should Enter Judgment For Defendants, Or A New Trial, Because The Court Erred Regarding The Intent Elements Of The Claims.

The liability judgment cannot be sustained due to errors in applying the intent elements of each claim. First, the Court erred as a matter of law in declining to apply the intent standard of

*Therasense*.  Second, the Court's instructions regarding the intent elements of the *Walker Process* and sham litigation claims are erroneous.  Third, Defendants are entitled to judgment, or alternatively a new trial, on the issue of intent.

### 1.    The Court Erred In Not Applying *Therasense*.

The Federal Circuit's decision in *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011), should have guided this Court on the *Walker Process* claim.  The Court declined to apply it, holding that *Therasense* did not apply to a *Walker Process* claim, but rather only to patent unenforceability based on inequitable conduct.  Dkt. 165 at 27.  Defendants are aware of no court that has reached a similar result.[3]  Defendants request that the Court reconsider its prior rulings and apply all of *Therasense*, including its "single most reasonable inference test." Doing so would result in judgment for Defendants at summary judgment or under Rule 50(b), as no reasonable jury could have found for Plaintiffs under the *Therasense* standard given, among other things, the lack of direct evidence of improper intent.  Alternatively, the Court should grant a new trial pursuant to Rule 59 before a jury instructed under the correct legal standard.

### 2.    The Court Erred In Instructing On Intent.

The Court also improperly instructed the jury on the intent elements of Plaintiffs' claims, separate and apart from *Therasense*.  The Court's improper instructions permitted the jury to impose liability based on its speculation, despite the absence of evidence of improper intent.

***Walker Process Claim.***    A plaintiff who brings a *Walker Process* claim must show "specific intent to deceive" with "clear and convincing evidence" that demonstrates an "actual fraud on the patent office" and "independent and clear evidence of deceptive intent" with

---

[3] District courts routinely apply *Therasense* in *Walker Process* cases.  *See, e.g.*, *Westlake Services, LLC v. Credit Acceptance Corp.*, 2017 WL 8948263, at *8 (C.D. Cal. Dec. 28, 2017); *Kimberly-Clark Worldwide Inc. v. First Quality Baby Prods. LLC*, 2016 WL 8201779, at *4 (E.D. Wis. Sept. 30, 2016); *Seiko Epson Corp. v. Abacus 24-7 LLC*, 866 F. Supp. 2d 1248, 1253-54 (D. Or. 2011).

"intentional fraud involving affirmative dishonesty." *Giuliano v. SanDisk LLC*, 705 F. App'x 957, 959-61 (Fed. Cir. 2017). There must be actual, contemporaneous knowledge that an omitted reference was non-cumulative and "but-for" material. *See Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1259 (Fed. Cir. 2000); *see also* MPEP § 2001.04. Affirmative evidence of deceit is required. *See 1st Media, LLC v. Electronic Arts, Inc.*, 694 F.3d 1367, 1376 (Fed. Cir. 2012).

Here, the Court erred in failing to instruct the jury as to these requirements. Juries must be instructed as to the meaning of "enigmatic" legal terms, rather than "leave the jury to speculate on their meaning." *Miller v. Neathery*, 52 F.3d 634, 638 (7th Cir. 1995). The Court's threadbare instruction omitted the requirements of proving non-cumulativeness, contemporaneous knowledge of materiality, and specific intent to deceive. Dkt. 291 at 16; Tr. 2720:16-2721:8. It failed to explain that negligence is not fraud, fraud cannot be inferred from negligence, and intent cannot be inferred from materiality. *Id.* Each of those requirements was explained in the parties' agreed instructions or Defendants' proffered instructions. Dkt. 225-13 at 43-45, Dkt. 225-15 at 14-17, Agreed Nos. 40-42, Defs.' Nos. 7-9. In the absence of proper instruction, the jury was free to speculate—and speculate the jury did. *See supra* Section II.

*Sham Litigation Claim.* To prevail on their sham litigation theory, Plaintiffs had to prove by clear and convincing evidence that SHFL sued DigiDeal with the subjective intent to harm DigiDeal by imposing the costs of litigation, as opposed to the harm resulting from any adverse outcome of the litigation. *See Prof'l Real Estate Inv'rs v. Columbia Pictures*, 508 U.S. 49, 60-61 (1993); *ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1292 (Fed. Cir. 2010).

The Court did not properly instruct the jury on this prong of sham litigation. The Court stated that Plaintiffs must prove Defendants pursued an objectively baseless lawsuit "as an attempt to interfere with the business relationships of a competitor through the litigation process." Dkt. 291 at 17. The Court refused to explain that Defendants' intent must have been to impose harm

by forcing the defendant to bear the expense and inconvenience of defending the litigation, rather than through the ultimate disposition of the litigation. Dkt. 291 at 16; Tr. 2721:16-23. The Court's instructions were erroneous. The term "through the litigation process" could refer either to the "costs of defending the litigation" or to "the damages that would result from a judgment in the litigation." The instruction does not tell the jury which is meant. Every lawsuit between competitors is an attempt to interfere "with the business relations of a competitor through the litigation process." The jury was never told that what makes litigation actionable is the desire to cause competitive harm by the costs of litigation, not its outcome.

### 3. The Evidence Of Improper Intent Was Insufficient.

There was no direct evidence that Defendants acted to deceive the PTO to issue an invalid patent or that the Nevada litigation was initiated or maintained to harm DigiDeal through the litigation process. Nor can inferences of intent properly be drawn from the evidence. The evidence failed to show Defendants knew of the supposed non-cumulative, but-for materiality of the prototype references, let alone show deceit or lack of good faith. Plaintiffs' case rested principally on SHFL's alleged intent to hide the so-called Roblejo, Nicoletti, and Luciano prototypes, as well as the Block patent. As to each of the prototypes, SHFL disclosed the actual patent, which had more information than the videos, brochures, and newspaper articles Plaintiffs addressed. PX1.2, PX2.2, Tr. 1066:8-1077:16, 1079:5-1088:19, PX109N. SHFL also disclosed the disks containing this information in more than 20 compartment family applications, refuting the charge it had an intent to conceal this information in order to defraud. Tr. 903:4-23; Tr. 1100:6-1104:11; Tr. 1148:7-1149:23; Tr. 1169:18-1171:8. And SHFL disclosed the Block patent frequently, including in connection with the '935 patent, and the examiner found that the Block patent "[taught] away" from the '982 invention. Tr. 1165:9-1166:21, DTX2633-400. No properly instructed jury could conclude by clear and convincing evidence that SHFL engaged in "careful and selective

28

manipulation" of disclosures with specific intent to deceive. *1st Media*, 694 F.3d at 1375.

Likewise, Plaintiffs presented no evidence that SHFL intended to injure DigiDeal through the costs of the litigation, as opposed to its outcome. SHFL's CEO Gavin Isaacs testified SHFL sued to stop DigiDeal's infringement after SHFL's pre-litigation entreaties were rebuffed, Tr. 2386:14-2387:1, and Plaintiffs presented no evidence to the contrary. Moreover, rather than aggressively pursue the litigation after the favorable *Markman* hearing, SHFL agreed to a stay of litigation, allowing both parties to limit the expense of litigation while the reexaminations proceeded through the PTO. Tr. 1502:20-24; PX142.

## B. Alternatively, The Court Should Enter Judgment As A Matter Of Law For Defendants On Liability Pursuant To Rule 50(b).

Defendants renew their Rule 50(a) motion, Dkt. 279, which they incorporate herein.

Plaintiffs failed to present sufficient evidence of fraudulent patent procurement. *See Therasense*, 649 F.3d at 1290. No reasonable jury could find by clear and convincing evidence that any omitted reference is "material" because no reference qualifies as prior art. Plaintiffs failed to prove corroboration of public uses, or that prior art was known by or accessible to Defendants or had been commercially exploited, or that prior inventions had not been abandoned, suppressed, or concealed. Nor could a reasonable jury find any omitted prior art was material, given the evidence that (1) the PTO issued the reexamination certificates even after SHFL filed its Notices of Concurrent Proceedings which attached Plaintiffs' Complaint with all their assertions of materiality; and (2) SHFL has obtained patents in other gripper family applications, including one so close to the '982 patent that it almost did not issue due to double patenting. Dkt. 291 at 8.

Plaintiffs also failed to prove actual, contemporaneous knowledge that an omitted reference was non-cumulative and "but-for" material to patentability or validity. *See Speedplay*, 211 F.3d at 1259. Plaintiffs presented no evidence that any individual substantively involved in the

prosecution of the patents was aware of any prior art and thought it was material. Plaintiffs also failed to show anyone "*made a deliberate decision* to withhold a *known* material reference." *1st Media*, 694 F.3d at 1374. In fact, witness after witness from Shuffle Master (or its counsel) testified to precisely the opposite. Plaintiffs also failed to prove, as they must, that a Defendant decision-maker knew a patent was procured by fraud when it sued to enforce the patent.

Plaintiffs failed to present sufficient evidence of their sham litigation claim. The Nevada lawsuit was not objectively baseless and Plaintiffs failed to prove fraudulent procurement. Plaintiffs also failed to prove SHFL intended to harm through the litigation process.

## CONCLUSION

The three Plaintiffs lack antitrust standing and never should have been before a jury. The damages award is error because it is based on speculation, not evidence, and because it bears no resemblance to the testimony that Plaintiffs' expert offered about the damages each party should receive. DigiDeal's claims are collaterally estopped. And the liability finding is error because the jury was asked to apply the wrong legal standards. In the face of a verdict based on no evidence and infected by error, the Court should set aside the verdict and enter judgment for Defendants. Alternatively, the Court should order a new trial on all issues, order a new trial on damages, or alter or amend the judgment, including through remittitur, as set forth above.

Dated: September 4, 2018                    Respectfully submitted,

                                            By: /s Craig C. Martin
                                                One of the Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I certify that on September 4, 2018, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will then send a Notice of Electronic Filing to all counsel of record.

/s/ Craig C. Martin